```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
       UNITED STATES OF AMERICA,
 4
                         Plaintiff,
 5     vs.                              Case No. 15-20217
                                        Hon. Stephen J. Murphy, III
 6     D-1 DAVID HANSBERRY
       D-2 BRYAN WATSON
 7     D-3 KEVLIN OMAR BROWN,

 8                         Defendants.
       _____/
 9
                          JURY TRIAL: VOLUME 15
10                      TESTIMONY OF GARY JACKSON

11           BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                     United States District Judge
12           Theodore Levin United States Courthouse
                     231 West Lafayette Boulevard
13                   Detroit, Michigan  48226
                     Wednesday, June 29, 2016
14
       APPEARANCES:
15
       For the Plaintiff           J. MICHAEL BUCKLEY
16     United States of America:   SHELDON N. LIGHT
                                    U.S. Attorney's Office
17                                  211 W. Fort Street
                                    Suite 2001
18                                  Detroit, Michigan  48226
                                    313-226-9732
19
       For the Defendant           MICHAEL J. HARRISON
20     David Hansberry:            Harrison Law PLC
                                    240 Daines Street
21                                  Birmingham, Michigan  48009
                                    248-430-6421
22
       For the Defendant           STEVEN F. FISHMAN
23     Bryan Watson:               615 Griswold
                                    Suite 1125
24                                  Detroit, Michigan  48226
                                    313-962-4090
25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant         KENNETH SASSE
      Kevlin Omar Brown:        27 E. Flint Street
 3                              2nd Floor
                                Lake Orion, Michigan  48362
 4                              248-821-7325

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        To obtain a copy of this official transcript, contact:
              Linda M. Cavanagh, Official Court Reporter
25          (248) 884-0327 • linda_cavanagh@mied.uscourts.gov
```

TABLE OF CONTENTS

Government Witnesses:                                      <u>Page</u>

<u>GARY JACKSON</u>

    Direct Examination by Mr. Buckley              5
    Cross-Examination by Mr. Harrison            77
    Cross-Examination by Mr. Harrison           129

<u>EXHIBITS</u>

<u>Identification</u>                          <u>Offered</u>    <u>Received</u>

NONE

1          Detroit, Michigan

2          Wednesday, June 29, 2016

3                    —  —  —

4          (Proceedings commenced at 8:37 a.m., all parties

5          present)

6          (Whereupon the jury entered the courtroom at

7          8:37 a.m.)

8          THE LAW CLERK:  United States District Court for the

9    Eastern District of Michigan is now in session, the Honorable

10   Stephen J. Murphy presiding.

11         The Court calls Case No. 15-20217, United States of

12   America versus David Hansberry and others.

13         THE COURT:  Okay.  Everybody may be seated.  All our

14   jurors are here, everybody's in their spots and we're ready to

15   go.

16         MR. BUCKLEY:  Good morning, Your Honor.  The United

17   States calls Gary Jackson to the stand.

18         THE COURT:  Okay.  Thank you.  Right this way, sir.

19              G A R Y   J A C K S O N

20   was thereupon called as a witness herein, and after being

21   first duly sworn to tell the truth and nothing but the truth,

22   testified on his oath as follows:

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Okay.  Have a seat, relax in the box.

25   It's a little snug but you should be able to stretch out your

```
1    legs.  Speak toward the mic so it picks it up.
2              And go ahead, Mr. Buckley.
3              MR. BUCKLEY:  Thank you, Your Honor.
4                        DIRECT EXAMINATION
5    BY MR. BUCKLEY:
6    Q.  Sir, you've been sworn.  Could you kindly state your name
7    and spell your last name for the record?
8    A.  Gary Jackson, J-A-C-K-S-O-N.
9    Q.  Thank you, sir.
10             First of all, Mr. Jackson, how old are you?
11   A.  Fifty-three.
12   Q.  And have you lived most of your life in or near the City
13   of Detroit?
14   A.  Yes, sir.
15   Q.  Are you currently employed?
16   A.  Yes, sir.
17   Q.  Without telling us where you work, could you please tell
18   us the type of work that you do?
19   A.  Truck driver.
20   Q.  Now, Mr. Jackson, in a former life were you a drug dealer
21   here in Detroit?
22   A.  Yes, sir.
23   Q.  And what types of drugs did you deal in?
24   A.  Cocaine, weed and heroin.
25   Q.  And did you traffic in cocaine and weed and heroin in
```

1    distribution amounts?

2    A.  Yes, sir.

3    Q.  Were you, in fact, charged in a federal indictment with

4    drug trafficking offenses?

5    A.  Yes, sir.

6    Q.  And, sir, were you charged in -- in this case or -- or in

7    your own separate case?

8    A.  My own separate case.

9    Q.  And with what crime or crimes were you charged federally

10   in your separate case?

11   A.  Trafficking for cocaine, weed -- cocaine, heroin and phone

12   use.

13   Q.  And when you say phone use, were you, in fact, charged

14   with a conspiracy to use cellular telephones to traffic in

15   controlled substances.

16   A.  Yes, I was.

17   Q.  And Mr. Jackson, what federal law enforcement agency

18   investigated your case?

19   A.  DEA.

20   Q.  And at some point, Mr. Jackson, did you learn that the DEA

21   had intercepted your telephone conversations concerning drug

22   trafficking by using a wiretap on your phone or telephones?

23   A.  Yes, sir.

24   Q.  Now, at some point, Mr. Jackson, were you approached by

25   agents of the DEA and the FBI?

1   A.   Yes, sir.

2   Q.   And can you tell us the date, if you recall?

3   A.   The 25th, July the 25th.

4   Q.   And in what year?

5   A.   I think 13, 14.

6   Q.   All right.  And can you tell us the circumstances?  Were

7   you -- were you approached at your home and placed under arrest

8   or what happened?

9   A.   Well, I was driving from my house in West Bloomfield and

10  they stopped me on Northwestern Highway and Middlebelt.

11  Q.   Were you arrested at that time?

12  A.   I wouldn't call myself arrested but I was took in for

13  questioning.

14  Q.   And did you consent to go with the agents for questioning?

15  A.   Yes.

16  Q.   And did you go downtown?

17  A.   Yes, sir.

18  Q.   And who was the agent from the DEA?

19  A.   His name was Ryan.

20  Q.   And who was the agent from the FBI?

21  A.   Mr. Fitzgerald.

22  Q.   Now, sir, during that interview did you provide FBI

23  Special Agent Mike Fitzgerald with information concerning the

24  activities and your dealings with certain Detroit police

25  officers?

1   A.   Yes, I did.

2   Q.   And did you agree at some point to cooperate with federal

3   authorities in this case?

4   A.   Immediately.

5   Q.   And by cooperating, what is it that you agreed to do?

6   A.   Tell the truth.

7   Q.   Now, you've told us that you've lived in or near Detroit

8   most of your life.

9   A.   Yes.

10  Q.   And you've told us that you've been a drug dealer here in

11  Detroit who has dealt in distribution amounts of cocaine and

12  heroin as well as marijuana, is that right?

13  A.   Yes.

14  Q.   Now, you tell us that you almost immediately agreed to

15  cooperate, is that right?

16  A.   Yes.

17  Q.   Surely you're aware that in the drug world there are

18  certain consequences for cooperating with law enforcement, is

19  that right?

20  A.   Yes, sir.

21  Q.   Particularly federal law enforcement?

22  A.   Yes, sir.

23  Q.   Why is it that you agreed to cooperate almost immediately?

24  A.   Because of corrupt, dishonest police officers.

25  Q.   Now, after your interview downtown with the DEA agent you

1    know as Ryan and Special Agent Michael Fitzgerald, did you and

2    your attorney engage in formal plea negotiations with the U.S.

3    Attorney's Office and the DEA?

4    A.   Yes, sir.  Yes, sir.

5    Q.   Were you represented by an attorney in your case?

6    A.   Yes.

7    Q.   And who is your attorney?

8    A.   Todd Perkins.

9    Q.   And during your negotiations with the U.S. Attorney

10   through your attorney, did you advise that you had personal

11   knowledge concerning corrupt activities by Detroit Police

12   narcotics officers?

13   A.   Yes, sir.

14   Q.   After the plea negotiations, did you, in fact, agree to

15   plead guilty to a charge or charges contained in your federal

16   pleadings?

17   A.   Yes.

18   Q.   And was your agreement to plead guilty reduced to writing?

19   A.   Yes.

20   Q.   And do you know what that's called?

21   A.   A Rule 11.

22        MR. BUCKLEY:  And Ms. Koch, if you could help us by

23   publishing Exhibit 1100.  Thank you, ma'am.

24   BY MR. BUCKLEY:

25   Q.   Now, on the screen before you, Mr. Jackson, do you

```
 1    recognize the document?

 2    A.   Yes, I do.

 3    Q.   And what is that document?

 4    A.   It's the Plea Agreement.

 5    Q.   And is that, in fact, your Rule 11 Plea Agreement?

 6    A.   Yes, sir.

 7         MR. BUCKLEY:  And could you go to page 2, Ms. Koch,

 8    please?

 9    BY MR. BUCKLEY:

10    Q.   And the counts of conviction, sir, they're Conspiracy to

11    Possess With Intent to Distribute and to Distribute Five

12    Kilograms or More of a Substance Containing Cocaine, is that

13    right?

14    A.   Yes, sir.

15    Q.   And a Conspiracy to -- it says With Intent to Distribute

16    and to Distribute One Kilogram or More of Heroin, is that

17    right?

18    A.   Yes.

19    Q.   And then the Conspiracy to Unlawfully Use a Communication

20    Facility, that's -- that's legalese for cell phones, is that

21    right?

22    A.   Yes, sir.

23    Q.   Now, did your Rule 11 Plea Agreement contain sentencing

24    guidelines that set forth the amount of time you were looking

25    at in your case without cooperation?
```

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.873   Filed 07/20/16   Page 11 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

11

1   A.   It was 138 to 168 months.

2   Q.   All right.

3          MR. BUCKLEY:   And Ms. Koch, could you go to page 9 of

4   the Rule 11 Agreement?

5   BY MR. BUCKLEY:

6   Q.   And do you see there, sir, "Agreed-Upon Guideline Range"?

7   A.   Yes, sir.

8   Q.   And that's pretty much what you just said, isn't it, 135

9   to 168 months?

10  A.   Yes, sir.

11  Q.   And your understanding, was it not, from talking to your

12  lawyer is that these guide -- these were guideline figures, is

13  that right?

14  A.   Yes, sir.

15  Q.   Now, did you also enter into a Cooperation Agreement with

16  the government?

17  A.   Yes, sir.

18          MR. BUCKLEY:   And Ms. Koch, could you kindly put the

19  cooperation provision up?   Thank you, ma'am.   And if you go to

20  subsection A and enlarge that for us.   Thank you, ma'am.

21  BY MR. BUCKLEY:

22  Q.   Does your agreement provide, sir, that you will provide

23  truthful and complete information concerning all facts of this

24  case known to you?

25  A.   Yes, sir.

1   Q.   And, sir, what is it that you expect to receive from the

2   government in return for your promise to testify truthfully in

3   this matter?

4   A.   By me telling the truth, I would get a Plea Agreement that

5   they would -- the government would let me, allow me to have.

6        MR. BUCKLEY:   And Ms. Koch, if you could go about

7   three pages further and zoom in on "Downward Departure."

8   BY MR. BUCKLEY:

9   Q.   Now, sir, is it your understanding that if you

10  substantially assist in the investigation or prosecution of

11  others, the government will make a motion to your judge asking

12  for a sentence reduction?

13  A.   Yes, sir.

14  Q.   And what in the Cooperation Agreement does it provide that

15  that recommendation will be?

16  A.   For telling the truth.

17  Q.   And what type of reduction would you hope to receive in

18  return for truthful testimony?

19  A.   Seventy-six months.

20  Q.   Now, you understand, do you not, that the U.S. Attorney's

21  Office does not decide your sentence?

22  A.   True.

23  Q.   Ultimately who will decide your sentence?

24  A.   The judge.

25  Q.   And who is your judge?

1    A.   Ms. Hood, Judge Hood.

2    Q.   Here in this building?

3    A.   Yes, sir.

4    Q.   And have you pled guilty to the charges set forth in your

5    Rule 11 Plea Agreement before Judge Hood?

6    A.   Yes, I have.

7    Q.   And do you remember the date?

8    A.   Not exactly, but I think -- because I went twice.  It was

9    November, near Thanksgiving.

10   Q.   Okay.  And you pled guilty, is that right?

11   A.   Yes, sir.

12   Q.   So you accepted responsibility for the drug trafficking

13   that you're about to describe for us?

14   A.   Yes, sir.

15   Q.   Now, have you been sentenced?

16   A.   Not yet.

17   Q.   What is your current sentencing date?

18   A.   August the 11th, 16.

19   Q.   And again, sir, you understand that the U.S. Attorney's

20   Office only makes a recommendation, is that right?

21   A.   True.

22   Q.   And that Chief Judge Hood will decide your sentence?

23   A.   Yes, sir.

24   Q.   Now, sir, I'm going to ask you, have I or any other

25   Assistant U.S. Attorney or any federal agent promised you

1    anything that is not contained in your Rule 11 Plea and

2    Cooperation Agreement?

3    A.   No.

4    Q.   Sir, in addition to your federal drug felony convictions

5    that you've just described, do you have any prior state felony

6    convictions?

7    A.   CCW and possession of marijuana.

8    Q.   And how old are those?

9    A.   2003 for the marijuana and 1985 for the gun conviction.

10   Q.   Now, Mr. Jackson, I want to first draw your attention to

11   the year 2010.  Were you trafficking drugs here in Detroit?

12   A.   Yes, sir.

13   Q.   And in addition to your drug trafficking activities, did

14   you have another lawful way of -- of making money?

15   A.   No.  I was just doing drugs, sir.

16   Q.   Did you lease a truck wash?

17   A.   Oh, yes.  Yes, sir.

18   Q.   And where was that truck wash located?

19   A.   On the east side, Outer Drive near Seven Mile.

20   Q.   Was the truck wash a way for you to discover information

21   about drug trafficking here in the city?

22   A.   It was nothing for me to discover.  It was for me to have

23   trucks come and deliver narcotics.

24   Q.   Did you spend time at the truck wash?

25   A.   Yes, sir.

1    Q.   And by virtue of that, sometime during the summer of 2010

2    did you come into possession of information about a substantial

3    cocaine deal here in Detroit?

4    A.   Yes, sir.

5    Q.   And did you know about it anyway?

6    A.   Yes.

7    Q.   And in July of 2010 had there been a large cocaine

8    shipment received here in Detroit?

9    A.   Yes, it was.

10   Q.   And do you remember roughly how many kilograms of cocaine

11   were involved in this deal?

12   A.   A hundred.

13   Q.   And did you have knowledge about where those hundred

14   kilograms of cocaine had been offloaded here in Detroit?

15   A.   Yes.

16   Q.   And where had that taken please?

17   A.   At the wash that I leased.

18   Q.   And as the lessor of this truck wash, did you actually see

19   the hundred kilograms being offloaded?

20   A.   Yes, sir.

21   Q.   Did you receive information as to where those hundred

22   kilograms of cocaine had come?

23   A.   Yes, sir.

24   Q.   Who had sent the hundred kilograms here to Detroit?

25   A.   Cartel.

1   Q.   And did you know where the cartel was located?

2   A.   Not exactly, but I knew the cartel member that was

3   receiving them.

4   Q.   Did you know if this was an international cartel?

5   A.   Yes, it was.

6   Q.   And where -- without even telling us a city, in what

7   country was the cartel?

8   A.   Mexico.

9   Q.   So the hundred kilos had been sent to Detroit by a Mexican

10  cartel?

11  A.   Yes, sir.

12  Q.   And you told us that you had seen the kilograms offloaded

13  at the truck wash, is that right?

14  A.   True.

15  Q.   And was it offloaded at the truck wash by local men, by

16  Detroit men?

17  A.   True.

18  Q.   And is it your understanding that these Detroit men were

19  then going to distribute or sell those kilos of cocaine here in

20  Detroit?

21  A.   They were.

22  Q.   Now, did you become aware of a planned money shipment from

23  those hundred kilos back to Mexico?

24  A.   Right.

25  Q.   And was that to pay for the hundred kilograms?

1    A.   Yes, that was received.

2    Q.   And how much money was going back to Mexico for those

3    hundred kilograms?

4    A.   Three million dollars.

5    Q.   And from where in Detroit was the $3 million going to be

6    shipped?

7    A.   From the same wash, Detroit wash.

8    Q.   And by what conveyance, how, how was the $3 million going

9    to be transported back towards Mexico?

10   A.   Same way it came in, by truck, semi.

11   Q.   Now, you're confident that the amount of money was

12   $3 million?

13   A.   Yes, sir.

14   Q.   Now, Mr. Jackson, in your estimation at the time, was this

15   information that you've just shared with the jury valuable?

16   A.   Yes, it was.

17   Q.   And -- and how did you learn that that information could

18   be valuable?

19   A.   Because I knew where it was $3 million placed in one place

20   that I had the control over.

21   Q.   Were you made aware of a Detroit Police Department program

22   that paid for information leading to large drug money seizures?

23   A.   Yes.

24   Q.   Now, do you know a man named Calvin Turner?

25   A.   Yes, I do.

1    Q.  Who's Calvin Turner?

2    A.  A long-time friend and grew up, childhood.

3    Q.  And you've known him since your childhood?

4    A.  Yes, sir.

5    Q.  Was Calvin Turner a drug associate of yours?

6    A.  Yes.

7    Q.  And to your knowledge, has Calvin Turner pled guilty to

8    federal drug charges?

9    A.  Yes.

10   Q.  Now, at some point, Mr. Jackson, did you share your

11   knowledge of this large money shipment with Calvin Turner?

12   A.  Yes, I did.

13   Q.  And why?

14   A.  Because of him telling me about a reward that can be took

15   for seizure of money.

16   Q.  And so just so the record's clear, so Calvin Turner told

17   you about a program that the Detroit Police Narcotics Section

18   had that could reward people for tips concerning money

19   shipments?

20   A.  Yes, sir.

21   Q.  Now, did Calvin Turner, in fact, introduce you to a friend

22   or associate of his who was a DPD narcotics officer?

23   A.  Yes.

24   Q.  And do you know the name of that officer?

25   A.  Well, I know him better by Curly.

1    Q.   And when you were first introduced to Curly by Mr. Turner,

2    were you aware that Curly was involved in -- in corrupt

3    activities, that he was a dirty cop, so to speak?

4    A.   I didn't know right off, no.

5    Q.   And did Calvin Turner introduce you to Curly?

6    A.   Yes, he did.

7    Q.   And can you tell us, where did that introduction take

8    place?

9    A.   On Linwood at the car wash, at Calvin Turner's car wash in

10   Detroit.

11   Q.   Do you know that to be Showroom Shine?

12   A.   Yes, sir, that's the name of it.

13   Q.   Now, at that first introduction when Calvin Turner

14   introduced you to Curly, was Curly alone or with other

15   officers?

16   A.   He was with one other officer.

17   Q.   Did you later learn that officer's name?

18   A.   Yeah.  Watson, Bullet.

19   Q.   And do you see Bullet or Watson here in court today?

20   A.   Yes, sir, right here, sitting down in this gray suit,

21   burgundy tie.

22        MR. BUCKLEY:  Your Honor, may the record reflect the

23   identification of the defendant, Bryan Watson?

24        THE COURT:  Yes, yes.  Thank you.

25        Go ahead.

1    BY MR. BUCKLEY:

2    Q.  Now, at the very first meeting at Showroom Shine, did you

3    share in general with Curly and with the defendant, Mr. Watson,

4    that you had information concerning a large money shipment?

5    A.  Yes, $3 million.

6    Q.  And did Mr. Watson along with Curly express interest in

7    the information that you said you had?

8    A.  Yeah, they expressed interest.

9    Q.  Did they immediately say, "Okay, let's do this"?  What

10   happened?

11   A.  Well, it was told to me that I would get $300,000 off the

12   top, and the DPD, Detroit, city would pay me 500,000.

13   Q.  Who told you that?

14   A.  Mr. Watson.

15   Q.  So he told you you'd get $300,000 off the top of the 3

16   million?

17   A.  Right.

18   Q.  Roughly 10 percent, and an official reward from -- from

19   the Detroit Police Department?

20   A.  Yes.

21   Q.  Did that sound attractive to you?

22   A.  Yes, it did.

23   Q.  Did that sound worth the risk to you?

24   A.  Yes, it did.

25   Q.  Were there risks involved in providing law enforcement

1   with this kind of information?

2   A.   Yes, it was.

3   Q.   Let's be real simple about it.  What kind of risks are

4   involved in telling about Mexican cartel money?

5   A.   Death.

6   Q.   You decided, doing a cost-benefit analysis, that $800,000

7   was worth the risk, is that right?

8   A.   Yes, sir.

9   Q.   So did you agree to yourself to go forward and provide the

10  police with information that might lead to a seizure of this

11  money, this $3 million?

12  A.   Yes, I did.

13  Q.   Did you tell the officers that the hundred kilograms of

14  cocaine had already arrived in the city?

15  A.   Right.

16  Q.   Did you at that time know a specific date when the money

17  was going to leave for Mexico?

18  A.   I knew not the pacific date but I knew when it was ready

19  to leave, they had to come through me.

20  Q.   Now, at that very first meeting you told us that Mr.

21  Watson and Curly expressed interest, is that right?

22  A.   Yes.

23  Q.   Did either one of them tell you that they had to talk to

24  their superiors before they could tell you this is a go?

25  A.   No.

1    Q.   Did you have later conversations with either one of them?

2    A.   Yes.

3    Q.   And when was the next time that you spoke with either the

4    defendant, Mr. Watson, or Curly about this subject matter?

5    A.   I think a day and the day of when they -- the money was

6    getting delivered.

7    Q.   So when you next spoke to them, what, if anything, did

8    they tell you?

9    A.   Well -- well -- well, wait a minute.  Let me retract.  I

10   spoke to them and told them where the location was.  They went

11   out and looked at the location, and Curly called and told me

12   that it wasn't such an address on Outer Drive.  And he said

13   that Watson had said something like, "You know what we call

14   him?  He's a guy that like telling a lie, trying to put us into

15   another position."  And I asked him, I said, "What are you

16   talking about?"  I said, "The address that I gave you," and

17   they said -- I said, "East Outer Drive."  They went to West

18   Outer Drive and looked at the location.

19   Q.   So you learned from this conversation that based on what

20   you had told Defendant Watson and Curly, that the officers had

21   gone out and done a little surveillance?

22   A.   True.

23   Q.   And they expressed concern because they didn't find the

24   site there, is that right?

25   A.   True.

1  Q.   But they had been confused whether it was East or West

2  Outer Drive?

3  A.   Yes, sir.

4  Q.   Once you cleared that up, did you have further

5  conversations with them?

6  A.   Yes, I did.

7  Q.   And did they continue to be interested in pursuing this

8  potential seizure of $3 million?

9  A.   Yes, they were.

10  Q.   Now, ultimately did you provide Mr. Watson and/or Curly

11  with more detailed information?

12  A.   Yes, I did.  I told them the date, what time so they had

13  the -- a stakeout all ready, and they had found the location

14  where they can watch without really being close to the

15  situation.

16  Q.   Now, at some point, at some point did the day come where

17  you became aware that the money, the $3 million, was being

18  loaded up for shipment back to Mexico?

19  A.   Yes, I did.

20  Q.   And where was that taking place?

21  A.   Over at my truck wash on Outer Drive near Seven Mile.

22  Q.   Did you see the money?

23  A.   Yes, sir.

24  Q.   And did you see the money loaded into any vehicle?

25  A.   Yes, sir.

1  Q.   How was the money packaged?

2  A.   Well, in plastic bags and it had little black markings on

3  it.

4  Q.   Did you notice anything about the way the money was

5  packaged that suggested to you that the money was coming from

6  more than one group of cocaine dealers?

7  A.   Well, I knew it was because the money, when we got the

8  hundred, 50 kilos went this way, 50 kilos went to the SA.  And

9  so what happened is the money was turned in.  I think the money

10  was really turned in 10 days before the truck had a path to

11  deliver because the cartel has a day to -- has a regular route,

12  so had to wait til the truck come in.

13  Q.   In your experience, sir, is a hundred kilograms of cocaine

14  a large shipment?

15  A.   Yes, sir.

16  Q.   And how many groups here in Detroit were distributing it?

17  A.   Two groups.

18  Q.   And when the money came in back to the car -- truck wash,

19  excuse me, to be loaded up, did you see that the groups had

20  packaged it in a slightly different manner?

21  A.   Right.  Well, really the cartel, after you drop the money

22  off to them in southwest Detroit, they did the packaging.  And

23  so at the end of the day, they couldn't tell you where all the

24  money was going to be at, you know, for them to say nothing had

25  happened to the money, but then when it got there, you know

1    what I'm saying, is how they packaged it.

2    Q.   So did you see the money loaded into a vehicle?

3    A.   Semi.

4    Q.   And was the semi just a cab or was it towing a trailer?

5    A.   It had a sleeper.

6    Q.   Hmm?

7    A.   With a sleeper.

8    Q.   But was it towing a trailer?

9    A.   No.

10   Q.   As -- as the vehicle, the semi cab was preparing to leave,

11   did you make notification to anybody?

12   A.   Yes.  I went to the Burger King and called Curly and told

13   him it's -- it's getting loaded, it's getting ready to go out.

14   Q.   Why did you go to the Burger King to do that?

15   A.   Because I didn't want to use phone conversation around the

16   cartel so people would look, and when this incident happened,

17   that who used the phone or anything like that, so I didn't want

18   to raise no flags.  So I just told everybody I'm going to get

19   them something to eat.  The driver wanted something to eat too.

20   Q.   The driver of the semi cab with the money?

21   A.   Yeah, mm-hmm.

22   Q.   So you went over to Burger King and you placed a call, is

23   that right?

24   A.   Yes, I did.

25   Q.   And who did you call?

1    A.   Curly.

2    Q.   Now, at that time, sir, were -- were you a Detroit Police

3    Department source of information?

4    A.   At that time, no.  Was I signed up?

5    Q.   Yes.

6    A.   No, I wasn't signed up right then and there.

7    Q.   At some point were you signed up?

8    A.   Yes, I was.

9    Q.   And who was your controlling officer?

10   A.   Curly.

11   Q.   So when you went to Burger King, you called Curly, is that

12   right?

13   A.   Yes.

14   Q.   And what did you tell Curly?

15   A.   That they're getting ready to pull off, you know, the

16   semi's getting ready to come out the wash.  It was only a one

17   bay, so where they was angled right at the Randazzo across the

18   street, you can see it right from the parking lot, so they had

19   surveillance already on it.

20   Q.   Did you see the cab containing the money leave the truck

21   wash?

22   A.   Yes, sir.

23   Q.   And did you see any other vehicle or vehicles accompany

24   the cab containing the money when it left the truck wash?

25   A.   Yeah.  The first vehicle, I don't remember the second, was

1   a PT Cruiser, and it had the cartel member, that Fat SA that I

2   deal with, and then it had another cartel member from Mexico

3   there.

4   Q.   And in addition to the PT Cruiser containing the Mexican

5   cartel associates, did you see another vehicle accompany the

6   semi cab?

7   A.   Yes, it was.

8   Q.   Do you remember what that vehicle was?

9   A.   Not exactly, sir.  My concern was on the main members

10  really.

11  Q.   Did you --

12  A.   I just don't remember it.

13  Q.   That's fine.  Did -- did -- did you relay that information

14  to Curly or -- or did you just watch them leave?

15  A.   I just opened the door and watched them leave.

16  Q.   Did you become aware of a DPD traffic stop of the semi cab

17  and -- and the police seizure of the money?

18  A.   Yeah, I became aware of it.

19  Q.   How did you become aware of it?

20  A.   Because Curly called me.

21  Q.   Where were you when you received this call from Curly?

22  A.   I think I was driving towards the west side.

23  Q.   And do you recall what Curly said to you when he called

24  you?

25  A.   Right.

1    Q.   What did he say?

2    A.   He said, "We sweet," and that's what I heard Watson

3    saying, to "tell him we sweet."

4    Q.   They seem pleased?

5    A.   Yes.

6    Q.   Did you hear any conversations between Mr. Watson and

7    Curly about whether the money was in any type of order?

8    A.   Yeah.  "Ask him is it in sequence."

9    Q.   So someone wanted you to be asked whether the money was in

10   sequence, is that right?

11   A.   Yes.

12   Q.   Who -- who asked that?

13   A.   Watson.  I overheard him on the phone when I was talking

14   to Curly.

15   Q.   What does it mean for the money to be in sequence?

16   A.   In order.

17   Q.   Does that mean serialized in some fashion?

18   A.   Numbered.

19   Q.   Now, after that call, did -- did you make arrangements to

20   stay anywhere for the night?

21   A.   Yes, at a hotel out in Romulus by the airport.

22   Q.   And for what purpose?

23   A.   So I can get the 300,000 off the top that was promised to

24   me.

25   Q.   After arriving at the hotel, did you receive another

1   telephone call?

2   A.   Yes, I did.

3   Q.   And from whom?

4   A.   Curly.

5   Q.   And what, if anything, did Curly tell you during that

6   phone call?

7   A.   "Hey, man, they said they didn't get any money."  I

8   said -- I can't cuss -- I said, "What are you talking about,

9   you didn't get no money?"  Then he told me, "Well, the lady

10  sergeant or the head of the department was at the Ninth

11  Precinct and arrived over there on Gratiot and Conners too

12  quick.  They didn't have a chance to get any money."

13  Q.   Did you understand that to mean that Curly was telling you

14  that the claim was there wasn't enough time to get the 300,000

15  off the top?

16  A.   That's what he said.

17  Q.   So were you happy about that?

18  A.   I was furious.

19  Q.   Did you later see anything on the television evening news

20  that made you more unhappy?

21  A.   Yeah, a seizure of $2.1 million.

22  Q.   So you saw on the news that only $2.1 million was seized,

23  is that right?

24  A.   Yes, sir.

25  Q.   And you've already testified and told us that you had

1  information that $3 million was shipped.

2  A.  Yes, sir.  So I knew they was a liar and corrupt from that

3  point.

4  Q.  Did that affect the way you chose to deal with them?

5  A.  Yes.

6  Q.  Now, did you immediately then receive a cash award from

7  the department, an official one?

8  A.  Yes, after I met with certain people.

9  Q.  So that's the question.  Was it immediate?

10  A.  No.

11  Q.  Did you get your money the next day?

12  A.  No, sir.

13  Q.  Did you get it the next week?

14  A.  No, sir.

15  Q.  Did you get it two weeks later?

16  A.  No.

17  Q.  Did -- did you be -- begin to feel, based on all the

18  circumstances, that maybe you weren't going to get that reward

19  at all?

20  A.  True.

21  Q.  Did you feel like you had been cheated?

22  A.  I knew I had been cheated.

23  Q.  So do you recall, sir, on August 14th of 2010 receiving an

24  official DPD premium payment?

25  A.  Yes, I did.

1    Q.  And how much money did you receive from the department for

2    the tip you had provided?

3    A.  $250,000 cash.

4    Q.  And where did that take place?

5    A.  At a hotel on Telegraph near 11 Mile.

6    Q.  And you've told us that you received how much?

7    A.  250,000 cash.

8    Q.  Do you recall signing any paperwork at some point for

9    that?

10   A.  Yes, I did.  Yes, I did.

11        MR. BUCKLEY:  Ms. Koch, could you publish 720-A

12   please?

13   BY MR. BUCKLEY:

14   Q.  Sir, on the screen before you is a document entitled

15   "Receipt From Source of Information For Payment."  Do you see

16   that?

17   A.  Yes, sir.

18        MR. BUCKLEY:  Could you zoom in on the top half

19   please?  Thank you, Ms. Koch.

20   BY MR. BUCKLEY:

21   Q.  Says that's a Form IR-1, is that right?

22   A.  Yes, sir.

23   Q.  Says the box is checked for "Specific Information."  Do

24   you see that?

25   A.  Yes, sir.

1    Q.   And it says "Bonus Payment."

2    A.   Yes.

3    Q.   Says, "I hereby acknowledge receipt of $250,000," is that

4    right?

5    A.   Yes, sir.

6         MR. BUCKLEY:  Can you scroll down, Ms. Koch, for me?

7    BY MR. BUCKLEY:

8    Q.   Have you seen this document before, Mr. Jackson?

9    A.   I when I signed it.

10   Q.   Okay.

11        MR. BUCKLEY:  Could you zoom in the whole bottom

12   half?  Okay.

13   BY MR. BUCKLEY:

14   Q.   It says August 14th, 2010?

15   A.   Yes, sir.

16   Q.   And the payee, you recognize that signature?

17   A.   It's mine.

18        MR. BUCKLEY:  Thanks, Ms. Koch.

19   BY MR. BUCKLEY:

20   Q.   So where did you receive this cash payment from the

21   department.

22   A.   At the hotel on Telegraph near 696.

23   Q.   You've told us that you had been cheated by the police, is

24   that right?

25   A.   Yes, sir.

1    Q.   And you told us that that affected the way you chose to

2    deal with them, is that also true?

3    A.   Yes, sir.

4    Q.   So before this meeting, did you take any steps to make a

5    record of what was going to happen?

6    A.   Well, if you let me explain, there was two steps.  One was

7    contact the Chief Godbee and talk to him and tell him about it.

8    Q.   Well, let's back up and -- and I'm going to ask you about

9    that.  Was that during the delay between July 26th, the time of

10   the $3 million seizure, and August 14th when you received the

11   payment?

12   A.   Yes.

13   Q.   Did you start to believe that you weren't going to receive

14   any payment at all?

15   A.   No, I wasn't.

16   Q.   So what steps did you do?

17   A.   I contacted the Chief of Police and had a special meeting

18   with him in Troy, Michigan.

19   Q.   Did you meet with the chief alone?

20   A.   No.  Derrick Coleman.

21   Q.   Who was the chief at that time?

22   A.   Chief Godbee.

23   Q.   Derrick Coleman, is he the former NBA star?

24   A.   Yes, sir.

25   Q.   And how was it that you knew Mr. Derrick Coleman?

1    A.   Childhood friends, Calvin Turner's cousin.

2    Q.   So you all had a meeting, is that right?

3    A.   Yes, sir.

4    Q.   And who was there?

5    A.   Just me, Derrick and Mr. Godbee.

6    Q.   Did you tell Chief Godbee what had happened?

7    A.   Yes.

8    Q.   Did you tell him that it was a $3 million seizure and

9    not -- not a $2.1 million seizure?

10   A.   Well, that's what -- he asked me how much money was there,

11   and I told him $3 million.

12   Q.   And what did he say?

13   A.   "I knew it."

14   Q.   Do you recall how much time passed after that meeting and

15   the time that you received your $250,000 cash reward from the

16   department?

17   A.   I think it was in -- within a week or two.

18   Q.   And, you know, you've told us that you've been cheated by

19   the police, is that right?

20   A.   Yes, sir.

21   Q.   Did you feel that you could sue them?

22   A.   I knew that by me being a criminal and the drug record

23   that I had, that nobody in the world would believe me against a

24   honest law enforcement officer.

25   Q.   Did you feel like you could fight them over it?

1    A.    Couldn't fight 'em, couldn't argue, couldn't do anything.

2    Q.    At that time in your life, Mr. Jackson, if -- if -- if

3    you'd been cheated out of, what, 800 less 250 is $550,000,

4    would you have tolerated that?

5    A.    I couldn't do -- I was defenseless against the police

6    officers.

7    Q.    And you told us that that affected the way you chose to

8    deal with them from then on out?

9    A.    True.

10   Q.    So in addition to meeting with Chief Godbee, did you take

11   another step?

12   A.    Yes, I did.

13   Q.    What did you decide to do?

14   A.    I bought -- I went to the spy shop and I bought a pen, a

15   recording device, and I placed it in my pocket, when next time

16   I go and I was going with them -- I was scared to get the money

17   because I didn't even know if they was going to try something

18   then if they just ripped off $900,000 from me.  So what I

19   wanted to do was make sure if anything ever happened, that they

20   can hear it from their own mouth.

21   Q.    So you said you went to the spy shop, is that right?

22   A.    Yes, sir.

23   Q.    And -- and what did you do when you went to the spy shop?

24   A.    I bought the pen for a hundred dollars, $99.

25   Q.    And what was -- was there anything unique about this pen?

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.898   Filed 07/20/16   Page 36 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

36

1   A.   It could fit without it being out in the open.  And then I

2   always used to wear dicky outfits and I wear dicky outfits a

3   lot, so I can slip it in this pocket and it be -- can be

4   covered so nobody can see it.

5   Q.   And besides being a -- a writing utensil, what was this

6   device?

7   A.   A writing pen.

8        MR. BUCKLEY:  Gentlemen, Exhibit 723 as demonstrative

9   evidence.

10  BY MR. BUCKLEY:

11  Q.   Mr. Jackson, I'm handing you what has been admitted into

12  evidence as Government Exhibit 723.  And first of all, is that

13  the actual pen recorder that you used back in 2010?

14  A.   It's not the actual pen recording but it's a replica of

15  the exact pen that I used.

16  Q.   Is it the same manufacturer and the same model?

17  A.   Yes.  It was -- I had gold tips instead of silver, that's

18  the only thing.

19  Q.   And could you open that box up please, sir?

20       Now, what happened to the actual pen recorder that

21  you used that day?

22  A.   I misplaced it.

23  Q.   And could you hold that up please?  And -- and you've told

24  us that the actual pen recorder you used back in 2010 on

25  August 14th had gold trim, is that right?

1    A.   Yes, sir.

2    Q.   This has silver?

3    A.   That's all, the difference.

4    Q.   And that's the only difference?

5    A.   Yes, sir.

6    Q.   And did you turn that recorder on before the meeting?

7    A.   Yes.

8    Q.   And did you have it on your person?

9    A.   Yes, I did.

10   Q.   Now, at that time, sir, were -- were you recording this

11   meeting on behalf of any law enforcement agency?

12   A.   No.

13   Q.   You've told us that at some point you were signed up by

14   the Detroit Police Department, is that right?

15   A.   Yes.

16   Q.   At some later point were you also signed up by the FBI as

17   a source?

18   A.   Yes.

19   Q.   And we're going to talk about that a little bit later.

20   But at this time, on August 14th of 2010 when you recorded the

21   meeting, you did it on your own, is that right?

22   A.   Yes, sir.

23   Q.   And you've told us why.

24        So was there the meeting?

25   A.   You say what, sir?

1    Q.   Was there the meeting?

2    A.   Yes.

3    Q.   Did -- did it occur?

4         And you've told us it was a hotel?

5    A.   Yes, sir.

6    Q.   Now, you've told us that you received $250,000 in cash, is

7    that right?

8    A.   Yes, sir.

9    Q.   Who was there at that meeting from the police department?

10   A.   Curly, Watson, Hansberry, another tall, light-skinned guy,

11   a lady and a personal friend of mine.

12   Q.   And why did you have a personal friend of yours there?

13   A.   Because she was a Wayne County sheriff.

14   Q.   You've told us that you had some concerns about your own

15   safety, is that right?

16   A.   Yes, that's why.  I couldn't -- I couldn't trust the DPD

17   no more.

18   Q.   You mentioned a man named Hansberry.  Do you see Mr.

19   Hansberry in the Court today?

20   A.   Yes, sir.  The gentleman right there.

21        MR. BUCKLEY:  Your Honor, may the record reflect the

22   identification of the defendant, Mr. Hansberry?

23        THE COURT:  Okay.  Go ahead.

24   BY MR. BUCKLEY:

25   Q.   Now, when Mr. Hansberry came to that meeting, was that the

1   first time you had ever met him?

2   A.   Yes, sir.

3   Q.   And what was your understanding as to why he was there,

4   what was his position relative to the defendant, Mr. Watson,

5   and to Curly?

6   A.   Sergeant over them both.

7   Q.   Now, since that meeting, Mr. Jackson, have you had an

8   opportunity to listen to the recording that you captured that

9   day?

10  A.   Yes, I have.

11  Q.   And have you had an opportunity to compare that recording

12  to the transcript that the jury's about to be seeing?

13  A.   Yes.

14  Q.   And is it a verbatim or word-for-word accurate

15  transcription of the conversation?

16  A.   Yes, it is.

17  Q.   And -- and does it accurately identify the speakers?

18  A.   Yes, it does.

19          MR. BUCKLEY:  Your Honor, with the Court's

20  permission, we would publish Exhibit 722, which is the

21  recording.

22          THE COURT:  Yes, sir.  Go right ahead.

23          MR. BUCKLEY:  Thank you.  Ms. Koch?

24          (Audio clip being played at 9:18 a.m.)

25  Q.   Can you stop?  When you said, "This is my cousin," sir, to

1    whom were you referring?

2    A.   To Lynn.

3    Q.   And was that the lady that you had there for your

4    protection?

5    A.   Yes, it was, Wayne County sheriff.

6    Q.   Thank you.

7          MR. BUCKLEY:  Go ahead, Ms. Koch.

8          (Audio clip being played at 9:18 a.m.)

9          MR. BUCKLEY:  Can you stop it, Ms. Koch?

10   BY MR. BUCKLEY:

11   Q.   So when you said, "Are you Sarge?", were you asking

12   someone if they were Mr. Hansberry?

13   A.   Right.

14   Q.   Because you told us you had not met him before?

15   A.   I never met him before.

16   Q.   All right.

17         MR. BUCKLEY:  Go ahead, ma'am.

18         (Audio clip being played at 9:19 a.m.)

19         MR. BUCKLEY:  Can you stop it, Ms. Koch?

20   BY MR. BUCKLEY:

21   Q.   So do you recognize that to be Curly?

22   A.   Yes.

23   Q.   And when he says, "That's the fastest anybody's got that

24   money," what is he telling you?

25   A.   That the money for a witness or a defendant that's

1  received any type of money from a drug deal and proceeds,

2  that's the fastest anybody had received it, but not knowingly

3  that I had talked to the chief.

4  Q.   Okay.

5          MR. BUCKLEY:  Please go ahead, Ms. Koch.

6          (Audio clip being played at 9:20 a.m.)

7          MR. BUCKLEY:  Can you stop it?

8  BY MR. BUCKLEY:

9  Q.   Who's Benny?

10  A.   Benny Napoleon.

11  Q.   A high-ranking Detroit police officer?

12  A.   Yes, sir.

13  Q.   And why would you tell these men that you knew Benny

14  Napoleon?

15  A.   Well, from them robbing me the first time, I -- I just

16  wanted to throw something out there, but that's not really her

17  cousin.  Him and his father grew up -- and her father grew up

18  in Texas -- I mean Tennessee, and, you know, going to the same

19  church, so I just wanted to put something out there to -- to

20  let them back off because I already knew they had -- it was

21  corrupt police officers and had stolen that money.

22          MR. BUCKLEY:  Go ahead, Ms. Koch.

23          (Audio clip being played at 9:21 a.m.)

24          MR. BUCKLEY:  Stop it, Ms. Koch.

25  BY MR. BUCKLEY:

1    Q.   So it identifies a person named Herbert.  Did someone

2    arrive with the money?

3    A.   Yes.

4    Q.   And is that the person?

5    A.   Yes.

6    Q.   Was that a man or a woman?

7    A.   It was a man and a woman.

8         MR. BUCKLEY:  And go ahead, Ms. Koch.

9         (Audio clip being played at 9:23 a.m.)

10        MR. BUCKLEY:  Can you stop it there?

11   BY MR. BUCKLEY:

12   Q.   So the transcript identifies that as Hansberry.  The

13   speaker, is that the Defendant Hansberry?

14   A.   Yes, it is.

15   Q.   In this courtroom?

16   A.   Yes, it is.

17   Q.   Thank you.

18        MR. BUCKLEY:  Go ahead, Ms. Koch.

19        (Audio clip being played at 9:25 a.m.)

20        MR. BUCKLEY:  Can you stop it right there?

21   BY MR. BUCKLEY:

22   Q.   So Mr. Jackson, what's that noise, what's that racket?

23   A.   The money being into a money counter.

24   Q.   Now, is a money counter the type of machine used by

25   financial institutions like banks?

1   A.   Yes.

2   Q.   And -- and how does it operate?

3   A.   You put the money in and it tells you exactly what it is.

4   If you put it for 100s or 50s, that's some old ones, but the

5   new ones just takes it right out the top, finding out the

6   dimension of the money.

7   Q.   So a person could take a number of bills, of currency,

8   push in the denomination of the -- of the currency, and then

9   the machine counts the number of bills?

10  A.   Yes, sir.

11  Q.   And then does it also calculate the total?

12  A.   Yes, sir.

13  Q.   Now, who had brought the money counting machine to the

14  hotel?

15  A.   Well, they brought one and I brought one.

16  Q.   And which one was being used here?

17  A.   I think it started off with mine and then they went to

18  theirs or...

19  Q.   Okay.

20          MR. BUCKLEY:  Go ahead.

21  A.   One or the other.

22          (Audio clip being played at 9:26 a.m.)

23          MR. BUCKLEY:  Would you stop it?

24  BY MR. BUCKLEY:

25  Q.   That -- do you recognize that voice as being the

1   defendant, Mr. Watson?

2   A.   Yes, it is.

3   Q.   Here in this courtroom?

4   A.   Yes, it is.

5   Q.   Thank you.

6          MR. BUCKLEY:  Go ahead, Ms. Koch.

7          (Audio clip being played from 9:26 a.m. to 9:33 a.m.)

8          MR. BUCKLEY:  Counsel, may we stipulate that the

9   money counter continues until 14:57 and fast forward to 14:55?

10         MR. FISHMAN:  Yes, sir.

11         MR. HARRISON:  Yes.

12         MR. BUCKLEY:  All right.  Ms. Koch, can you assist us

13  in that regard?

14         (Audio clip being played at 9:33 a.m.)

15         MR. BUCKLEY:  Could you stop that please?

16  BY MR. BUCKLEY:

17  Q.   So at that point when you're signing something, is that

18  what you recognize and identified as 728, the receipt?

19  A.   Yes, sir.

20         MR. BUCKLEY:  Go ahead, Ms. Koch.

21         (Audio clip being played at 9:35 a.m.)

22         MR. BUCKLEY:  Can you stop it, Ms. Koch?

23  BY MR. BUCKLEY:

24  Q.   So you signed an internal departmental form as well?

25  A.   Yes.

1    Q.   A record of payment?

2    A.   Yes.

3             MR. BUCKLEY:  Go ahead, Ms. Koch.

4             (Audio clip being played at 9:37 a.m.)

5             MR. BUCKLEY:  Can you stop.

6    BY MR. BUCKLEY:

7    Q.   So -- so Mr. Jackson, why were you afforded an opportunity

8    to wash your hands?

9    A.   I don't know.  I just --

10   Q.   Was it from handling the currency?

11   A.   Yes.

12   Q.   Were your hands sticky?

13   A.   No, but, you know, money's dirty.

14            MR. BUCKLEY:  Would you go ahead?

15   BY MR. BUCKLEY:

16   Q.   Oh, and at some point were Officer Herbert and your cousin

17   excused from the room?

18   A.   Yes.

19   Q.   Who excused them from the room?

20   A.   I think -- I'm not trying to be exact, but I knew it was

21   either Watson or Hansberry, one of them.

22   Q.   But, in fact, did Officer Herbert and Sue, your cousin,

23   leave the room?

24   A.   Yes.

25   Q.   And did you remain in the room?

1    A.   Yes, I did.

2    Q.   Who remained in the room with you?

3    A.   It was me, Curly, Watson and Sarge.

4         MR. BUCKLEY:  Go ahead, Ms. Koch.

5         (Audio clip being played at 9:39 a.m.)

6         MR. BUCKLEY:  Can you stop it, Ms. Koch?

7    BY MR. BUCKLEY:

8    Q.   And Mr. Jackson, you're experienced.  Do -- do drug

9    traffickers sometimes speak in code when they're referring to

10   illegal drugs?

11   A.   True.

12   Q.   And what are birds?

13   A.   Kilograms, kilos.

14   Q.   And when you said to the defendants that 10 birds are raw,

15   what does that mean?

16   A.   Heroin.

17   Q.   Okay.

18        MR. BUCKLEY:  Go ahead, Ms. Koch, please.

19        (Audio clip being played from 9:41 to 9:44 a.m.)

20        MR. BUCKLEY:  That's good.

21   BY MR. BUCKLEY:

22   Q.   So you mentioned that you had information pertaining to a

23   Cuban, correct?

24   A.   True.

25   Q.   And then you tell the defendants, "One, two and three."

1   What -- what are you talking about there?

2   A.   One is cocaine, two is heroin, three is weed.

3   Q.   And, you know, when you were making that statement, did

4   you actually have information about a Cuban bringing in those

5   three types of drugs?

6   A.   True.

7   Q.   Okay.

8          MR. BUCKLEY:  Go ahead, Ms. Koch, please.

9          (Audio clip being played at 9:45 a.m.)

10          MR. BUCKLEY:  Stop it please.

11   BY MR. BUCKLEY:

12   Q.   So the money that is legal, Mr. Hansberry talking about

13   the $250,000 in cash you just received?

14   A.   Yes.

15   Q.   And he told you that if you put it in the bank, the IRS

16   would be aware of it, is that right?

17   A.   True.

18          MR. BUCKLEY:  Go ahead, Ms. Koch.

19          (Audio clip being played at 9:46 a.m.)

20          MR. BUCKLEY:  Stop it right there.

21   BY MR. BUCKLEY:

22   Q.   So Mr. Hansberry tells you that he excused Officer Herbert

23   and your cousin from the room?

24   A.   True.

25   Q.   And then the very first thing he says to you is he had to

1   make sure you weren't with the feds, the FBI or the DEA, is

2   that right?

3   A.   Yes, sir.

4   Q.   And then he -- he said, "I don't -- well, I ain't got no

5   problem giving it to you, shit off the top," is that right?

6   A.   True.

7   Q.   Was that your understanding of what the original deal was

8   going to be?

9   A.   That was, was supposed to be.

10  Q.   And now Mr. Hansberry is telling you, "Since I know you're

11  not with the feds, we can do it that way."

12  A.   True.

13          MR. BUCKLEY:  Go ahead, Ms. Koch, please.

14          (Audio clip being played at 9:48 a.m.)

15          MR. BUCKLEY:  Can you stop the tape?

16  BY MR. BUCKLEY:

17  Q.   So, in effect, was Mr. Hansberry telling you that from now

18  on, you're going to get yours right off the top?

19  A.   True.

20  Q.   And then that 20 or 30 grand on the back end, what was

21  that supposed to be?

22  A.   From DPD or the City of Detroit with a legal payment

23  showing that they paid something legally.

24  Q.   Just to make it look good?

25  A.   Yes, sir.

```
1            MR. BUCKLEY:  Go ahead please, Ms. Koch.
2            (Audio clip being played at 9:49 a.m.)
3    BY MR. BUCKLEY:
4    Q.   Did you understand that to mean that in the future the
5    cash would be brought to you off the top in a brown paper bag,
6    for example?
7    A.   Like it was supposed to be the first time.
8    Q.   Thank you.
9            MR. BUCKLEY:  Go ahead, Ms. Koch, please.
10           (Audio clip being played).
11           MR. BUCKLEY:  Can you stop right there?
12   BY MR. BUCKLEY:
13   Q.   So Mr. Hansberry at first says, "We can -- we can all --
14   you could be a millionaire doing this," is that right?
15   A.   True.
16           MR. BUCKLEY:  Go ahead, Ms. Koch.
17           (Audio clip being played at 9:50 a.m.)
18           MR. BUCKLEY:  Can you stop?
19   BY MR. BUCKLEY:
20   Q.   So when he talks about you getting popped with one, what's
21   he saying to you?
22   A.   That he's going to get me out of jail, but -- but in
23   the -- it's not -- if you tell the police or the feds about it,
24   it's a get out of jail free card.
25   Q.   So being popped means being arrested?
```

1    A.   Yes, sir.

2    Q.   So what he expressed to you was the problem with giving

3    you drugs is if you get caught with drugs, you might give up

4    the police that were involved with you?

5    A.   True.

6    Q.   And then Mr. Watson said, "We everybody's get out of jail

7    free card," is that right?

8    A.   True.

9    Q.   Mr. Hansberry says, "You know that's what I'm saying."

10   A.   Right.

11   Q.   All right.

12            MR. BUCKLEY:  Go ahead, Ms. Koch, please.

13            (Audio clip being played).

14   BY MR. BUCKLEY:

15   Q.   So when Mr. Hansberry says to you, "If you get popped,

16   I'll come get you," what is he telling you?

17   A.   That he's going to get me released from jail.

18   Q.   When he said to you, "I need you to do what you do," what

19   is it that you were doing at the time?

20   A.   Continuing to sell drugs.

21   Q.   Was it your understanding based on this conversation that

22   you had the green light to keep dealing drugs?

23   A.   Yes, I did.

24   Q.   Was it your understanding that you were going to be

25   protected by the defendants?

1    A.   Yes, I was, supposed to.

2    Q.   Did you ever tell Calvin Turner that the defendants told

3    you you had the green light?

4    A.   Yes.

5              MR. BUCKLEY:  Go ahead, Ms. Koch, please.

6              (Audio clip being played at 9:53 a.m.)

7              MR. BUCKLEY:  Can you stop it?

8    BY MR. BUCKLEY:

9    Q.   So when Mr. Hansberry says, "We're going to get rid of the

10   red tape," what was he telling you?

11   A.   I don't have to go through the legal process no more to

12   receive the money.

13   Q.   Money is going to come off the top?

14   A.   Yes, sir.

15             MR. BUCKLEY:  Go ahead, Ms. Koch, please.

16             (Audio clip being played at 9:56 a.m.)

17             MR. BUCKLEY:  Can you stop right there?

18   BY MR. BUCKLEY:

19   Q.   So what was happening there?  Was there a phone call

20   received by one of the defendants?

21   A.   Yes.

22   Q.   Seemed to relate to something urgent involving other

23   police officers out on the street?

24   A.   Yes.

25   Q.   And as soon as they hang up, Mr. Hansberry says, "If you

1    bring that money, we'll get rid of the red tape," is that

2    right?

3    A.   Yes.

4    Q.   He gets right back to business, right?

5    A.   Yes.

6    Q.   He's all about that money.

7            MR. BUCKLEY:  Okay.  Go ahead, Ms. Koch.

8            (Audio clip being played at 9:56 a.m.)

9            MR. BUCKLEY:  Can you stop it there?

10   BY MR. BUCKLEY:

11   Q.   So this conversation about -- you know, a hypothetical Mr.

12   Hansberry gives about maybe being told there was a hundred but

13   only finding 95, he mentions you might get a call and be told

14   some's in the dumpster, isn't that right?

15   A.   True.

16   Q.   Was he talking about giving you seized drugs?

17   A.   Well, those drugs wasn't seized.  He took the seizure with

18   him and left them behind.

19   Q.   He's talking about drugs that he took from a drug house,

20   for example?

21   A.   True.

22   Q.   And was going to divert to you?

23   A.   True.

24           MR. BUCKLEY:  Go ahead.  Thank you.

25           (Audio clip being played at 9:58 a.m.)

1   BY MR. BUCKLEY:

2   Q.   When you said that you're not going to do any brothers,

3   what are you telling Mr. Hansberry?

4   A.   The black brothers, race, that I'm not going to do the

5   associates that I'm around and be there because they're not the

6   powerful ones, period.  If people want to stop everything, they

7   got to go over the seas and stop it from coming here.  Once it

8   get here, it's distributing it.  These people ain't making the

9   type of money these people making.  We don't make it, we don't

10  have no country to come and call out to ship anything overseas.

11          THE COURT:  All right.  All right.  Let's stop the

12  speech and move on here.

13          MR. BUCKLEY:   Thank you.

14  BY MR. BUCKLEY:

15  Q.   Now, bottom line is you told him that you weren't going to

16  give up local men from Detroit, is that right?

17  A.   True.

18  Q.   And then he said, "I appreciate that 100 percent," is that

19  right?

20  A.   True.

21          MR. BUCKLEY:  Go ahead, Ms. Koch.

22          (Audio clip being played at 10:01 a.m.)

23          MR. BUCKLEY:  Stop it, Ms. Koch.

24  BY MR. BUCKLEY:

25  Q.   Did you understand Mr. Hansberry to tell you that if one

1    of your drug distributors was arrested, if you told him, he'd

2    take care of it?

3    A.    True.

4    Q.    Okay.

5              MR. BUCKLEY:  Go ahead, Ms. Koch.

6              (Audio clip being played at 10:02 a.m.)

7              MR. BUCKLEY:  Stop it please.

8    BY MR. BUCKLEY:

9    Q.    So Defendant Watson said to you, "I don't care about

10   putting a brother in jail."

11   A.    True.

12             MR. BUCKLEY:  Could you go ahead, Ms. Koch?

13             (Audio clip being played at 10:05 a.m.)

14   BY MR. BUCKLEY:

15   Q.    So at that point you shared with the defendants that the

16   PT Cruiser left the truck wash with the semi carrying the

17   money, is that right?

18   A.    It wasn't carrying the money.

19   Q.    No, that the semi cab carrying the money was found --

20   A.    Yeah.

21   Q.    -- by that PT Cruiser?

22   A.    Yes, it was.

23   Q.    As you testified today?

24   A.    Yes.

25             MR. BUCKLEY:  Go ahead, Ms. Koch.

 1              (Audio clip being played at 10:07 a.m.)

 2              MR. BUCKLEY:  Could you stop there?

 3    BY MR. BUCKLEY:

 4    Q.   So you're saying it's got to be sold first, is that right?

 5    A.   True.

 6    Q.   That's the cocaine?

 7    A.   True.

 8    Q.   For example, a hundred kilos?

 9    A.   True.

10    Q.   To be distributed out into the streets?

11    A.   Yes.

12    Q.   Mr. Hansberry says, "My priority, we interested in the

13    money," is that right?

14    A.   Right.

15              MR. BUCKLEY:  Go ahead, Ms. Koch, please.

16              (Audio clip being played from 10:08 a.m. to 10:11

17              a.m.)

18              MR. BUCKLEY:  Can you stop there please?

19    BY MR. BUCKLEY:

20    Q.   So when Mr. Hansberry says to you, "Are we straight?",

21    what was he asking you?

22    A.   Was I happy with the payment of money.

23    Q.   And we heard your response.  Is that because you had been

24    expecting what you were originally promised?

25    A.   $800,000.

1  Q.  Which you told us was $300,000 off the top and then a $500

2  premium payment from the department?

3  A.  True.

4       MR. BUCKLEY:  Thanks, Ms. Koch.  Go ahead.

5       (Audio clip being played at 10:11 a.m.)

6       MR. BUCKLEY:  Can you stop it there?

7  BY MR. BUCKLEY:

8  Q.  When you said, "When I read the paper, did you see my

9  face?", what -- what were you talking about?

10  A.  I'm talking about when I saw the seizure of money that

11  they turned in.  Instead of $3 million, it was 2.1 they had in

12  the paper, so I knew then if you add the numbers, 900,000 makes

13  3 million.

14       MR. BUCKLEY:  Ms. Koch, could you go ahead?

15       (Audio clip being played at 10:14 a.m.)

16       MR. BUCKLEY:  Can you stop there please?

17  BY MR. BUCKLEY:

18  Q.  So at that point Defendant Watson talks to you about a

19  dummy, is that right?

20  A.  True.

21  Q.  What's he talking about?

22  A.  A fake kilo.

23  Q.  And in what context?

24  A.  It's not made with real cocaine but it probably test

25  positive.

```
 1    Q.  And was he talking to you about a plan to do some sort of
 2    rip?
 3    A.  Yes.
 4    Q.  And he said, "I'll show you how to do that," is that
 5    right?
 6    A.  True.
 7    Q.  And he's talking about making dummies?
 8    A.  True.
 9    Q.  Okay.
10             MR. BUCKLEY:  Go ahead, Ms. Koch.
11             (Audio clip being played at 10:17 a.m.)
12             THE COURT:  Okay.  Let's take our morning break at
13    10:17.  We'll take five minutes and be back here by about 10:25
14    or 10:30.  Let's all rise for our jurors please.
15             (Whereupon the jury was excused at 10:17 a.m.)
16             (Court in recess)
17             (Proceedings resumed at 10:34 a.m., all parties
18             present)
19             (Whereupon the jury entered the courtroom at
20             10:34 a.m.)
21             THE COURT:  All right.  All of our jurors are back in
22    their spots.  Everybody may be seated.
23             Mr. Jackson's coming back up to the stand, Mr.
24    Buckley is in place and we will resume.  Go right ahead.
25             MR. BUCKLEY:  Thank you, Your Honor.
```

1    BY MR. BUCKLEY:

2    Q.   So Mr. Jackson, before we recessed, you were explaining

3    what was said at the meeting at the hotel room when you

4    received the $250,000 cash payment from the Detroit Police, is

5    that right?

6    A.   Yes, sir.

7    Q.   Which was brought to you at a meeting attended by

8    defendants, Mr. Hansberry and Mr. Watson?

9    A.   Yes, sir.

10   Q.   What did you do with the 250,000 cash that you received?

11   A.   I put some in the bank, spent some, took care of some

12   bills.

13   Q.   Did you, in fact, have a safe deposit box?

14   A.   Yes.

15   Q.   Did you put some of the money there?

16   A.   Yes, sir.

17        MR. BUCKLEY:  Ms. Koch, could you show 726 please?

18   BY MR. BUCKLEY:

19   Q.   Do you recognize this to be records relating to a safe

20   deposit box that you had?

21   A.   Yes, sir.

22   Q.   And where was the bank, what bank was it?

23   A.   Bank of America on Evergreen and 11 Mile.

24        MR. BUCKLEY:  Could you go to the next page please,

25   Ms. Koch?

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.921   Filed 07/20/16   Page 59 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

59

1    BY MR. BUCKLEY:

2    Q.   And do you recognize this to be related to your safe

3    deposit box?

4    A.   Yes.

5         MR. BUCKLEY:   And can we go to the next page, Ms.

6    Koch, and could you zoom in on the top?

7    A.   But this is -- this is my son's name.  I'm the senior,

8    he's the third, so it was his account.

9    BY MR. BUCKLEY:

10   Q.   Okay.

11   A.   All right.

12   Q.   Did you use that box however?

13   A.   Yes.

14        MR. BUCKLEY:   Thank you, Ms. Koch.

15   BY MR. BUCKLEY:

16   Q.   Now, after the meeting, the recording of which we just

17   heard in court, did you continue to have contact with Curly and

18   Mr. Watson and Mr. Hansberry?

19   A.   Yes, sir.

20   Q.   Did you continue to provide information to Curly as your

21   controlling officer?

22   A.   Yes, sir.

23   Q.   Because at some point were you, in fact, signed up as a

24   source of information by the Detroit Police Department?

25   A.   That's the only way I could receive the money anyway.

1   Q.   Because if you're not signed up as a source, you can't

2   receive money legally from the department, is that right?

3            MR. HARRISON:  Objection.  Leading, Your Honor.

4            THE COURT:  Overruled.  Go ahead.

5   A.   Yes.

6   BY MR. BUCKLEY:

7   Q.   And who explained that to you?

8   A.   Curly.

9   Q.   So you learned from the police that if you weren't a

10  documented source of information, you couldn't receive money

11  legally from the department, is that right?

12  A.   Yes.

13  Q.   Now, after the meeting in August of 2010 when you were

14  given that cash payment, did you ever move drugs for any of the

15  defendants?

16  A.   Yes.

17  Q.   And could you tell us what types of drugs?

18  A.   Heroin.

19  Q.   And who provided you with that heroin?

20  A.   Well, all three of them was there.  Watson pulled up with

21  it.  I was already with Hansberry and Curly.

22  Q.   And what was your understanding of what you were supposed

23  to do with that heroin?

24  A.   Sell it and give them back some of the proceeds.

25  Q.   Where did that meeting take place?

1    A.   Voigt Park between Second and Third in Detroit.

2    Q.   Did you, in fact, sell that heroin?

3    A.   Yes, sir.

4    Q.   And do you recall how much money you received when you

5    sold it?

6    A.   What I received is what I took.  I gave them about 50,000.

7    They wanted 70,000.

8    Q.   Now, were there ever disagreements between you and -- and

9    Mr. Watson or you and Mr. Hansberry about how the money should

10   be split up?

11   A.   Well, what it was is they was trying to give me street

12   prices, and after they did their corruption to me, I really

13   didn't feel the same about them anymore.

14   Q.   Did you give them a nickname?

15   A.   Super Friends.

16   Q.   You called Mr. Hansberry and Mr. Watson Super Friends when

17   talking to other people?

18   A.   Also Curly, yeah.

19   Q.   Why did you call them the Super Friends?

20   A.   Because they always come -- Super Friends come to your

21   rescue, like comic characters.

22   Q.   Was there a time when the Super Friends helped come to the

23   rescue of -- of someone that you knew?

24   A.   True, some they did.

25   Q.   Did you ever receive information that a man, Fred Tucker,

1    was in kind of a dire situation?

2    A.    True.

3    Q.    Did Fred Tucker have a nickname?

4    A.    Deke.

5    Q.    Did Deke work for you?

6    A.    Yes.

7    Q.    Is he a runner for you?

8    A.    Yes.

9    Q.    And at some point did you receive information that Deke

10   was in trouble?

11   A.    Yes.

12   Q.    And what kind of trouble was Deke in?

13   A.    I think -- I don't know the guy personally, but it was a

14   gentleman named Dante was holding him hostage.  That -- that's

15   what he called it.

16   Q.    Where was Dante holding Deke hostage?

17   A.    In the Linwood/Dexter area.  I don't know the exact

18   street, but I -- I know I had called the police and told them

19   after I called Curly.

20   Q.    Was it someone's residence where Deke was being held?

21   A.    Yes, it was Dante's.

22   Q.    Okay.  And what was the nature of that beef?

23   A.    Well, he had went over there to buy up some marijuana, but

24   Dante also had owed him some money for a drug deal.

25   Q.    Now, when you say he, Deke?

1    A.   Yes.

2    Q.   Deke had gone over to Dante's house?

3    A.   Yes.

4    Q.   You said that Deke wanted to purchase marijuana?

5    A.   True.

6    Q.   But also there was -- there was a debt, is that right?

7    A.   True.

8    Q.   And was Deke going to collect that debt?

9    A.   Yes.

10   Q.   Was Deke collecting that debt for you?

11   A.   Yes.

12   Q.   And what did that debt relate to?

13   A.   A heroin deal.

14   Q.   And so what was it that caused Dante to hold Deke hostage?

15   A.   I guess Dante told him that it wasn't the right drugs, it

16   wasn't potent enough.

17   Q.   So Dante wasn't satisfied with the quality of the heroin

18   you provided, is that right?

19   A.   True.

20   Q.   So what means did Dante employ or use to hold Deke

21   hostage?

22   A.   A gun.

23   Q.   And how did you first learn about this situation?

24   A.   I was called.

25   Q.   And who did you speak with?

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.926   Filed 07/20/16   Page 64 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

64

1    A.   First I think it was Fred -- it was a couple of people I

2    spoke to, but Fred and Dante himself.

3    Q.   And -- and what, if anything, did Dante say he was going

4    to do to Deke?

5    A.   Kill him if he don't get his money back or you won't see

6    him again, so same thing.

7    Q.   So what, if anything, did you do when Dante threatened to

8    shoot Deke?

9    A.   I called Curly.

10   Q.   And what happened next?

11   A.   Well, I called Curly.  He told me I have to call in

12   because they not at -- he's not at work so I have to call 911.

13   Q.   So the Super Friends weren't on duty, is that right?

14   A.   No, sir, they wasn't.

15   Q.   And did you learn that although not on duty, the Super

16   Friends were able to somehow come to the rescue?

17   A.   True.

18   Q.   What did they do?

19        MR. FISHMAN:  Well, I -- I think the plural is not

20   what the witness said.  Witness is just talking about talking

21   with Curly.

22        THE COURT:  I recommend rephrasing.  Go ahead, Mr. --

23   Mr. Buckley.

24        MR. BUCKLEY:  Certainly, sir.

25   BY MR. BUCKLEY:

1   Q.   When -- when you say Super Friends, to whom were you

2   referring?

3   A.   To Curly, Watson and Mr. Hansberry.

4   Q.   And you've told us that Curly was your controlling

5   officer, is that right?

6   A.   True.

7   Q.   So he was to be your primary point of contact?

8   A.   True.

9   Q.   Do you know whether Curly advised Mr. Watson and Mr.

10  Hansberry that Deke was being held at gunpoint at Dante's

11  house?

12  A.   I really couldn't say 'cuz I just talked to him and I was

13  trying to get this situation resolved.

14  Q.   Fair enough.  You called the Super Friends, you called

15  Curly?

16  A.   Yes.

17  Q.   Did you learn -- you said that Curly said that they were

18  not on duty, is that right?

19  A.   Yes.

20  Q.   Did that mean Watson and Hansberry?

21  A.   When -- when he said they, I just -- you know, my mind was

22  just spinning because he was being held hostage against his own

23  will.

24  Q.   Was Deke rescued?

25  A.   Yes.

1    Q.   What happened?

2    A.   I called one of my nephews that stayed in the area because

3    they had took somebody else, Hook, into the house too, but he

4    had got me the address.  Then I can relay the address to the

5    police department.

6    Q.   Did the police show up?

7    A.   Yes, they did.  I think Special Tactical Squads, you call

8    them something.

9    Q.   Did you continue to deal with the Super Friends, including

10   Mr. Watson and Mr. Hansberry?

11   A.   Yes.

12   Q.   And did you continue to move drugs for them?

13   A.   Yes.

14   Q.   Did you receive money for doing that?

15   A.   No.

16   Q.   How'd that work?

17   A.   Well, whatever money that -- if they gave me something off

18   the record, I just -- I give it to Curly and meet him in

19   Southfield.

20   Q.   Now, sir, at some later point were you, in fact, signed up

21   by the FBI as a source of information?

22   A.   Yes.

23   Q.   And do you recall when that was?

24   A.   Not exactly.  If I'm -- from the FBI, I think it was

25   November.  Yeah, it was in November.

1   Q.   Of what year?

2   A.   I think it was 12.

3   Q.   And do you recall which Special Agent of the FBI was your

4   handler, who signed you up?

5   A.   Pete Lucas.

6   Q.   So it wasn't Special Agent Fitzgerald?

7   A.   No.

8   Q.   It was Pete Lucas.

9        And do you recall approximately how long you were

10  a -- a source for the FBI at that time?

11  A.   About eight months.

12  Q.   And did you ever receive a payment from the FBI for any

13  information you provided?

14  A.   No.

15  Q.   Now, around the time that you signed up as a source for

16  the FBI, were you aware of any transfers or changes in career

17  path for any of the Super Friends?

18  A.   I think -- yeah, Watson and Curly, 'cuz they was a little

19  hesitant about me going to the FBI.

20  Q.   Did you notice a change in the way you were treated by Mr.

21  Watson and Mr. Hansberry after you became an FBI source?

22  A.   Yeah.  They bagged up.

23  Q.   And had you told them that you had signed up as a source

24  for the FBI?

25  A.   Well, they knew that Curly was transferring over to -- on

1    the FBI task force, and Curly wanted to ask me did I want to

2    sign up and they was like, "No" -- well, Watson particularly --

3    "No, you don't want to do that, man."  You know, he gave me an

4    incident scenario what happened to an informant before, like

5    you guys don't care, the FBI don't care.

6    Q.  At some point you were terminated as an FBI source, is

7    that right?

8    A.  Yes.

9    Q.  And after that, did you have another deal with Mr.

10   Hansberry and Mr. Watson involving the rip of drug money from

11   someone?

12   A.  Yes.

13   Q.  And can you tell us what -- what was this supposed to be?

14   Who brought this to your attention originally?

15   A.  Deke.

16   Q.  So Deke, Fred Tucker, came to you with information, is

17   that right?

18   A.  True.

19   Q.  And -- and what did Fred Tucker tell you that he knew?

20   A.  He said he had a source that wanted the kilo of cocaine,

21   and -- and I told him about the Super Friends I had and he

22   wanted me to put them together.

23   Q.  So Fred had someone interested in buying cocaine, is that

24   right?

25   A.  Yes.

1    Q.   And do you know the name of that person?

2    A.   I don't know him particularly.  I know it's a Don, but I

3    never did know him or meet him.

4    Q.   So Don was not a friend of yours?

5    A.   Never.

6    Q.   He was a friend of Deke's?

7    A.   Yes, sir.

8    Q.   And did Deke tell you how much cocaine Don wanted to buy?

9    A.   Yeah.

10   Q.   How much?

11   A.   Key, a kilo.

12   Q.   A kilo?

13        And did Deke tell you whether Don had buy money?

14   A.   Yeah.

15   Q.   And what happened next?

16   A.   Well, I hooked him up, let him talk to Curly, and they

17   said it was a go and they just needed an area where to do it.

18   Q.   Did you talk to the defendants, Hansberry and Watson,

19   about this situation?

20   A.   I -- I really thought I talked to Curly.  I might have

21   talked to Watson just a little bit, but we really didn't talk

22   on the phone.  It was mainly Curly.

23   Q.   Okay.  Did -- did Curly tell you how the Super Friends

24   intended to handle this situation?

25   A.   Yes.

1    Q.   What did he tell you was going to happen?

2    A.   Well, put him at a particular location and then have the

3    police to come up there in their car, and then while the money

4    is being transferred from the drug dealer that Deke had over to

5    the car, they was going to make a raid like with the lights

6    coming on, and then usually that scares the drug dealer away.

7    Q.   Who then does what?

8    A.   Takes off, leaves without the money.

9    Q.   What location was picked to do this rip?

10   A.   Meyers between Six Mile and the Lodge Freeway, Popeye's

11   Chicken, right across the street from Popeye's.

12   Q.   And who picked that meet spot?

13   A.   I can't say in particular.  It could have been us, could

14   have been them, but it was somewhere quick off of -- off the

15   side; I can't be exact.

16   Q.   Now, do you know, did the rip occur?

17   A.   Yes.

18   Q.   Were you there personally at that time?

19   A.   No.

20   Q.   How do you know that the rip occurred then?

21   A.   Because I had a hotel room, a meet-up room for afterwards.

22        MR. BUCKLEY:  And Ms. Koch, if you could publish

23   Exhibit 503 please.

24   BY MR. BUCKLEY:

25   Q.   Sir, if you look on the screen before you --

1    A.   Yes, sir.

2         MR. BUCKLEY:  Could you zoom in on the top half, Ms.

3    Koch, please?  Thank you, ma'am.

4    BY MR. BUCKLEY:

5    Q.   You see there "Stay Details For Gary Jackson," is that

6    right?

7    A.   Yes.

8    Q.   At the Quality Inn?

9    A.   Yes, sir.

10   Q.   In Southfield?

11   A.   Mm-hmm.

12   Q.   Now, is that the same hotel where you received the

13   $250,000 in cash?

14   A.   Yes, it was.

15   Q.   And it says an arrival date of September 6th of 2012, is

16   that right?

17   A.   Right.

18   Q.   For a two-night stay?

19   A.   Yes.

20   Q.   Now, why, sir, had you secured that hotel room?

21   A.   So we can all get together afterwards so they can all --

22   it's a meeting spot.

23   Q.   When you say "we all," who all was going to get together?

24   A.   Hansberry, Watson, Curly, myself and Fred Tucker.

25   Q.   Do you know how much money was taken from Don?

1    A.   Approximately 40,000.

2    Q.   Now, did you go to the hotel room?

3    A.   Yes, I was at the hotel, yes, sir.

4    Q.   And did you meet with anybody there?

5    A.   Yeah.  I met with all the people I just named.

6    Q.   And was this immediately after the rip?

7    A.   True.

8    Q.   And what happened there?

9    A.   They divided the money.

10   Q.   And when you say "they," who divided the money?

11   A.   Watson, Curly, Hansberry and Deke.

12   Q.   And do you recall, were you involved in that divvying up

13   of the money?

14   A.   Well, it wasn't really my rip, it was Fred Tucker's, but

15   he had owed me some money but he gave me 10,000.  We split it

16   20/20.

17   Q.   Was that from a preexisting drug debt?

18   A.   Yeah, he had owed me.

19   Q.   And did Mr. Watson and Mr. Hansberry get some of that

20   cash?

21   A.   Yes.

22   Q.   Now, at some point, sir, you've told us you were

23   approached by Special Agents from both the DEA, an agent named

24   Ryan, and Special Agent Michael Fitzgerald of the FBI, is that

25   right?

1    A.   True.

2    Q.   And at that time did they confront you with the evidence

3    that they had put together against you?

4    A.   Yes.

5    Q.   And you've told us that you were invited to come downtown

6    and talk, is that right?

7    A.   True.

8    Q.   During that meeting, Mr. Jackson, were you made aware that

9    the DEA had had a Title III wiretap on your phone or

10   telephones?

11   A.   Yes, they told me.

12   Q.   And were you also made aware that during the course of

13   that wiretap, conversations between you and Curly had been

14   intercepted by the FBI in a federal wiretap?

15   A.   Yes.

16   Q.   Did you agree to cooperate with the FBI on a sting of

17   Curly?

18   A.   Immediately.

19   Q.   Now, whose plan was this, was this your plan or the FBI's

20   plan?

21   A.   Well, it was just to get -- to tell the truth, because

22   like I say previously, if I don't have any tape recordings to

23   explain myself, nobody's going to believe me going against a

24   federal law enforcement agent.

25   Q.   Did an FBI sting of Curly actually take place?

1    A.   Yes.

2    Q.   And were you involved in that?

3    A.   Yes.

4    Q.   And what was -- what was the -- the sting of Curly,

5    what -- what was he told was going to happen??

6    A.   That it was going to be somewhat like Don, it was a

7    meet-up, do a drug purchase.  He pull up with the lights going

8    and seize the money while the other guy flees.

9    Q.   So did you tell Curly that you were aware of someone who

10   was interested in -- in buying cocaine?

11   A.   True.

12   Q.   And where was this person coming from supposedly?

13   A.   Ohio.

14   Q.   And this was an FBI investigative ruse, is that right?

15   A.   True.

16   Q.   And how much money in -- in -- in drug proceeds was taken

17   from this man?

18   A.   40,000.

19   Q.   And after the 40,000 was taken from this man, did you and

20   Curly meet?

21   A.   Yes.

22   Q.   Now, the man in question, did you know he was actually an

23   undercover FBI agent?

24   A.   Yes, I did.

25   Q.   And where did you and Curly meet after the -- the money

```
1    was taken from the agent posing as a drug buyer?

2    A.   At the same hotel, previously met twice before.

3    Q.   At that meeting with Curly, did he give you any money?

4    A.   20,000.

5    Q.   Did you get to keep that 20,000?

6    A.   No.

7    Q.   What did you do with it?

8    A.   FBI, DEA and federal prosecutors came in and got the money

9    after he had left the room.

10   Q.   Mr. Jackson, do you know anyone named Renee Williams?

11   A.   Who?

12   Q.   Renee Williams?

13   A.   Renee Williams?  No.  No, sir.

14   Q.   Do you know a man named Richard Jones?

15   A.   No.

16   Q.   What about Nicholas Simmons, do you know Nicholas Simmons?

17   A.   No.

18   Q.   Do you know a woman named Amber Pickett?

19   A.   No.

20   Q.   Do you know Charlotte Simmons?

21   A.   No.

22   Q.   Do you know a man named Christopher Wilson?

23   A.   No.

24   Q.   Do you know a man named Derrick Warren?

25   A.   No.
```

1    Q.   What about Dwayne Browning, do you know Dwayne Browning?

2    A.   No.

3    Q.   Do you know a man named Rafael Vasquez?

4    A.   No.

5    Q.   Do you know a man named Louis Mars?

6    A.   No.

7    Q.   Do you know a woman named Sharde Mars?

8    A.   No.

9    Q.   Do you know a man named Arthur Knuckles?

10   A.   Arthur Knuckles?  No.

11   Q.   Do you know a man named Calvin Pulley?

12   A.   Calvin Pulley?  No.

13   Q.   Now, you've told us that you know Fred Tucker.  Have you

14   discussed your testimony in this case with Fred Tucker, Deke?

15   A.   No.

16   Q.   Told us that you know Calvin Turner.  Have you discussed

17   your testimony in this case with Calvin Turner?

18   A.   No.

19   Q.   You've told us that you know Curly.  Have you discussed

20   your testimony in this case with Curly?

21   A.   No.

22   Q.   Thank you, Mr. Jackson.

23          MR. BUCKLEY:  Nothing further, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          Your turn, Mr. Harrison.

1          MR. HARRISON:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. HARRISON:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   Mr. Jackson, you said you're 53 years old, is that right?

7    A.   Yes, sir.

8    Q.   Been in the drug business your entire adult life, correct?

9    A.   Wrong.

10   Q.   Okay.  Tell me what's right.

11   A.   I'll tell you it's -- it's not been my whole life.

12   Q.   How long have you been --

13   A.   I've been in trucking -- I've been trucking for 17 years

14   on and off.

15   Q.   So you're a truck driver?

16   A.   Yes.

17   Q.   And you casually dabbled in drug dealing, that's your

18   testimony to us?

19   A.   Yes.

20   Q.   Okay.  And you're -- you're a truck driver like Officer

21   Leavells is a truck driver, is that correct?

22   A.   You say what?

23   Q.   You know former Officer Leavells currently is a truck

24   driver now too?

25   A.   I didn't know that.

1    Q.   You didn't know that?  You didn't get him that job?

2    A.   No.

3    Q.   Okay.

4    A.   We haven't talked.

5    Q.   You knew he was a truck --

6              THE COURT REPORTER:  Wait, wait.  You're both talking

7    at the same time.

8              MR. HARRISON:  I'm sorry.

9    A.   I said we haven't talked.

10   BY MR. HARRISON:

11   Q.   You haven't talked?

12   A.   Yeah.

13   Q.   Okay.  And you used to lease a truck wash, right?

14   A.   True.

15   Q.   And that was to wash your trucks?

16   A.   Not my trucks, just the trucks that came in, sir.

17   Q.   And you -- just a moment.  You -- as your side job -- job

18   when you were -- weren't driving the truck, you were --

19   A.   I just didn't drive a truck, sir.  I owned beauty salons,

20   car washes too, so...  okay?

21   Q.   Okay.  This is the way it's going to work on

22   cross-examination.  I'm going to ask you questions.  I'm going

23   to try and make them so that they're yes or no questions.  I

24   ask that you answer my questions yes or no.

25   A.   Yes, sir.

1   Q.   If you can't, just let me know, okay?

2   A.   Okay.

3   Q.   That's the rules, how it works?

4   A.   No problem, sir.

5   Q.   Okay.

6          THE COURT:  Let's avoid -- you don't need to be

7   referring to the rules.

8          Go ahead, Mr. Harris.

9          MR. HARRISON:  Thank you.

10  BY MR. HARRISON:

11  Q.   Okay.  And, sir, you testified before a grand jury a

12  couple of times, correct?

13  A.   True.

14  Q.   Okay.  And you testified before a grand jury on

15  March 12th, 2015.  You remember that?

16  A.   Yes, sir.

17  Q.   Okay.

18  A.   That was the date, yeah.

19  Q.   And you testified to the grand jury, you told them that

20  you were involved in illegal distribution of cocaine, correct?

21  A.   True.

22  Q.   And you told them you were involved in the illegal

23  distribution of heroin, correct?

24  A.   True.

25  Q.   And you were involved in the illegal distribution of

1  marijuana, correct?

2  A.  True.

3  Q.  And you remember being asked that you would -- about how

4  many pounds of marijuana on average would be picked up?  You

5  remember being asked about that?

6  A.  Well, yeah, I was asked about it, yeah.

7  Q.  Okay.  And do you recall saying that, on average, what

8  would be picked up from you or your organization was 50 to a

9  hundred pounds a day?

10  A.  No.

11  Q.  No?

12       Directing your attention to line 15 -- I'm sorry,

13  page 15.

14  A.  You did say a day, right, sir?

15  Q.  I'm sorry?

16  A.  You said a day, right?

17  Q.  They?

18  A.  You said a day?

19  Q.  A -- a day.

20  A.  Okay.

21  Q.  A day.

22  A.  Okay.

23  Q.  Okay.  Well, what would be right, to your recollection,

24  how much marijuana would --

25  A.  I said I might have picked up 150 pounds at a time.

1    Q.   At a time?

2    A.   Not every day.

3    Q.   Okay.  You remember being asked this question:  "And you

4    say some pounds of marijuana.  Can you approximate the average

5    weight of the marijuana that he would pick up for you to

6    distribute?"  And you saying, answering, "About 50 to a hundred

7    pounds."

8    A.   Okay.

9    Q.   You remember that?

10   A.   Yes.

11   Q.   That sound right?

12   A.   Yeah.

13   Q.   Okay.  And then you were asked the question, "50 to a

14   hundred pounds each day?"  And you gave the answer, "Not each

15   day but in the course of, say, a month, something like that."

16   A.   True.

17   Q.   Okay.  So you were involved in the distribution of 50 to

18   150 pounds of marijuana a month, would that be fair?

19   A.   On and off, yeah.

20   Q.   Okay.

21   A.   Wasn't nothing regular.

22   Q.   Okay.  And about five to ten kilograms of cocaine a month,

23   right?

24   A.   True.

25   Q.   And four to five kilograms of heroin -- of heroin a month?

1    A.    True.

2    Q.    Right?

3    A.    Yes, sir.

4    Q.    Okay.  So this was, in your words, a part-time operation

5    you were involved in?

6    A.    Well, it wasn't all the way consistent every day.

7    Q.    Insignificant?

8    A.    Well, all I can say is it wasn't every day, sir.

9    Q.    You made more money in your legitimate businesses, that's

10   your testimony?

11   A.    No, I wouldn't say that.  I wouldn't say that, sir.

12   Q.    Okay.  So you'd agree with me that you made more money

13   dealing drugs than you did in any legitimate business you may

14   have been involved in, fair enough?

15   A.    True.

16   Q.    Okay.  And, in fact, sir, you were the leader of an

17   organized group of people who were involved in the

18   distribution, correct?

19   A.    I wouldn't call two or three people a group.  Just --

20   Q.    Okay.

21   A.    All right.

22   Q.    Fred Tucker worked for you, Deke, right?

23   A.    Okay.

24   Q.    Right?  Yes?

25   A.    Yes.

1   Q.   Okay.  And William Campbell, AKA Dub, worked for you,

2   correct?

3   A.   No.

4   Q.   Okay.  And Tony Anderson, Little Tone, he worked for you,

5   right?

6   A.   True.

7   Q.   Okay.  And Johnny Metcalf, AKA Hook, he worked for you,

8   correct?

9   A.   Not all the time.

10   Q.   Not all the time he worked for you?

11   A.   No.

12   Q.   Just part-time?

13   A.   Yeah.  And Tony Anderson.

14   Q.   How about Orlando Perez?

15   A.   No, he hasn't worked for me.

16   Q.   Never worked for you.

17          Okay.  And Calvin Turner?

18   A.   No, he haven't worked for me.  He worked for theirselves.

19   Q.   But you worked together, correct?

20   A.   Very minor.  Very minor.

21   Q.   Very minor.

22          You're -- you -- the prosecutor asked you if you were

23   aware of the fact that there were Title III wiretaps of your

24   phone.

25   A.   Yes.

1   Q.   And you said yes.

2   A.   Yes.

3   Q.   Okay.  You'd agree that you talked to Calvin Turner every

4   day during the time at least that that wiretap was up, right?

5   A.   No, I wouldn't say every day, sir.

6   Q.   You wouldn't say every day.

7        How often do you recall talking to Calvin Turner?

8   A.   The last 17 months before this happened, we had just had

9   occasional talk.  We wasn't even talking.  The friendship had

10  spreaded apart, sir.

11  Q.   You and Calvin Conner (sic) --

12  A.   Yeah, he was --

13  Q.   -- had distanced yourself?

14       THE COURT REPORTER:  Wait, wait.  One at a time.  I

15  can't take both of you talking at the same time.

16       THE WITNESS:  Oh, okay.

17  BY MR. HARRISON:

18  Q.   You distanced yourself?

19  A.   Yes.  He had new friends.

20  Q.   He was a friend of yours since childhood, correct?

21  A.   Yes.

22  Q.   And he was involved in the distribution of marijuana,

23  correct?

24  A.   Well, not so much with me.

25  Q.   You were aware that he was involved in the distribution of

1    marijuana, correct?

2    A.   Well, that's his business.  I don't really have nothing to

3    do with that.

4    Q.   The question is were -- were you aware that Calvin Turner,

5    Pretty Tony, sold marijuana, yes or no?

6    A.   Yes.  Yes.

7    Q.   Okay.  Were you aware that Calvin Turner sold cocaine?

8    A.   Again, sir, you -- I don't know what he did in his last

9    17 months.  It was very minor with me before time.  I'm just

10   being correct with you.

11   Q.   Okay.  Well, I'm taking you back to May of 2014.  You were

12   aware that Calvin Turner was selling cocaine, heroin, marijuana

13   in May of 2014, correct?

14   A.   Well, that's what -- I was not a part of it so I'm telling

15   you where the friendship had already dissolved.  I couldn't

16   tell you what he was doing every day.  I'm just being honest,

17   sir.

18   Q.   So fair enough.  I'd like you to be honest.

19   A.   Okay.

20   Q.   Okay.  So your answer to my question is no, you were not

21   aware that Calvin Turner was dealing in those drugs during that

22   time period?

23   A.   I didn't -- well, like I say, I don't know all, but he

24   could but he wasn't -- we wasn't involved, sir.

25   Q.   You weren't involved?

```
 1    A.   Right.
 2    Q.   You didn't have conversations about what was coming in,
 3    how much it was going to cost?
 4    A.   Probably had conversations, but as far as him selling it
 5    direct, sir, I can tell you no, I don't know.
 6    Q.   Okay.  And --
 7              MR. HARRISON:  Moment, Your Honor?
 8              THE COURT:  Yep.  Yes, sir.
 9              MR. HARRISON:  Thank you.
10              (Brief pause)
11    BY MR. HARRISON:
12    Q.   And when was it that you said your relationship with Mr.
13    Turner drifted apart?
14    A.   About 17 months.
15    Q.   Seventeen months from when?
16    A.   Before this incident happened with me.
17    Q.   This incident, meaning when you were arrested?
18    A.   Yes.
19    Q.   Okay.  And -- but you do -- you do agree that the other
20    persons that we just talked about, with the except --
21    exception -- that -- that -- Frederick Tucker, William
22    Campbell, Johnny Metcalf, at least were employees of yours in
23    your drug organization, right?
24    A.   You said employees?
25    Q.   Who worked for you.
```

1    A.   No, William Campbell never worked for me.

2    Q.   Oh, but he --

3    A.   We might have worked together but -- okay?

4    Q.   Worked together.

5         And you entered into a cooperation with the --

6    agreement with the government where you agreed to testify

7    against these men, correct?

8    A.   True.

9    Q.   And that included Calvin Turner, didn't it?

10   A.   Yes.

11   Q.   Okay.  And you agreed to testify to them about the

12   operations that you had -- you with those people regarding a

13   narcotics conspiracy, correct?

14   A.   Yeah.  It's previous times with Calvin Turner, yeah, but

15   it wasn't nothing in that 17 months.

16   Q.   Nothing in that 17 months?

17   A.   Nothing that I can recall --

18   Q.   But you --

19   A.   -- that we --

20   Q.   -- but you --

21        THE COURT REPORTER:  Wait.

22   A.   We were spreaded apart, sir.

23   Q.   I -- I know.  You've been --

24   A.   Okay.

25   Q.   -- wanting to make that very clear.

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.950   Filed 07/20/16   Page 88 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

88

1    A.   All right.  Okay, sir.

2    Q.   But you did enter into an agreement with the government --

3    A.   Right.

4    Q.   -- where you agreed that you had conspired with all these

5    men to distribute --

6    A.   Yes --

7    Q.   -- narcotics, correct?

8    A.   -- because it goes back to 2010, sir, yes, it does.

9    Q.   Okay.

10   A.   Yes, I did.

11   Q.   So yes is your answer?

12   A.   That's what I just said, sir.

13   Q.   Okay.  And you were the leader of this conspiracy,

14   correct?

15   A.   I was the leader of Fred Tucker, Hook and a part of Tony

16   Anderson before he left, but no leaders between the other two.

17   Q.   No leadership with the other two.  Okay.

18        MR. HARRISON:  Maria, can we please get his Rule 11

19   agreement please?

20   BY MR. HARRISON:

21   Q.   Sir, I'm going to direct your attention to Exhibit 1100.1,

22   page 20.

23   A.   Okay.

24   Q.   The bottom of the page.

25        This was a worksheet that you went -- you went over

1   this worksheet with your lawyer as part of your Rule 11

2   Agreement that you signed, right?

3   A.   Okay.  True.

4   Q.   Okay meaning yes, true?

5   A.   Yes.

6   Q.   And you agreed that you were assigned four points as the

7   organizer or leader, didn't you?

8   A.   True.

9   Q.   Okay.  You went over that with your attorney before you

10  signed it, right?

11  A.   Mm-hmm, right.

12  Q.   And the government explained it to you, right?

13  A.   True.

14  Q.   Okay.  In fact, your -- your -- your attorney's here in

15  court today, isn't he?

16  A.   True.

17  Q.   Okay.  And so you'd agree with me that you agreed with the

18  government that you were the leader?

19  A.   And I've told you with who, sir.

20  Q.   And you what?  I'm sorry.

21  A.   I told you with who.

22  Q.   And you told me with who?

23  A.   That's Deke, Hook and Little Tone.

24  Q.   Okay.  All right.

25  A.   Took responsibility for that.

1  Q.  Okay.  And you told us that you had been previously

2  convicted of Carrying a Concealed Weapon, right?

3  A.  1985, sir.

4  Q.  1985?

5  A.  Mm-hmm.

6  Q.  And, in fact, on the day that you were stopped by the FBI

7  and the DEA, pulled over, over I think you said West

8  Bloomfield, right --

9  A.  Yep.

10 Q.  -- you had a 9mm handgun on you --

11 A.  True.

12 Q.  -- that day, right?

13 A.  True.

14 Q.  Okay.  And you're a convicted felon, right?

15 A.  True.

16 Q.  And you knew you couldn't be in possession of a firearm,

17 right?

18 A.  True.

19 Q.  You know that's actually a federal offense to have a gun

20 if you're a convicted felon, right?

21 A.  You're explaining it to me now, sir.

22 Q.  Okay.  You never knew that before?

23 A.  No.  I just -- if it was -- you got stopped by Detroit

24 Police, I just thought it would be a state case.

25 Q.  Mm-hmm.  Okay.  And you know that's a state felony too,

1    right, Felon --

2    A.   Okay.

3    Q.   -- in Possession of a Firearm?

4    A.   Yep.

5    Q.   Okay.  And you were never charged with that by the federal

6    government, were you?

7    A.   No, sir.

8    Q.   Because you immediately agreed to cooperate, right, that's

9    your understanding?

10   A.   Yes, sir.

11   Q.   Okay.  And you had also been previously convicted of, you

12   said, just the marijuana charge?

13   A.   Yes, sir.

14   Q.   Okay.  That was possession with intent to distribute

15   approximately 500 pounds of marijuana, correct?

16   A.   No, sir.  It was 68.

17   Q.   Sixty-eight pounds?

18   A.   Yes, sir.

19   Q.   Okay.  And when you got the prior concealed weapon charge,

20   you never went to prison, right?

21   A.   No, sir.  That was so long ago, sir.

22   Q.   So the answer is, "No, I did not"?

23   A.   Right.

24   Q.   Okay.  And when you got pulled over and charged with

25   possession with intent to deliver 68 pounds of marijuana, you

1   didn't go to prison for that either?

2   A.   No.  They came in at my brother's house.  I didn't even

3   live here; I lived in Atlanta.

4   Q.   Uh-huh.  Okay.  So your answer is, "No, I did not go to

5   prison for that"?

6   A.   True.

7   Q.   Okay.  And, in fact, you had never gone to jail or prison

8   for any extended period of time in your entire life, correct?

9   A.   True.

10  Q.   Okay.  And when do you say that you got involved in the

11  narcotics business?

12  A.   I never did say when, sir.

13  Q.   Well -- well, please, will you tell us?

14  A.   I don't know.  It's been dibbling and dabbling since I

15  been -- I don't -- I guess in the 20s, and I'm out of it and go

16  to work and go back and -- occasionally; it wasn't permanently.

17  Q.   Okay.  So when I previously asked you if you had been

18  involved in drug -- in the drug business your entire adult

19  life --

20  A.   And I said no.

21  Q.   -- and you said no, but now you're saying you dillied and

22  dallied in it since your 20s, right?

23  A.   Yeah.

24  Q.   Okay.  And you're 53 now?

25  A.   True.

1    Q.   Okay.  So for 33 years you've been involved in --

2    A.   I wouldn't say --

3    Q.   -- narcotics?

4    A.   Sir, we had a trucking company from 2000 to 2007 and 8.

5    You can check.  We was making $400,000 a year.  I didn't do no

6    dilly-dallying in 2003.  I went to visit my brother, sir.

7    Q.   Been a trucking company since when was that?

8    A.   1999 to be exact when I started.

9    Q.   Long haul or short haul?

10   A.   Whatever it took.

11   Q.   Whatever it took.

12        Is that how you met the Mexican cartel people?

13   A.   No, sir.

14   Q.   What did you ship?

15   A.   You say what?

16   Q.   What did you ship in the trucks?

17   A.   I shipped commodities, sir, of Ms. Fields cookies, frozen

18   foods.  I had an account with Ms. Fields for one of them,

19   frozen food company out of New Jersey --

20   Q.   Okay.

21   A.   -- and anybody that I can get hired for for doing it, just

22   food, no drugs.

23   Q.   No drugs?

24   A.   None.

25   Q.   Never hauled -- never hauled drugs?

1    A.   Never.

2    Q.   Okay.  And I want to take -- I want to take you back to

3    this money seizure, okay, that we've talked about, the truck

4    that came out of your truck wash, all right?

5    A.   Go ahead.

6    Q.   Okay.  So you found out that millions of dollars in money

7    was going to be transported or transferred to the Mexican drug

8    cartel, right?

9    A.   Well, I knew -- excuse me -- I knew about it, sir, 'cuz I

10   got the wash for that particular reason, sir.

11          THE COURT REPORTER:  I'm sorry, you got the what?

12          THE WITNESS:  The wash, at the least the truck wash

13   for that particular reason, sir.

14   Q.   You -- you had the truck wash for the purpose of unloading

15   and distributing kilos of narcotics, right?

16   A.   Yeah.  It was only one time, sir.  Yes, sir.

17   Q.   It was only one time?

18   A.   Yes, for that wash, yes.

19   Q.   Okay.  So you're telling us that the only time that that

20   truck wash was ever used for narcotics was that one time?

21   A.   True.

22   Q.   Okay.  And you knew that all this money was coming in the

23   truck wash, right?

24   A.   Yes.

25   Q.   And how is it that you knew that the money was coming into

1    the truck wash?

2    A.   Because I talked to the SAs and I was a part of it, sir.

3    Q.   You were a part of it?

4    A.   Yes.

5    Q.   And when you say SAs, you're referring to the cartel

6    members?

7    A.   Yes.

8    Q.   Okay.  What does SA mean?

9    A.   Spanish Americans.

10   Q.   Okay.  And is it your testimony that it was their money

11   that was coming in?

12   A.   Yes.

13   Q.   From who?

14   A.   From -- from selling the drugs, sir.

15   Q.   From selling the drugs.

16   A.   Right.

17   Q.   From the Mexicans selling the drugs?

18   A.   No.  Well, the Mexicans took a part of it and I took a

19   part of it.

20   Q.   So your testimony --

21   A.   Fifty-fifty.

22   Q.   -- so your testimony is that the money, the millions of

23   dollars, was half yours and half the Mexicans?

24   A.   Well, it was their money that was coming back to 'em that

25   I had went out there and made for 'em.

1    Q.   So you made half of the millions of dollars, either 2 --

2    A.   1.5 and they made 1.5.

3    Q.   They made 1.5?

4    A.   Yes, sir.

5    Q.   Okay.  No one else was involved in that, that's your

6    testimony?

7    A.   What do you mean, sir?

8    Q.   No other parties were involved in that?

9    A.   There was other parties involved.

10   Q.   And who were they?

11   A.   I can't explain, give you all their names --

12   Q.   Why don't you --

13   A.   -- because I don't --

14   Q.   -- just give us the main names.

15   A.   -- I mean because I don't know.

16        THE COURT REPORTER:  Wait, wait, wait.  You've got

17   to -- I can only take one of you at a time.  So let him finish

18   his question --

19        THE WITNESS:  Okay.

20        THE COURT REPORTER:  -- and then you answer.

21        THE WITNESS:  Okay.

22   A.   Go ahead.

23   Q.   Who were the primary names?

24   A.   The primary names was Tony Anderson, Fred Tucker, then I

25   know nicknames, Lace, School and L.

1    Q.   Lace, School --

2    A.   And L.

3    Q.   -- and L?

4    A.   Yep.

5    Q.   So the money was yours, it was these cartel guys, whoever

6    they are, and it was Tone Anderson, Fred Tucker, Lace, School

7    and L?

8    A.   Yeah.

9    Q.   That was all their money?

10   A.   No, it wasn't all their money.  That's -- you said who

11   helped me make the money, sir.  Which one is it?

12   Q.   Well, we can ask them one at a time so we make sure we get

13   it right.

14   A.   Okay.

15   Q.   Whose money was it?

16   A.   It was the cartel's money, sir.

17   Q.   It was going to the cartel?

18   A.   Yes.

19   Q.   And where was it coming from, who?  Let me rephrase.  Who

20   was it coming from?

21   A.   It was coming from the guys who helped me sell it.

22   Q.   From the guys who helped you sell it, and those --

23   A.   On this side, yeah.

24   Q.   -- and those are the people that you just listed?

25   A.   Yeah.  Could have been others too.  I don't -- wasn't

1    around.

2    Q.   Okay.

3    A.   We just distributed it, sir.

4    Q.   Okay.  So you distributed the proceeds of this.  You said

5    it was -- you said it was --

6    A.   Are you saying proceeds for the money or the cocaine,

7    which one, sir?

8    Q.   Okay.  Well, let's -- let me ask you another question so

9    that we're crystal clear here, okay?  You told us that a

10   hundred kilos of cocaine came in from the Mexicans, correct?

11   A.   Yes.

12   Q.   Okay.  And that came into the truck wash that you were

13   leasing, correct?

14   A.   True.

15   Q.   And is it your testimony that half of that hundred kilos

16   went to you and your organization?

17   A.   I wouldn't call it a organization, but, yes, half of it

18   came to me.

19   Q.   And the other half, your testimony is, the Mexicans

20   carried on with?

21   A.   True.

22   Q.   Okay.  And you and your people sold 50 kilos of cocaine?

23   A.   True.

24   Q.   Correct?

25          And then returned with how much, 1 -- you're saying

1    $1.5 million in cash?

2    A.   Yes.

3    Q.   Okay.

4    A.   Not to the wash because 10 days before the money was

5    already accounted for and pushed over to the cartel.

6    Q.   Okay.  And so you gave the $1.5 million to the cartel some

7    days before the day the money was forfeited?

8    A.   True.

9    Q.   Okay.  And then you knew that the money was going to come

10   back through the truck -- truck wash to be what, loaded onto

11   the truck?

12   A.   True.

13   Q.   Okay.  And you were present, right?

14   A.   True.

15   Q.   And who else was present?

16   A.   The gentlemens I just named, sir, except -- except Fred

17   Tucker.

18   Q.   Except Fred Tucker?

19   A.   Fred -- Fred Tucker.  And it was also the cartel.  It was

20   Fat SA I call him, it was another cartel guy and two more.  The

21   guys had a .38 and a .45.  I haven't saw 'em before.  They're

22   coming to protect the money.

23   Q.   They're armed with a .38 and a .45, pistols?

24   A.   Yes, sir.

25   Q.   Okay.  And Tone Anderson was there?

1    A.    True, watching the truck.

2    Q.    But Fred Tucker wasn't there?

3    A.    Nope.

4    Q.    Okay.  And the money was laid out on a table, right?

5    A.    True.

6    Q.    And what was done with it, if anything?

7    A.    Well, it was two sides of the building, sir:  One side

8    where the truck wash and it's another side where it's a pool

9    table, and the other tables sit up there like a little hall

10   area so it's a sitting hall, and the money was transferred out

11   the PT Cruiser and the other vehicle right onto the table and

12   they laid everything out.

13   Q.    And who laid it out?

14   A.    The SAs, cartel.

15   Q.    The cartel laid it out?

16   A.    Mm-hmm.

17   Q.    And when you saw it, was it already marked with markings

18   on -- on it?

19   A.    First -- first the cart -- the money was just there.  Then

20   I guess they put it into the bags.

21   Q.    You guess or you know?

22   A.    No, I know.  Well, they did put it into the bags.

23   Q.    Okay.  You saw them put it in the bags?

24   A.    Okay.

25   Q.    Did you?

1    A.   Yeah.

2    Q.   Yes?

3    A.   Yeah.

4    Q.   Okay.  And were these bags already marked?

5    A.   I think they was marking them at the time.

6    Q.   Okay.

7    A.   I wasn't really trying to stare what they was trying to

8    do, sir.  It's two sides of the building and I already knew

9    that -- what I had planned.

10   Q.   So your testimony is that you were on one side of the

11   building and they were on the other?

12   A.   Well, in that particular time.  You want me to be exact?

13   Q.   I do.

14   A.   Okay.  And that's exactly what I'm saying.

15   Q.   That's exact?

16   A.   Right.

17   Q.   Okay.  So to be exact, you don't know how the money was

18   bagged because you weren't there, right?

19   A.   Go ahead.

20   Q.   Being exact.

21   A.   Yeah, I go with you saying that.

22   Q.   Okay.  And you don't know how the money was marked, being

23   exact, right?

24   A.   Yeah, because they was marking it.  Go ahead.

25   Q.   Okay.  And being exact, you don't know how much money was

1    actually loaded into the truck?

2    A.   Wrong.

3    Q.   Wrong.

4         You know how much money was loaded into the truck?

5    A.   I said I didn't see them packaging the money.  I didn't

6    say I didn't see how much money it was.

7    Q.   So you came back from the other side of the truck stop and

8    you watched and you counted all the money that was loaded into

9    the truck, is that your testimony?

10   A.   Sir, when they took it out and when they brought it and

11   when we delivered it, I saw the 3 million beforehand.  Well,

12   I'm not saying right from there, but I knew 1.5 and 1.5 is 3

13   million.  At the same time the cartel told me we finished.  So

14   when you finished, if you had a hundred kilos at $30,000 a

15   piece, that's $3 million.  So at the same time when we give it

16   to them 10 days before time, that's one half, and then when

17   they finish, we got the other half, we have 3 million.  So when

18   they brought it to the wash, they already -- well, that's the

19   3 million right here.

20   Q.   I understand the math and I understand what you say you

21   were told, but you never counted this money, correct?

22   A.   I didn't count -- I didn't count their half, sir, but

23   before that truck to come in to be picked up, I know all the

24   money had to be there, sir.  It wasn't no shorts to this.

25   Q.   Mm-hmm.  I understand what you say you knew.  I'm asking

1    you, because we're being exact, what you actually saw and what

2    you actually did, fair?

3    A.    Fair.

4    Q.    Okay.  You didn't count the money, right?

5    A.    I didn't count every dollar.

6    Q.    You didn't see it bagged?

7    A.    They bagged it, but I saw the money delivered, the 3

8    million.

9    Q.    You saw that there was money put on the truck, is that

10   what you're telling us?

11   A.    I -- yes, that the bags was put in there, yeah.

12   Q.    Okay.  And you told us that you were on the other side of

13   the truck wash for a period of time when this all was going

14   down, correct?

15   A.    At the same time, sir, I told you I just didn't see them

16   put it in the bag and put this label on there in sequence.

17   Q.    And there was another time when you'd already told us that

18   you went to the Burger King which was across the street,

19   correct?

20   A.    Yeah, around the corner, around the bend, yes.

21   Q.    So you weren't 24-7 with that money when those people were

22   there, right?

23   A.    Just the times that I was from one side to the other, sir.

24   Q.    Mm-hmm.  And there were guys from the cartel there when

25   you weren't there at times, correct?

1   A.   Yes.

2   Q.   And there was Tone Anderson there, your guy, right?

3   A.   True.

4   Q.   And there was Lace, School and L that were there?

5   A.   Yeah.

6   Q.   Right?

7   A.   Yes.

8   Q.   And those people were all there at times when you weren't

9   there, we can agree on that, right?

10  A.   True, sir.

11  Q.   Okay.  And --

12  A.   But the money couldn't be delivered if it wasn't the

13  correct amount, sir.

14  Q.   Oh, I understand that.  That's why it had to be stopped by

15  the police, right, Mr. Jackson?

16  A.   Mm-hmm.

17  Q.   Exactly.  Now, if something had happened, if you had

18  somehow tried to get this money yourself and it was in your

19  possession, you would have been held accountable by the cartel,

20  right?

21  A.   True.

22  Q.   And that would have been serious business, wouldn't it

23  have?

24  A.   True.

25  Q.   And while that truck was in the truck wash, it was your

1    responsibility, right?

2    A.   No.  It was the head cartel's responsibility, sir, that

3    they sent from Mexico and the head one in Michigan.

4    Q.   If something went down at that truck wash --

5    A.   It was on them.

6    Q.   -- it was on them?

7    A.   Right.

8    Q.   Okay.  Sir, do you remember when you -- being --

9    testifying at the grand jury and being asked this question?

10            MR. BUCKLEY:  Which date, Mr. Harrison, please?

11            MR. HARRISON:  Date, March 18th, 2015, page 14, line

12   11.

13            MR. BUCKLEY:  Thank you, sir.

14   BY MR. HARRISON:

15   Q.   Remember being asked the question, "Was the plan for them

16   to swoop in and raid the truck wash?"  And you giving the

17   answer, "No.  I didn't want that because there would have been

18   other individuals involved in that, and then with the cartel,

19   you got to understand that you're responsible for the money

20   while it's in your hands so you're responsible."  You remember

21   being asked that question and giving that --

22   A.   Yes.

23   Q.   -- answer to the grand jury?

24   A.   Yes.  But when the cartel was there, sir, you got to

25   understand, they was the overseers.  I'm just there.

1  Q.  Okay.  Did you ever tell the grand jury about the

2  overseers that you say were there?

3  A.  What do you mean, sir?

4  Q.  You ever testify about that to either grand jury you

5  talked to?

6  A.  What do you mean?  I mean tell me some more.  I'm -- I'm

7  not understanding you right now.

8  Q.  You're not understanding the question?

9  A.  True.

10  Q.  Okay.  So let me see if I can ask it differently.  Did you

11  ever say that there were cartel overseers at the truck wash to

12  either grand jury that you testified to?

13  A.  I don't know exactly, but I already know that I already

14  mentioned that, regardless that they was there.  That's the

15  only way it can be run.  They had the money, sir.  They had to

16  bring it in.

17  Q.  Okay.  And that's important that they were there because

18  otherwise, you and your people would have been in a position

19  where you could have stolen some of the money off the top and

20  then later blamed it on those dirty police officers.

21  A.  You know --

22  Q.  Right?

23  A.  -- you know what?  I don't understand what you're trying

24  to put me to, but at the end of the day, it was on them.  I

25  know what I did for the police to do the rip, but at the end of

1    the day, it wasn't in my possession.  The millions was in their

2    possession that they had to bring, sir.  So --

3    Q.   So --

4    A.   -- they're responsible.

5    Q.   -- is that a yes --

6    A.   Once it got on that truck, once it got on that truck, none

7    of the people from Michigan or the cartel.  Now it's on the

8    driver.

9    Q.   -- or no?

10   A.   Are you saying what?

11   Q.   Was that a yes or no?

12   A.   Because --

13            THE COURT:  Well, you asked him an argumentative,

14   open-ended question and I think he could explain beyond yes or

15   no.

16            Let's move on.

17   BY MR. HARRISON:

18   Q.   Sir, we heard a tape-recorded call that you gave the

19   government.  By the way, when did you give the government that

20   tape-recorded call that we heard this morning?

21            MR. BUCKLEY:  Judge, I -- I object to the form of the

22   question.  That --

23            THE COURT:  Sustained.

24            MR. BUCKLEY:  Thank you.

25            THE COURT:  Let's take our midday break.  It's 11:28.

1    Let's try to make this compressed, ladies and gentlemen.  Let's

2    start lining up at about 11:50 and we will -- we'll try to be

3    back here before noon and -- and get this moving along.

4            Let's all rise for our jurors please.

5            (Whereupon the jury was excused at 11:28 a.m.)

6            (Court in recess)

7            (Proceedings resumed at 11:56 a.m., all parties

8            present)

9            (Whereupon the jury entered the courtroom at

10           12:01 p.m.)

11           THE COURT:  Okay.  Our jurors are back, witness is

12   back.  Everybody may be seated.

13           It's noon, ladies and gentlemen.  We'll try to stay

14   on schedule and go til -- til 2:00 with one more break and then

15   we'll adjourn til tomorrow morning.

16           MR. HARRISON:  May I continue, Your Honor?

17           THE COURT:  Yes, please do.

18           MR. HARRISON:  Thank you.

19           THE COURT:  Thank you.

20           MR. HARRISON:  Thank you.

21   BY MR. HARRISON:

22   Q.  Okay.  Mr. Jackson, this -- before we broke, you and I

23   were having some difficulties, all right?  So what I want to

24   promise you is I'm going to let you finish your answer, all

25   right?  I'd ask that you afford me the same courtesy, let me

1  finish my question, and we'll try and get through this easier

2  and give Linda an easier time making a record, okay?  Is that

3  fair?

4  A.  Yes, sir.

5  Q.  Okay.  All right.  Sir, when we broke, I had asked you a

6  question and I had misspoke.  I asked you when you gave the

7  government a copy of the recorded phone call.  What I meant to

8  ask you is when did you give the government the copy that you

9  had of the recording of the meeting that you had with Sergeant

10  Hansberry and Watson and other members of the police department

11  where they paid you the $250 premium bonus payment?

12  A.  It was earlier this year, sir.

13  Q.  Earlier this year?

14  A.  Yes, sir.

15  Q.  Okay.  2016?

16  A.  Yeah.  Yes, sir.

17  Q.  Okay.  And you had been initially stopped and -- and spoke

18  with the federal agents back on June 25th, 2014, right?

19  A.  July.

20  Q.  July?

21  A.  Yeah.

22  Q.  Okay.

23  A.  2000 --

24  Q.  I -- okay.  I -- so you gave -- and you met with them

25  since then numerous times, correct?

1    A.   Yes, sir.

2    Q.   All right.  And you've given statements to FBI agents on

3    more than one occasion, correct?

4    A.   True, sir.

5    Q.   Okay.  And you -- you only mentioned this recording

6    existed this year in 2016?

7    A.   No.  When I was stopped, sir, I know I had a recording.  I

8    just couldn't find it, I misplaced it.  It was a CD and it was

9    placed under Blue Jay Z.  So I have moved three times --

10   Q.   Mm-hmm.

11   A.   -- but was trying to find it, so my wife found it one day.

12   Q.   Okay.  And one day this year, 2016?

13   A.   Yeah, earlier this year, sir.

14   Q.   Okay.  And you -- you told us that you recorded the police

15   officers because you -- you -- you felt that you couldn't trust

16   them, correct?

17   A.   True.

18   Q.   Okay.  And you told us that after this money seizure

19   incident, there were other occasions where you met with them,

20   correct?

21   A.   True.

22   Q.   And you told us that -- and one occasion you met with my

23   client and Mr. Watson and Mr. Leavells at a park in Detroit,

24   Voigt Park I think, right?

25   A.   Several times.

1    Q.   Several times?

2    A.   Mm-hmm.

3    Q.   And you told us that they provided you with heroin to

4    sell, correct?

5    A.   On occasions, yeah.

6    Q.   On occasions.

7    A.   At times, yes.

8    Q.   Okay.  More than once?

9    A.   No.  I'm just saying right there, yeah.  I'm not saying

10   every time we met they gave me drugs or anything.  We talked.

11   Q.   Okay.  Well, I'm referring specifically to the time you

12   told us about on -- you told the prosecutor about where you met

13   at Voigt Park I think, right?

14   A.   Voigt park, yes, sir.

15   Q.   And you told us that they provided you -- someone provided

16   you heroin that day, right?

17   A.   Not someone.  They provided me and Watson pulled up with

18   it.  It was one kilo and I think 300 to 400 grams in a private

19   package.

20   Q.   Okay.  And -- and you met at the park for purposes of

21   handing off this kilo to you to sell, correct?

22   A.   Yes.  That was our meeting spot, sir.

23   Q.   Okay.  And then you told us about another time where your

24   associate, Fred Tucker, Deke, worked with these officers and

25   Officer Leavells to set up a guy named Don, correct?

1    A.   True, sir.

2    Q.   And your involvement, though you weren't there, was you --

3    you were part of it directly?

4    A.   I put them together, sir.

5    Q.   Okay.  Remember, I -- we'll -- let's --

6    A.   Oh --

7    Q.   -- just try and pause --

8    A.   Okay.

9    Q.   -- just for her sake.

10   A.   All right.  Okay.

11   Q.   Okay.  So you put Don -- or, I'm sorry, Deke, Fred Tucker

12   together with the police for purposes of robbing this Don

13   person of his money, correct?

14   A.   True.

15   Q.   And part of the plan was to provide this Don person with

16   fake cocaine, that's what your testimony is?

17   A.   Well, that's what it was supposed to do.  He was supposed

18   to take the 40,000, purchase a brick from whoever was pulling

19   up, so that was either Curly, Watson or Hansberry, one of them,

20   and they was supposed to pull up with the police car with

21   the -- going, and, you know, while Deke went from one car.

22   This was explained to me.  I wasn't there, sir.

23   Q.   Right.

24   A.   Okay.

25   Q.   You were at the hotel, right?

1    A.   Yes, sir.

2    Q.   And Mr. Buckley showed you a receipt I think of a hotel

3    room?

4    A.   True.

5    Q.   And that was the hotel room that you -- you got, right?

6    A.   Yes, sir.

7    Q.   And the purpose you say of you getting that hotel room was

8    to split up the proceeds?

9    A.   True, sir.

10   Q.   Okay.  And you were there for that part, right?

11   A.   Yes, sir.

12   Q.   Okay.  And this was involving the same three police

13   officers that were involved you say in the Voigt Park heroin

14   exchange, right?

15   A.   True.

16   Q.   And the same police officers that you met with after the

17   seizure of the truck money, correct?

18   A.   After the seizure of the truck money?  No, sir.

19   Q.   When you received your --

20   A.   I -- go ahead.

21   Q.   I --

22   A.   Go ahead.  Sorry about that.

23   Q.   I don't want to get yelled at by her.

24   A.   All right.  We both don't.

25   Q.   Okay.

```
 1              THE COURT REPORTER:  You're going to also.
 2              THE WITNESS:  All right.
 3   Q.   Okay.  So say it again so I've got it clear please, your
 4   answer.
 5   A.   You said after the seizure.  The hotel after the seizure
 6   was in Romulus where I was waiting for him, not in -- on
 7   Telegraph in Southfield.
 8   Q.   Different hotel room?
 9   A.   Not room; location altogether, sir.
10   Q.   Fair enough.  Same three?
11   A.   Yeah.
12   Q.   Okay.  All right.  Sir, did you turn over recordings of
13   the Voigt Park incident or the meeting after the rip-off of Don
14   to the government?
15   A.   I didn't have any, sir.
16   Q.   You didn't have any?
17   A.   This was six years ago.
18   Q.   You didn't make it.  Okay.
19              Even though you told us that you already didn't trust
20   them so much that you recorded them the first time, you didn't
21   bother to make them --
22   A.   Well, sir --
23              THE COURT REPORTER:  Wait.  I didn't hear that last
24   part.
25              THE WITNESS:  Go ahead.
```

```
 1              THE COURT REPORTER:  "You didn't bother to make

 2   them..."

 3   BY MR. HARRISON:

 4   Q.   Make recordings on the subsequent meetings?

 5   A.   The reason why I didn't --

 6   Q.   Well, my question was did --

 7   A.   Well, I didn't -- no, I didn't make other recordings, sir.

 8   Q.   Okay.  All right.  Now, we talked a bit about some names

 9   that are mentioned in your Cooperation Agreement.  You recall

10   that?

11   A.   Yes, sir.

12   Q.   All right.  And one of those names was a -- a William

13   Campbell, right?

14   A.   Go ahead.

15   Q.   Yes?

16   A.   Yes.

17   Q.   Okay.  And William Campbell is you said not an employee of

18   yours, correct?

19   A.   True.

20   Q.   He's an associate of yours, correct?

21   A.   True.

22   Q.   All right.  And William Campbell's also known as Old

23   School, correct?

24   A.   No.

25   Q.   He's not?
```

1    A.   No.

2    Q.   Okay.  And you know an individual by the name of Old

3    School though, right?

4    A.   Yeah.  School, yeah.

5    Q.   And who's that?

6    A.   I don't know.  That's all I know him as, sir.

7    Q.   That's just -- that's the School person that you talked

8    about earlier?

9    A.   Yep.

10   Q.   Okay.  And you tell us that School or Old School was at

11   the car wash --

12   A.   True.

13   Q.   -- on the day in question, correct?

14   A.   True.

15   Q.   Okay.  And you have -- you have a nephew whose name is

16   Ronald Jackson, correct?

17   A.   True.

18   Q.   And his nickname is Little, correct?

19   A.   Yeah.  He got a few nicknames, yes, sir.

20   Q.   That's one of them?

21   A.   Mm-hmm.

22   Q.   Okay.  And, sir, isn't it true that you believed that

23   School or Old School and Little were actually the ones who got

24   the Mexicans for that money?

25   A.   No.

1    Q.   You ever have a conversation with Deke or Fred Tucker

2    where you told him that you should have taken that money

3    yourself, that Old School and Little got the Mexicans and you

4    didn't get yours?

5    A.   No, sir.  Now, if you want me to explain, it was all doing

6    for me.  Little --

7    Q.   Time out please.  No, sir was your answer?

8    A.   What?  No.

9    Q.   No, sir was your answer?

10   A.   No.

11   Q.   Okay.

12        MR. HARRISON:  Could we please play --

13   BY MR. HARRISON:

14   Q.   You -- and you know that your telephone was tapped by

15   the D -- DEA, correct?

16   A.   Go ahead.

17   Q.   Okay.

18        MR. HARRISON:  Can we please play May 6th, 2014 at

19   8:25 a.m.?

20        MR. BUCKLEY:  Is -- is this an exhibit?  I don't know

21   that this is an exhibit.  I don't know for what purpose this is

22   being played.

23        MR. HARRISON:  Impeachment, Your Honor.

24        THE COURT:  Well, let's get it worked out.

25        (Audio clip being played at 12:12 p.m.)

1    BY MR. HARRISON:

2    Q.   You recognize the voices on there?

3    A.   No, not really.

4    Q.   You don't?

5    A.   No.

6    Q.   It's not you?

7    A.   Turn it up a little bit.

8    Q.   Sorry?

9    A.   Turn it up a little bit.

10   Q.   Okay.

11          MR. HARRISON:  Start it over.

12          (Audio clip being played at 12:12 p.m.)

13   Q.   You recognize the voice of the person you're speaking to

14   as Frederick Tucker?

15   A.   Okay.

16   Q.   Yes?

17   A.   That's Fred Tucker, yes.

18   Q.   That is?

19   A.   Yes.

20   Q.   And you, correct?

21   A.   I really couldn't tell honestly if that was me, sir.  I'm

22   just being honest.

23   Q.   Fair enough.

24          MR. HARRISON:  Continue please.

25          MR. BUCKLEY:  Well, Judge, I think we have an

1    authentication problem then.

2             THE COURT:  Sustained.

3             MR. BUCKLEY:  Thank you.

4             THE COURT:  There's no foundation for the playing of

5    the tape.

6             MR. BUCKLEY:  Thank you, Your Honor.

7    BY MR. HARRISON:

8    Q.  Okay.  So your testimony is that you never told Fred

9    Tucker that Little and Old School actually sold -- stole that

10   money from the Mexicans?

11            MR. BUCKLEY:  Asked and answered, Your Honor.

12            THE COURT:  Overruled.  Answer that if you can,

13   witness.  Go ahead.

14            THE WITNESS:  Never.  It was my idea, sir,

15   100 percent, so why would I say that?  Now, seriously.

16   BY MR. HARRISON:

17   Q.  And you never said to Frederick Tucker that next time

18   you're just going to do it yourself?

19   A.  I can't recall that, sir.  What I said to him, that I know

20   this deal came from me, sir, without no knowledge of Little,

21   Old School or anyone.

22   Q.  Sir, you are aware, are you not, that the DEA raid --

23   raided Deke and Fred Tucker's home prior to you being stopped?

24   A.  You said Deke and Fred Tucker.  They're the same person,

25   sir.

1    Q.   Correct.  You're aware that he was raided, 2424 Glynn,

2    right?

3    A.   No, he wasn't raided there, sir.

4    Q.   Are you aware that he was arrested prior to you being

5    stopped by the DEA and the FBI?

6    A.   Yes.

7    Q.   And you were aware of it shortly after it happened, right?

8    A.   True, sir.

9    Q.   Okay.  So you knew that it was only a matter of time

10   before they were going to come and say hello to you?

11   A.   Yes, sir.

12   Q.   Right?

13   A.   That's fair.

14   Q.   Okay.  And that's why when they came and they stopped you

15   on -- it was July 25th, 14, right?

16   A.   Yes, sir.

17   Q.   Okay.  You immediately agreed to cooperate, right?

18   A.   True.

19   Q.   And you immediately told them, and in great detail, what

20   you say these police officers did, right?

21   A.   Yes, I was telling them what the police was -- had done

22   and robbed me for the $900,000.

23   Q.   Right.

24   A.   And they was corrupt, yes, sir.

25   Q.   Right.  Because you knew that that was your trump card,

1   right?

2   A.   It's not so much as a trump card, sir.  It's just being

3   truthful and honest about dishonest police officers.

4   Q.   And that's what you try and be, truthful and honest?

5   A.   That's what I'm doing right now, sir.

6   Q.   And, sir, you would agree with me that you had far more

7   contact with Police Officer Arthur Leavells than you ever did

8   with Mr. Watson or Mr. Hansberry is that fair?

9   A.   I'd say 60/40.

10   Q.   60/40.

11        When your guy, Mr. Tucker, had a gun to his head from

12   Dante Mitchell, Arthur Leavells is who you called, right?

13   A.   True.  I wasn't in conversation with Watson or Hansberry.

14   I kept going through Curly unless we all meet up together, sir.

15   Q.   Curly was your handler, right, when you weren't working

16   for the FBI, right?

17   A.   Yes, he was the one I reported to mostly.

18   Q.   Okay.  And when a family member of yours would get in

19   trouble, he's who you'd call, right?

20   A.   Well, my son got in trouble before, sir, yeah.

21   Q.   Your son Gary?

22   A.   The Third.

23   Q.   The Third.

24        How many sons do you have?

25   A.   Three.

1    Q.    Three.

2          And what are their names?

3    A.    Gary, Gary and Gary.

4    Q.    And Gary, III being -- meaning the third -- the youngest?

5    A.    No.  Gary is the youngest.  I have Gary, Jr., Gary, III.

6    It's by two different women.

7    Q.    Okay.  And when Gary, III got in trouble carrying a gun,

8    right?

9    A.    True.

10   Q.    Okay.  You called Arthur Leavells, right?

11   A.    True.

12   Q.    Okay.  And when your daughter's brother Ben-Ben got in

13   trouble, you called Arthur Leavells, right?

14   A.    True.

15   Q.    Okay.  And when Ben-Ben got in trouble, he was charged

16   with Felony Firearm Second, right?

17   A.    I don't know exactly what it was, but yeah, I know it was

18   a gun charge, sir.

19   Q.    Okay.  A serious gun charge, fair?

20   A.    Just a gun charge to me.

21   Q.    Okay.  And you called Curly, right?

22   A.    True.

23   Q.    Did you know who arrested Ben-Ben?

24   A.    DPD.

25   Q.    Did you know if it was Officer Hans -- Sergeant at the

1    time Hansberry?

2    A.    No.

3    Q.    You had no idea?

4    A.    Honestly.

5    Q.    Okay.  And you -- you learned at some point though that in

6    order for something to possibly happen with Ben-Ben's case,

7    he -- he was going to have to provide information, fair?

8    A.    Who was?

9    Q.    Ben-Ben.

10   A.    Provide information about -- go ahead, yeah.

11   Q.    To the police.

12   A.    Okay.

13   Q.    Yes?

14   A.    I can't really say yes because what type of information

15   are you talking about?

16   Q.    Okay.  You're aware that you -- you agreed with Curly to

17   plant fake drugs in an abandoned house, correct?

18   A.    True.

19   Q.    And that was to help Ben-Ben, right?

20   A.    True.

21   Q.    Okay.  And you worked together with Arthur Leavells on

22   that, correct?

23   A.    True.

24   Q.    Not with Mr. Hansberry, Mr. Watson, correct?

25   A.    True.

1   Q.  In fact, Arthur Leavells wasn't even working with either

2   of them at that point, right?

3   A.  I don't think he was, sir.

4   Q.  Okay.  And you and Arthur Leavells discussed and agreed

5   that he would get a search warrant and hit that Whitewood

6   house, right?

7   A.  True.

8   Q.  And that would obviously be a false search warrant, right?

9   It would have to be lies in there, right?

10  A.  What do you mean, a false search warrant?

11  Q.  Well, you knew that in order to get a search warrant, I

12  mean you knew that an officer has to go and put his hand up?

13  A.  I don't know --

14  Q.  You don't know anything about that?

15  A.  -- when they do that, but I know he had the search

16  warrant.

17  Q.  Okay.  All right.  And there was a gun that you put up

18  there too, right?

19  A.  I can't be exact.  I know it was cocaine, heroin and weed.

20  Q.  Mm-hmm.  You don't remember about the gun?

21  A.  I can't recollect on that one, sir.

22  Q.  So you --

23  A.  It might have been the gun.  I don't know.  I'm just being

24  honest.

25  Q.  Fair enough.

1   A.   All right.

2   Q.   So you don't know where the gun would have come from if

3   there was one?

4   A.   No.

5   Q.   Okay.  And you paid Arthur Leavells $5,000 to take care of

6   that thing with Ben-Ben, right?

7   A.   True.

8   Q.   Okay.  What happened to Ben-Ben?

9   A.   He's in prison now, sir.

10  Q.   For that gun charge, right?

11  A.   Yep.

12  Q.   It wasn't a good investment, was it?

13  A.   I didn't invest the money, sir.

14  Q.   Did you come to learn that Mr. Hansberry quashed that?

15  A.   That he did what?

16  Q.   That he made sure that Ben-Ben didn't get credit for that

17  Whitewood rip?

18  A.   I -- you telling me something new right now.

19  Q.   You didn't know that?

20  A.   No, sir.

21  Q.   Okay.  And, in fact, after that first cash seizure, Mr.

22  Hansberry arrested a number of your associates, didn't he?

23  A.   I don't have no recollection of that, sir.

24  Q.   Would it be fair to say that from the very beginning, you

25  and Mr. Hansberry had a rocky relationship?

 1    A.    No, sir.  Never saw him, never met him, never talked to

 2    him, no acknowledgement of him at all.

 3    Q.    Well, good.  Okay.  Thank you.

 4    A.    Can I say something, sir?

 5                THE COURT:  Not your turn, witness.

 6                Go ahead, Mr. Harrison.

 7                THE WITNESS:  Okay.  Sorry.  I'm sorry.

 8    BY MR. HARRISON:

 9    Q.    All right.  Now, you -- you told -- you told us a little

10    bit about a situation with Dante, this guy you knew as Dante

11    that had the gun to Mr. Tucker's head, okay?  Now, you

12    called -- you told us that you called Arthur Leavells when it

13    was going on, right?

14    A.    True.

15    Q.    Okay.  And after that you talked to Calvin Turner, right?

16    A.    True.

17    Q.    He was free, right?

18    A.    True.

19    Q.    And you had discussions with Mr. Turner about what he

20    should say in court, right?

21    A.    You said Mr. Turner or Mr. Tucker?

22    Q.    Tucker, Tucker.  Thank you.

23    A.    Okay.  Yeah, I just told him, you know, tell the truth,

24    write it down, go over it, just remember it if you can't

25    remember it.  Yeah, I told him that.

1    Q.   You told him to tell the truth?

2    A.   Well, yeah.  I mean the truth is remembering and then

3    writing it down, isn't it?

4    Q.   Sir, isn't it true that you talked to Arthur Leavells to

5    find out what Fred Tucker should say in court?

6    A.   I can't recall that, sir.

7    Q.   Isn't it true that you told Mr. Tucker that he should say

8    that he knew Dante for a longer period of time than he really

9    did?

10   A.   I can't recollect that, you know.  It wasn't an everyday

11   thing talking about that, sir.

12   Q.   Isn't it true that you told Mr. Tucker that he should say

13   that he knew him longer so you could put the drugs that were

14   seized from the Glynn Street house on Dante?

15   A.   I can't recall that, sir, 'cuz it -- what are you -- is

16   it -- it's -- which one are you talking about because from

17   Deke's house on Glynn and you talking about -- it's two

18   different incidents, sir, so I don't know.  One's DPD and one

19   was DEA.

20   Q.   Okay.  And you talked to Johnnie Metcalf about this

21   situation with Dante?

22   A.   He was -- he was right there and then was took hostage.

23   Q.   And you talked to him afterwards about what he should say

24   about what happened too, right?

25   A.   Well, I talked to him but I can't recall what I talked

1    about, sir.

2    Q.  You think listening to a conversation of you talking to

3    Tucker and Metcalf would refresh your mem -- recollection as

4    to --

5    A.  Go right ahead, sir.

6          MR. HARRISON:  This is DEA wiretap, May 3rd, 2014,

7    11:43.

8          MR. BUCKLEY:  Thank you.

9          (Brief pause)

10         (Audio clip being played at 12:27 p.m.)

11   BY MR. HARRISON:

12   Q.  You recall that conversation?

13   A.  Yes, sir.  Yeah.

14   Q.  Okay.  And in that conversation, sir, you and Mr. Tucker

15   are talking about putting the drugs that was in Mr. Tucker's

16   house on Dante, right?

17   A.  On Dante?  Well, no, I wasn't talking about putting them

18   on him, sir.  At the end of the conversation, you got to

19   understand, if somebody was talking about, like I say, killing

20   him for $500 or whatever the payment was, you know, you got to

21   understand, he was wrong, he was wrong totally.  Maybe I was

22   wrong for telling Mr. Tucker, you know, and talking to him.

23   But far as this, I don't understand what this has to do with

24   them.

25   Q.  Well, what it has to do with, sir, is perjury and

1    obstruction of justice.

2    A.   Oh.  Well, I didn't have him perjure myself, sir.

3    Q.   Okay.  You know encouraging someone else to perjure

4    themselves is a crime as well?

5    A.   What do you mean?  I talked to him one-on-one, sir.

6    Q.   Okay.  But you're here today to tell the truth, right?

7    A.   Yes, I am, sir.

8    Q.   Okay.

9         MR. HARRISON:  Thank you.

10        THE COURT:  Okay.  Mr. Fishman's turn is now.  Go

11   right ahead.

12                    CROSS-EXAMINATION

13   BY MR. FISHMAN:

14   Q.   Mr. Jackson, do you -- do you consider yourself to be an

15   honest man?

16   A.   Yes, I do, Mr. Fishman.

17   Q.   And you base that on your dealings with people throughout

18   your life, correct?

19   A.   Yes, sir.

20   Q.   And you're the type of guy, at least in your opinion, that

21   when you give somebody your word, your word is good, right?

22   A.   In most cases, yes.

23   Q.   And what types of cases would you say are the cases where

24   your word isn't good, what types of situations?

25   A.   With dishonest police officers.

1   Q.   So lying to police officers would be the only lies that

2   you've ever told?

3   A.   No.  I take a man as -- to know him, hisself.  So when you

4   do something wrong to me, that makes me don't like you anymore.

5   Q.   Okay.  I'm not asking you about your relationship with the

6   police.  I want to know, sir, you say you're an honest man --

7   A.   I'm saying that anybody --

8   Q.   You -- you have to let me finish and then you can talk.

9   You got it?

10  A.   Go ahead.

11  Q.   You say you're an honest man in most situations.  Aside

12  from dealings with police officers, my question is what kind of

13  situations are there where you're not honest?

14  A.   Sir, I'm honest, I'm telling you here now.  And like I

15  say, if you do something to me, well, that goes right out the

16  window.

17  Q.   Okay.  You -- you'd agree with me, wouldn't you, Mr.

18  Jackson, that the drug business is filled with dishonesty and

19  lies?

20  A.   I'm not going to agree to that, sir.

21  Q.   You think that most people that you've been involved with

22  in the drug game are -- are honest people?

23  A.   And like I said, I have to know you, sir.  You're

24  assuming, and assuming is not me, sir.  I like to know somebody

25  personally.

1    Q.   Okay.  So your testimony is that -- you -- you know a lot

2    of people personally that have been involved in the drug game,

3    right?

4    A.   No different than you, sir.

5    Q.   I'm not sure what that means, but my question is you know

6    a lot of people that have been involved in the drug game,

7    right?

8    A.   Yes, sir.

9    Q.   And you're saying and you're telling us that you have not

10   found it to be true that people in the drug game routinely lie?

11   A.   It's who you deal with, sir, and that's what I'm going to

12   stand onto.

13   Q.   Okay.  So Fred Tucker, for instance, he -- he's a truth

14   teller as far as you know?

15   A.   He's been a good guy with me.

16   Q.   My question is, is he a truth teller as far as you know?

17   A.   Yes, sir.

18   Q.   And Calvin Turner, he's a truth teller, right?

19   A.   As far as I know, yes, sir.

20   Q.   You don't have any idea sitting here today what either or

21   both of them testified to in front of this jury in this trial,

22   do you?

23   A.   No, sir.

24   Q.   And you personally, unless someone did something to you,

25   you don't make it a habit of doing anything to anybody else,

1    correct?

2    A.   Well, I don't come in in meeting somebody thinking

3    negativity; it's always positive.  And if you do something to

4    me, like I said, sir, then I find you dishonest and I go from

5    there.

6    Q.   Okay.  But my question is, sir, you're -- you're telling

7    us, aren't you, that in general, even in the drug game, you

8    assume everybody's honest til they do something to you?

9    A.   True.

10   Q.   And you don't believe that the nature of the narcotics

11   game, of the drug game, encourages people to lie, people to

12   cheat, people to steal, you haven't found that in your

13   experience?

14   A.   No, sir.

15   Q.   Okay.  Now --

16   A.   If it happens, it happens.

17   Q.   Now, listening to the direct examination, it sounds like

18   you told us you have a cousin on the Wayne County Sheriff's

19   Department, is that true?

20   A.   No, she's not a cousin.  I was just telling them that.

21   Q.   I thought you told us that.

22   A.   Well, no.

23   Q.   Didn't you say --

24   A.   I said a friend.  That's not a family, it's a friend.

25   Q.   Is this --

1    A.   I just told them on the tape it was a cousin.

2    Q.   Okay.  So I'm asking you now in front of the jury, was --

3    is the lady your cousin or not?

4    A.   She's not my cousin.

5    Q.   All right.  She's someone that you brought with you and

6    you pretended she was a Wayne County sheriff?

7    A.   No, she -- it wasn't no pretending; she was.

8    Q.   You pretended she was your cousin?

9    A.   She pretend that, right.

10   Q.   And this is someone that you're not related to but you're

11   friendly enough with that you asked her to come with you and

12   she came?

13   A.   True, because I was scared of the officers trying to rob

14   me again.

15   Q.   I -- I understand, sir, and I understand that every

16   question I ask you're going to bring up the police.  But I'm

17   just trying to ask you specific questions and see if you can

18   give me specific answers, okay?

19   A.   Well, I have to answer it how I feel, sir.

20   Q.   Well, just try to answer it as specifically as possible,

21   all right?

22   A.   I will.

23   Q.   All right.  So the Wayne County sheriff that you brought

24   with you, did you tell her that you were involved in drug

25   trafficking at the level that you were involved?

1    A.   Did I tell her?  No, she already knew.

2    Q.   You're -- the Wayne County sheriff that went with you to

3    the meeting at the hotel or motel --

4    A.   Right.

5    Q.   -- knew you were a drug dealer at the level that you were?

6    A.   Yes, sir.

7    Q.   And what department, what assignment did she have at the

8    Wayne County Sheriffs, do you know?

9    A.   Not exactly.  I just knew she was a Wayne County sheriff,

10   sir.

11   Q.   Did -- did you know whether or not she ever went to

12   anybody else in the sheriff's department and said, "Hey, I've

13   got a friend of mine, this guy's a huge dope dealer up in the

14   North End"?  Do you know whether she ever did that?

15   A.   I wasn't from the North End, sir.

16   Q.   Okay.  But wherever you were from.

17   A.   Okay.  I don't know if she did it, sir.

18   Q.   You -- you assume, do you not, that you were friendly

19   enough with her that you could bring her to this event, with

20   her knowing you were a drug dealer, and she wouldn't go tell

21   some other police agency about you?

22   A.   It wasn't a drug deal going down, sir.  It was money

23   transferred from the Detroit Police Department, and I didn't

24   want nobody else there from the Detroit Police Department

25   because I know what just occurred, sir.

1   Q.  You told us that you had some kind of relationship with

2   Benny Napoleon, right?

3   A.  It's just talking.  He sent some people to my mother's

4   funeral and I respected him for that because he had a

5   relationship with my father-in-law, his father, years ago in

6   Tennessee.

7   Q.  Are -- are you saying that you and -- and Mr. Napoleon

8   were friends?

9   A.  No.

10  Q.  Are you saying you ever had any contact with him other

11  than seeing somebody at a funeral or something like that?

12  A.  No, sir.

13  Q.  You're -- you're -- you're certainly not saying, are you,

14  that you were close to Benny Napoleon, are you?

15  A.  No.

16  Q.  Because you know he was -- you know he was the Chief of

17  Police in Detroit, correct?

18  A.  Correct.

19  Q.  You know he's the Wayne County Sheriff, correct?

20  A.  Well, that's what he is now.

21  Q.  Yeah.

22  A.  Yeah.

23  Q.  And you know that, right?

24  A.  Right.  In 96, sir, he helped escort my mother with a

25  police escort and that was wonderful for me.

1    Q.   You indicated that you had a relationship or you were able

2    to have a meeting with Ralph Godbee who was the Chief of Police

3    at the time, correct?

4    A.   Yes, in Troy.

5    Q.   And you met with him through Derrick Coleman, the ex-ball

6    player, correct?

7    A.   True.

8    Q.   And you got with Derrick Coleman because you knew him or

9    because Calvin Turner knew him?

10   A.   Well, that was Calvin Turner's family, but I know him too.

11   Q.   And you knew him for a long time, correct?

12   A.   True.

13   Q.   And did you tell Derrick Coleman that the reason you

14   wanted to meet with Godbee was there was all kind of crookery

15   going on with the police department?

16   A.   Yeah, I had to get to somebody over their heads, sir.

17   Q.   Did you tell Derrick Coleman that?

18   A.   Yeah.

19   Q.   And he arranged a meeting with Chief Godbee, right?

20   A.   True.

21   Q.   And when you met with Chief Godbee, did you tell the chief

22   about the entire heist, the entire theft of the money?

23   A.   True.

24   Q.   And did you tell Chief Godbee, the Chief of Police, did

25   you tell him that you, Gary Jackson, were in the middle of all

1  of this large amount of cocaine and large amount of money?

2  A.  Well, I told him I was in the process of doing it.  I did

3  everything for the money; the cocaine, delivery and everything.

4  I didn't go into specifics with him about that, but I told him

5  about the seizure of money.

6  Q.  Did you tell the chief that you, Gary Jackson, were in the

7  process or had been dealing cocaine at these kilogram levels?

8  A.  My conversation with him is about corrupt police officers

9  that just took 900,000, that I just put $3 million on the

10  table, sir.

11  Q.  All right.  And my question to you, sir, is did you tell

12  the chief that you were in the middle of it, you weren't just

13  an informant, you were the dope dealer, did you tell him that?

14  A.  I told him what I just told you, sir.

15  Q.  Which means you didn't --

16  A.  I told him about money and them police officers taking the

17  money, sir.

18  Q.  All right.  So you did not --

19  A.  But I told him I'm responsible for the seizure.

20  Q.  You did not tell him though that you were the person who

21  helped sell a lot of these kilos -- just wait -- you were the

22  person who helped sell a lot of the kilos and you were there

23  when the money was loaded up and some of this money belonged to

24  friends of yours and was going to the cartel.  Did you tell him

25  you were in the middle of all that?

1    A.   I was on a pacific conversation, sir, and the pacific

2    conversation was that these police officers robbed me for

3    $900,000.  That's what this conversation was about.  I didn't

4    go into no other details, sir.  It was about him having crooked

5    police officers in his department.

6    Q.   And so your answer to my question is you did not tell the

7    chief that you were the person that was involved in the --

8    A.   I don't know how --

9    Q.   You have to let me finish, sir.

10        You did not tell Chief Godbee -- I heard what you

11   said you said.

12   A.   But that was the answer.

13   Q.   But my -- my question is, and it still is, you did not

14   tell the Chief of Police that you were the dope dealer, did

15   you?

16   A.   Sir, I -- I answered this question once.  How many times I

17   got to answer same question?

18   Q.   As soon as you answer.

19   A.   I told him that -- I told him pacifically what I was here

20   for, sir, and I'm trying to -- I can't change it no more than

21   that.  Corrupt police officers was the case that I came for,

22   not being a drug dealer, not for having possession of drugs or

23   anything, sir.  That's what it was.

24   Q.   You realized you were talking to the Chief of Police

25   obviously, right?

1   A.   Yes, sir.

2   Q.   That was --

3   A.   That's why -- that's why I called for the meeting.

4   Q.   That was your point, right?

5   A.   True.

6   Q.   And you've told us -- this is the last time I'm going to

7   ask you and you answer it whatever way you want -- you didn't

8   tell him that you're the dope dealer, did you?  That's simple,

9   yes or no?

10  A.   No, sir.

11  Q.   All right.  Now, I noticed that you -- you -- you've used

12  the word "sir" many times when you're talking to Mr. Buckley

13  and Mr. Harrison --

14  A.   I'm just -- I'm just polite like that.

15  Q.   Mr. Jackson, we're going to have to figure this out.  I'm

16  going to finish the question and you're going to finish the

17  answer.

18  A.   True.

19  Q.   And if you don't let me finish the question, we'll never

20  get to your answer.  You got it?

21  A.   Yes, sir.

22  Q.   You've used the word "sir" all throughout this day, and

23  you've just said it's because you're polite.  Is that the way

24  you talk in the street?

25  A.   No.

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.1002   Filed 07/20/16   Page 140 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

140

1    Q.   The way you talk in the street --

2    A.   But it depends who I'm talking to, sir.

3            THE COURT:  Listen, witness.  Listen to him --

4            THE WITNESS:  Okay.

5            THE COURT:  -- ask you and we'll move on.  All right.

6    BY MR. FISHMAN:

7    Q.   The way you talk in the street is more similar to what we

8    heard on the couple of tape recordings, correct?

9    A.   It's who I'm talking to, sir.

10   Q.   Right.  So if you're talking in court where there's a

11   judge and a jury and lawyers, you call people sir, correct?

12   A.   Outside of here too, sir.

13   Q.   Okay.  All right.  So, Mr. Jackson, putting aside all the

14   things you're saying about the police, there came a time where

15   one of your associates got stopped on the expressway with a

16   large amount of cocaine, true?

17   A.   I can't recall that.  You said a large amount of cocaine

18   on the freeway?

19   Q.   Right.

20   A.   You have to bring this up to my attention.

21   Q.   Do you remember Tone Anderson getting arrested?

22   A.   Oh, me and Tone Anderson, we didn't have a relationship

23   when he got stopped.

24   Q.   You had no relationship?

25   A.   We had a talking relationship but we didn't have -- that

1   didn't have anything to do with me, sir.

2   Q.   So what he got stopped with, whatever it was, had nothing

3   to do with you?

4   A.   Positively, sir.

5   Q.   Okay.  You told us that there came a time where the FBI

6   approached you, am I right?

7   A.   True.

8   Q.   And you told Mr. Harrison that that was after you learned

9   that Mr. Tucker had been either arrested or approached by the

10   FBI, correct?

11   A.   It was the DEA and the FBI, sir.

12   Q.   The feds let's say, okay?

13   A.   Yes, sir.

14   Q.   All right.  And that was after Mr. Tucker had been

15   approached by the feds, correct?

16   A.   True.

17   Q.   And when they came to see you, do you remember when that

18   was exactly?

19   A.   Yeah.  July the 25th on a Friday.

20   Q.   Of 2000 and?

21   A.   2000, I think it was 14, 13, something like that.

22   Q.   All right.

23   A.   I can't be exact.

24   Q.   And when they came to see you, before they said anything,

25   did you know you had been the subject of a -- a federal

1    wiretap?

2    A.   I didn't know that I was on a wiretap, no, I didn't.

3    Q.   All right.  And did they tell you that day that they had

4    wiretapped conversations of yours?

5    A.   True.

6    Q.   And you talked on the phone quite a bit, didn't you?

7    A.   I did what, sir?

8    Q.   Talked on the phone quite a bit.

9    A.   Yes, sir.

10   Q.   So you knew when they were talking to you that if they

11   were listening to your conversations, the odds were pretty good

12   that they were hearing conversations about drugs, right?

13   A.   True.

14   Q.   Even though you don't use the word cocaine or heroin and

15   you call them boy and girl or birds or whatever you all call

16   it, you knew that you'd been talking about drugs with some of

17   your associates while there was a wiretap, correct?

18   A.   I didn't know it was a wiretap but I knew I was on the

19   phone talking, sir.

20   Q.   I'm talking about as soon as you were informed that there

21   was a wiretap, you knew that you had been talking to your

22   associates about drugs in whatever code you all use, true?

23   A.   True, sir.

24   Q.   Okay.  And you decided then, didn't you, that it'd be a

25   good idea to cooperate, right?

1    A.   True, sir.

2    Q.   And as a result and as part of your cooperation, you

3    testified at two separate grand juries, true?

4    A.   True.

5    Q.   The first grand jury had nothing to do with police

6    officers, did it?

7    A.   No, sir.

8    Q.   The first grand jury had to do with you and the people you

9    were selling dope with, true?

10   A.   True.

11   Q.   And before you went to that grand jury on March the 12th

12   of 2015, you had discussed your dope dealing with either the

13   FBI, the DEA, the U.S. Attorney's Office or all three of them,

14   true?

15   A.   True.

16   Q.   And you told the grand jury at -- first thing you did was

17   you agreed or you admitted that you had been involved in a

18   conspiracy to sell cocaine, heroin, weed, and you used the

19   telephone to do all those things, correct?

20   A.   True.

21   Q.   And you were asked how it was that you first became

22   involved in drug distribution.  Do you remember that?

23   A.   I can't recall everything, but go ahead.

24        MR. FISHMAN:  Page 11, Mr. Buckley, of the three --

25   of the first one.

1    MR. BUCKLEY:  Thank you.

2    MR. FISHMAN:  3-12.

3  BY MR. FISHMAN:

4  Q.  The prosecutor who you were dealing with there was neither

5  Mr. Buckley nor Mr. Light.  It was a female, correct?

6  A.  Karen Gibbs.

7  Q.  Okay.  And you told us or you told somebody today that you

8  had a successful business, correct?

9  A.  True.

10  Q.  That you were making a bunch of money in -- I can't

11  remember if it was the trucking --

12  A.  From 2000, trucking.

13  Q.  Right?

14    You paid a lot of taxes I'm sure on that money,

15  right?

16  A.  Yes, sir.  If you can pull up the records, sir.

17  Q.  And when you were asked about how you first became

18  involved in drug distribution, do you remember answering,

19  "Knowing people out of work trying to make some money"?

20  A.  Well, it was hard for me coming up, but I don't want to

21  explain everything, so...

22  Q.  Look, Mr. Jackson, this is a simple question.  Do you

23  remember the question and answer?  Question, "And how was it

24  that you first became involved in drug distribution?"  Answer,

25  "Knowing people out of work trying to make some money."

1   A.   Okay.

2   Q.   Do you remember that answer?

3   A.   It -- it could be possible.  I don't know, recollect it

4   altogether.

5   Q.   If I show it to you, will it refresh your memory?

6   A.   It doesn't make a difference if you did.  If it's on the

7   paper, that's what I said, but I'm just saying I can't recall

8   everything, sir.

9   Q.   Okay.  But are you quarreling with it if I'm reading it

10  from the paper?

11  A.   No.  I --

12  Q.   Okay.

13  A.   -- I'm fine with it.

14  Q.   All right.  So when you were at grand jury, you gave the

15  grand jurors and the prosecutor some idea of the kind of money

16  that was involved in all of this different kind of drugs,

17  correct?

18  A.   What are you saying?  I don't know.  What are you --

19  Q.   All right.  Do you remember telling the grand jury that

20  you were paying 37,500 for a kilo of cocaine?

21  A.   Yes.

22  Q.   You remember telling them you would sell them for 40,000 a

23  kilo?

24  A.   True.

25  Q.   Do you remember telling them you were paying 80,000 a kilo

1    for heroin?

2    A.   True.

3    Q.   Do you remember telling them that you were selling heroin

4    for 85 to $90,000?

5    A.   But I never did use any money, sir.  It was all given to

6    me.

7    Q.   That's -- that's not my question, sir.

8    A.   Oh, okay.

9    Q.   Wait.  You say it was all given to you?

10   A.   Yes, it was supplied.

11   Q.   Okay.  Well, here's the -- well, here's the questions and

12   answer.  You tell me if you remember them.  Question --

13        MR. FISHMAN:  Top of page 16, Mr. Buckley.

14   BY MR. FISHMAN:

15   Q.   -- "How much at the time were you paying for a kilogram of

16   cocaine?"  Answer, "37,500."  Question, "And how much were you

17   selling them for?"  Answer, "40,000."  Question, "Per kilogram,

18   is that correct?"

19        MR. BUCKLEY:  Judge, I'd ask the purpose.  This is

20   consistent with what Mr. Jackson just said.

21        MR. FISHMAN:  He just said he was getting it for

22   free.

23        THE WITNESS:  I didn't say --

24        MR. FISHMAN:  And the question says paid.

25        THE COURT:  Okay.  All right.  All right.  All right.

1    He's acknowledged the prior testimony. The question of whether

2    or not or where he got it from I think -- I would say it -- it

3    can -- you can approach that a different way, but -- but I

4    think what he said here is the price is 37, the sale price is

5    40. Now, where he gets it from or whether he pays it is --

6    is -- is -- is different, but -- but I understand your point

7    and go right ahead.

8              MR. FISHMAN: Okay.

9    BY MR. FISHMAN:

10   Q.  Did -- didn't you just tell us you weren't -- you were

11   getting it free?

12   A.  You don't get anything. If it's supplied to you, sir, in

13   front, they call it a front, they front you the cocaine, the

14   weed or heroin, whatever it is, you don't have to pay direct.

15   Q.  Do you remember being asked this question with respect to

16   the heroin: "And then how much on average were you paying for

17   a kilogram of heroin?" Answer, "80,000." Question, "And how

18   much were you selling it for?" Answer, "85 to 90,000." You

19   remember those questions and answers?

20   A.  Yes, sir.

21   Q.  Was that true?

22             MR. BUCKLEY: Again, Judge, that's consistent with

23   his testimony today.

24             THE COURT: No.

25             MR. BUCKLEY: For what purpose is Mr. Fishman going

1  through this exercise?

2  THE COURT:  I -- I think he's trying to use that to

3  establish whether or not Mr. Gary Jackson paid cash for the

4  heroin, and I don't know if that's been established or not.

5  Go right ahead.

6  BY MR. FISHMAN:

7  Q.  You don't deny that whether you paid it in front or you

8  paid it in the back, you had to pay for the heroin, didn't you?

9  A.  Yeah, whatever I received on the front, yes, sir.

10  Q.  Yeah.  You're -- you're not saying you got it for free?

11  A.  That's -- yeah, okay.

12  Q.  Okay.  So when you were confronted by the FBI as you've

13  told us, you began to cooperate, correct?

14  A.  True.

15  Q.  January -- July 25th of 2014, right?

16  A.  True.

17  Q.  That was not the first time that you had contact with the

18  FBI though, was it?

19  A.  No.

20  Q.  Because you told Mr. Buckley that you were registered as

21  an FBI informant from November 2012 for, you said, about eight

22  months, correct?

23  A.  True.

24  Q.  And during that time that you were registered as an FBI

25  informant, you were still involved in selling narcotics, were

1   you not?

2   A.   True.

3   Q.   And did you tell the FBI, "Look, I don't mind being an

4   informant but I still got to sell dope"?  Did you tell them

5   that?

6   A.   I told them I had to do what I had to do for to get to the

7   cartel.

8   Q.   You -- my question --

9   A.   But I --

10  Q.   -- my question is simple.  Did you tell the FBI that you

11  were going to continue to sell dope?

12  A.   No.

13  Q.   Didn't the FBI tell you clearly that if you're going to be

14  an informant, you can't sell dope, right?

15  A.   True.

16  Q.   And they told you you can't carry pistols, right?

17  A.   True.

18  Q.   And you had pistols and you had weapons in your house

19  during the time you were working for the FBI, true?

20  A.   No, sir.

21  Q.   No guns?

22  A.   You -- I -- and when they stopped me, you said in my

23  house.  They never raided my house.

24  Q.   I'm not asking you, sir, if they raided your house.  You

25  kept guns and firearms while you were working for the FBI,

1    didn't you?

2    A.   No.  I was just this one incident, sir.

3    Q.   Just one time where they --

4    A.   Yes, sir.

5    Q.   -- happened to catch you?

6    A.   One time, sir.

7    Q.   The rest of the time between those eight months you never

8    had a pistol, never had an AK-47, never had anything?

9    A.   At the end of the day, sir, you talking about guns.  My

10   wife has a CCW, sir.

11        MR. BUCKLEY:  Judge, the question assumes facts not

12   in evidence because the witness was not an FBI source at the

13   time of the stop, so I think Mr. Fishman is confusing the

14   issue.

15        THE COURT:  Okay.

16        MR. FISHMAN:  I don't think so.  I'm asking the

17   specific time period when he's an FBI source.  I don't care

18   about the stop.

19        THE COURT:  Overruled.  Go ahead.

20   BY MR. FISHMAN:

21   Q.   My question is during that seven or eight months, whether

22   your wife had a CCW or not, did you carry weapons, either keep

23   'em in the house, take 'em in the car, walk down the street

24   with them, did you do that?

25   A.   No, sir.

1   Q.   Okay.  When you became a source with the FBI in November

2   of 2012, are you telling us it was because they wanted you to

3   help infiltrate the cartel?

4   A.   I was -- Curly switched from DPD to FBI task force, sir.

5   So he told me, "Do you want to come over this way?"

6   Q.   So you were registered by Curly over with the FBI, is that

7   what you're saying?

8   A.   Yes.

9   Q.   Didn't you mention some other FBI agent?  I think you

10  said --

11  A.   Pete Lucas because they was together.

12  Q.   -- his name is Lucas?

13       THE COURT REPORTER:  Wait, wait.

14  Q.   You've got to let me finish.

15  A.   Okay.

16  Q.   Or we'll be here all day.

17  A.   All right.

18  Q.   Didn't you tell us earlier that an agent named Pete Lucas

19  was the person who registered you at the FBI?

20  A.   Yes, sir.

21  Q.   And isn't it true then that Agent Lucas talked to you

22  about what the reason was for you to be registered?

23  A.   No.  I told him.

24  Q.   And you told him you had information that might lead to

25  the Mexican cartel, correct?

1    A.   True.

2    Q.   And that was -- at least as far as you could tell, that

3    was the purpose of you being registered as an informant, to

4    help them get to the cartel, true?

5    A.   True.

6    Q.   Well, in November of 2012 you were still angry with

7    Hansberry and Watson from back in July of 2010, weren't you?

8    A.   Never, sir.

9    Q.   Didn't you tell us that this whole thing started because

10   you say they cheated you out of about 900,000 or some amount of

11   money?

12   A.   You said in 2012 I was still angry, and I wasn't, sir.

13   Q.   Okay.  So your anger passed, correct?

14   A.   Oh, immediately.

15   Q.   You let it go?

16   A.   Yes, sir.

17   Q.   So when you were working with the FBI, did it cross your

18   mind that might have been a good time to tell them about these

19   dirty Detroit narcotics guys?

20   A.   I'm glad you brought that up, sir.  What it was, why I got

21   on that task force is because I knew that I couldn't trust them

22   no more and I needed somebody with higher leverage, sir.

23   Q.   Right.

24   A.   So if it comes to a situation -- if you let me finish

25   answering, sir.

1   Q.   Oh, you go right ahead.

2   A.   If it comes to a situation that it ever occurs, I know I

3   have a tape somewhere explaining them because nobody would

4   never believe me as you portraying me as this big drug dealer.

5   True, I sold a lot of drugs, but at the end of the day, how

6   would my conversation be without a conversation from them, sir,

7   coming out their mouth?

8   Q.   Okay.  Now can you answer my question?

9   A.   What is it, sir?

10  Q.   Why didn't you just tell the FBI, Pete Lucas or anybody

11  else, in November --

12  A.   Because we was going for major --

13  Q.   You've got to let --

14        THE COURT:  Hold on.  Let him ask and you -- go

15  ahead.  Let's be orderly.

16  Q.   Why didn't you tell the FBI in November of 2012, "I can

17  try to get you the cartel but let me tell you about these dirty

18  cops and I have a tape."  Why didn't you tell them that?

19  A.   Because we was going after cartels, sir.  It was something

20  totally different.

21  Q.   Is that your answer?

22  A.   Yes, it is.

23  Q.   And you figured then that if you told them about dirty

24  Detroit narcotics cops, they'd just tell you to go jump in the

25  lake, they weren't interested?

Case 2:15-cr-20217-SJM-APP  ECF No. 129, PageID.1016  Filed 07/20/16  Page 154 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

154

1   A.   I didn't say that, sir.  You trying to put those words in

2   my mouth.

3   Q.   I'm just asking you --

4   A.   I was going after the cartel, period, sir, if that's your

5   answer.

6   Q.   I'm just asking you, did you believe that since you were

7   talking about the cartel, there was no sense bringing up dirty

8   Detroit Police narcotics cops because the FBI wouldn't care?

9   A.   No, I didn't believe that, sir.

10   Q.   You knew --

11   A.   But I was on a pacific mission.

12   Q.   You knew, as sure as you're sitting here, that the FBI

13   would be interested in information from you, particularly with

14   this tape about dirty Detroit narcotics cops, you knew that,

15   didn't you?

16   A.   I wasn't going there, sir.

17   Q.   I understand that, but you knew they'd be interested?

18   A.   I knew everybody would be interested.

19   Q.   Okay.  When you began to cooperate, you told Mr. Buckley

20   earlier, and you've repeated it I don't know how many times,

21   that one of the reasons you were doing it is because these were

22   corrupt, dishonest police officers, right?

23   A.   True, sir.

24   Q.   Mr. Jackson, would you agree with me that you've lived

25   most of your life, particularly when you were hustling, under

1  the theory of "What's in it for me?"

2  A.  Sir, no, sir.

3  Q.  No?

4  A.  Nope.

5  Q.  Okay.  Is it your testimony that when you agreed to

6  cooperate, that you weren't thinking at all about what might

7  happen to you in terms of your case in federal court?

8  A.  What I was thinking about when I got stopped, sir, is at

9  the end of the day do what I have to do honestly because they

10  already knew that I would -- had information on corrupt police

11  officers.

12  Q.  My question to you, sir, is are you telling us that at no

13  time were you concerned with what might happen to you on your

14  case in federal court when you were deciding whether to

15  cooperate?

16  A.  Well, at the end of the day, you're going to think about

17  it because you get stopped, so you just looking at your

18  outcome, but at the end of the day, it wasn't a thing about

19  that.

20  Q.  So the fact that you're receiving the break that we're

21  going to discuss in a minute, the fact that you're going to get

22  some kind of a break was not in your mind when you decided to

23  cooperate?

24  A.  For telling the truth, sir?  I'm just trying to tell the

25  truth, sir, if that's your -- that's my answer.

1    Q.   I'm going to only ask it one more time.  If you don't want

2    to answer it, fine.

3            My question has nothing to do with telling the truth,

4    it has nothing to do with anything other than the following:

5    When you decided to cooperate, are you telling us that what

6    might happen to you in federal court and whether you would get

7    a break, that was not in your mind at all?

8    A.   What it was is me telling the truth, sir.  That's my

9    answer.

10   Q.   Okay.  That's your answer.

11           So eventually you had Mr. Perkins for a lawyer,

12   correct?

13   A.   True.

14   Q.   And you made a deal with the government, am I right?

15   A.   True.

16   Q.   And you don't dispute that you made a deal, do you?

17   A.   No, sir.

18   Q.   And you know -- you said you haven't talked to Fred Tucker

19   or Calvin Turner about this case but you've talked to them

20   about their deals, haven't you?

21   A.   No, sir.

22   Q.   You've not had a conversation -- when's the last time you

23   talked to Calvin Turner?

24   A.   That long ago, sir.

25   Q.   What does that mean?

1    A.   A one-on-one basis.  I haven't had a conversation like

2    that.  We haven't talked --

3    Q.   Okay.

4    A.   -- about nothing about this case, sir.

5    Q.   I didn't ask you about this case.

6    A.   Oh.

7    Q.   I'm saying if you had a conversation with -- when's the

8    last time you talked with Calvin Turner?

9    A.   We not -- we not -- we not friends, sir.

10   Q.   Okay.  All right.

11   A.   I've told you for the last 17 months we haven't -- before

12   even this even happened we had parted, sir.

13   Q.   Do you know what kind of deal he has?

14   A.   I read it in the paper.

15   Q.   Do you know what kind of deal Tucker has?

16   A.   Yes.

17   Q.   From talking to Tucker or from reading that in the paper?

18   A.   No, I talked to Tucker.

19   Q.   And he told you that he's looking at 60 months?

20   A.   Yes, sir.

21   Q.   Okay.

22   A.   I told him I was looking at 76.

23   Q.   And did you guys laugh when you talked to each other about

24   it and laugh about how you've pulled the wool over the eyes of

25   the government to get such a little amount of time for all the

1    dope dealing you did?

2    A.   Oh, no, sir.

3    Q.   Okay.

4    A.   It's no laughing matter.  I have a family.

5    Q.   And you had a family while you were out selling kilos of

6    cocaine and heroin too, right?

7    A.   Yes, sir.

8    Q.   And it didn't stop you from doing it, did it?

9    A.   No, sir.

10   Q.   In fact, you got involved with other members of your

11   extended family, didn't you?

12   A.   No, sir.

13   Q.   No?

14   A.   What are you talking about, extended family?

15   Q.   Who's Jermaine Rooks?

16   A.   Who -- what do you mean?  That's my nephew.

17   Q.   Did you get involved in drug dealing with him?

18   A.   Yeah, we talked and dibbled --

19   Q.   Okay.

20   A.   -- and dabbled, yeah.

21   Q.   Okay.  Your Plea Agreement was put up on the screen, and I

22   don't know that we need it unless you tell me you want to see

23   it again.

24         MR. FISHMAN:  Ms. Koch, could we just be ready

25   because I don't know what number it is, unfortunately.

```
 1            MR. BUCKLEY:  1101.
 2   BY MR. FISHMAN:
 3   Q.   Do you --
 4            MR. FISHMAN:  Yeah, maybe we should put it up there
 5   just -- I might want it.  Page 2 I think.
 6            MS. KOCH:   Page 2?
 7            MR. FISHMAN:  The factual basis is what I'm looking
 8   for.  Another one.  3, maybe 4, try 4.  Okay.  Yeah, I kind of
 9   need all the -- Count One maybe going to the bottom.
10   BY MR. FISHMAN:
11   Q.   All right.  Mr. Jackson, I'm going to ask you some
12   questions about that and feel free to look at it --
13   A.   Okay.
14   Q.   -- if you need to to refresh your memory.  Okay.
15            You understand or you remember what you pled guilty
16   to, correct?
17   A.   True.
18   Q.   You pled guilty to Conspiracy to Possess With Intent to
19   Distribute Five Kilograms or More of Cocaine and One Kilogram
20   or More of Heroin in Counts One and Two, correct?
21   A.    Is this Fred Tucker up here or me?
22   Q.   No, no, this is --
23   A.   Which one you got?
24            MR. FISHMAN:  Can we put it back up on -- the
25   original page?  Right there, just the offenses that he's
```

1    pleading to and the whole "United States of America" so he can

2    see his own name.

3    BY MR. FISHMAN:

4    Q.   Does that look like your name?

5    A.   Yes, it is, sir.

6    Q.   And is that you, also known as Geedy Weedy?

7    A.   Yes, sir.

8    Q.   Did you plead guilty to -- or did you agree to plead

9    guilty and then plead guilty to Conspiracy to Possess With

10   Intent to Distribute Five Kilograms or More of Cocaine and One

11   Kilogram or More of Heroin?

12   A.   True.

13   Q.   And you'd agree with me, sir, that in your career of dope

14   dealing, you conspired to possess with intent to distribute a

15   lot more than five kilos of cocaine and a lot more than one

16   kilo of heroin, true?

17   A.   True.

18   Q.   All right.  And you agreed to plead guilty to Count Ten,

19   conspiracy to use the phone basically to conduct drug deals --

20   A.   I can't see it up here, sir.

21   Q.   Right?

22   A.   Yes, sir, that's what I pleaded, but I don't --

23   Q.   And you knew and you know today that the first two counts

24   carry a minimum mandatory penalty of ten years, correct?

25   A.   True, sir.

1   Q.   Which you know would be 120 months, am I right?

2   A.   Yes, sir.

3   Q.   Okay.

4        MR. FISHMAN:   Can we go to page 4 then?

5   BY MR. FISHMAN:

6   Q.   And this Plea Agreement, sir, you would agree had nothing

7   to do with this case that we're here today about, right?

8   A.   True.

9   Q.   This was you and the other people you did things with,

10  right?

11  A.   I just see Sadek Tucker up there, but yes.

12  Q.   We'll get to the other people later.

13  A.   Oh.

14  Q.   But in this count you admitted and you agree that you and

15  Mr. Tucker conspired to distribute the same quantities we were

16  talking about before, correct?

17  A.   Yes, sir.

18  Q.   You were asked questions about being an organizer or

19  leader, and I can't remember what you told Mr. Harrison but I'm

20  going to ask you, were you an organizer or a leader of a group

21  of people that were selling cocaine and heroin?

22  A.   I said, and I -- again I tell you, it was me, Fred Tucker,

23  it's Little Tone and Hook.  That was about it.  And they was

24  off and on, sir.

25  Q.   Okay.  Now, let's see if you can answer my question.  Were

1    you an organizer and leader of however many people it were for

2    whatever it was you were doing, were you the head --

3    A.   Yes.

4    Q.   -- of it?

5    A.   Yes, sir.

6    Q.   All right.  And you agreed to that in your Plea Agreement,

7    correct?

8    A.   Yes, sir.

9    Q.   Okay.

10        MR. FISHMAN:  Can we go to page 5 please in the

11   middle paragraph please?

12   BY MR. FISHMAN:

13   Q.   Did you also agree, sir, that you were stopped on

14   June 25th, 2014 while driving a car?

15   A.   Yes.

16   Q.   And where did that occur?

17   A.   In Farmington, Southfield, right at Middlebelt and

18   Northwestern Highway, sir.

19   Q.   And when you were stopped --

20   A.   Is this me over here or -- or just -- it keeps saying

21   "Tucker."  That's the only way I'm trying to say it.

22        MR. FISHMAN:  Okay.  Maybe we should narrow it down

23   to the "Moreover."

24        MS. KOCH:  I'm sorry, where?

25        MR. FISHMAN:  You can't do that?  Can we start it at

1   "Moreover" which would eliminate Mr. -- "Moreover, Defendant

2   agrees..."

3           MS. KOCH:  I'm sorry, I'm not seeing that.

4           THE WITNESS:  That's not -- it's all Tucker on this

5   box.

6           MR. FISHMAN:  Don't use the box.  We'll go from

7   there.

8   BY MR. FISHMAN:

9   Q.  Mr. Jackson, you know that when it says "defendant" in

10  your Plea Agreement, that means you, right?

11  A.  Okay.

12  Q.  Okay is not an answer.

13  A.  Yeah, yeah, yeah.

14  Q.  Yes or no?

15  A.  Okay.  I know now, sir.

16  Q.  All right.  You were stopped on June 25th, 2014, you said

17  it was in Farmington Hills or Farmington?

18  A.  July the 25th, but yeah.

19  Q.  Okay.  And were you stopped for a lawful reason or did

20  they just stop you for the heck of it?

21  A.  Well, I knew both of my counterparts had got stopped, so I

22  knew it was going to just be a nick of time before they stopped

23  me.

24  Q.  All right.  So you agreed in your Plea Agreement that that

25  traffic stop was lawful.  Do you see that in there?

1    A.   Yes, sir.

2    Q.   And you agree that you had a 9mm Smith and Wesson firearm

3    on you, is that right?

4    A.   Yes, sir.

5    Q.   And you --

6    A.   It was in the vehicle.

7    Q.   I'm sorry?

8    A.   It was in the vehicle.

9    Q.   It was not on you?

10   A.   No, it wasn't on my person.

11   Q.   Was anybody else in the vehicle besides you?

12   A.   No, sir.

13   Q.   Was it your car?

14   A.   It was my wife's, yeah.

15   Q.   But you were driving your wife's car?

16   A.   Yes, sir.  Yes, sir.

17   Q.   And you agreed, didn't you, that you were carrying that

18   gun to protect yourself during and in relation to your drug

19   trafficking activities, correct?

20   A.   I'm not going to agree to that one, sir.

21   Q.   No, I'm not asking what you agree to today.  Read those

22   sentences --

23   A.   That's what -- that's what you trying to make me answer

24   to.  I'm just saying that I was carrying a gun but it wasn't

25   for drug trafficking, sir.

1    Q.   All right.  Well, let me read the whole sentence and then

2    you tell me -- I'm going to ask you two questions about it.

3    The sentence reads, "Moreover, defendant agrees that on or

4    about June 25th, 2014, he was subjected to a lawful traffic

5    stop where a .9mm Smith and Wesson firearm was seized, which

6    the defendant agrees he carried to protect himself during and

7    in relation to his drug trafficking activities."  Did I read

8    that right?

9    A.   You read it right.

10   Q.   And are you saying, sir, that you didn't agree to that?

11   A.   Well, I -- I wasn't doing it for no drug trafficking, sir.

12   Q.   Okay.  You signed the Plea Agreement that contained --

13   A.   Okay, yeah, but I was --

14   Q.   You've got to let me finish the question.

15   A.   Go ahead.

16   Q.   You signed a Plea Agreement that included that sentence,

17   correct?

18   A.   Correct.

19   Q.   And you told the judge at some point in time in your

20   guilty plea proceeding that you agreed with or accepted the

21   factual basis that is --

22   A.   Right.

23   Q.   -- part of this.  But you're telling us today that really

24   you just had the gun, it had nothing to do with drug

25   trafficking?

1    A.   Well, sir, I sold drugs.  I wasn't trafficking any drugs

2    at that time, sir.  That's what I'm just trying to say.  But if

3    you -- they put it together, drug trafficking, I sold drugs, I

4    was a trafficker and I admit to my crime, sir.  They just need

5    to admit to theirs.

6    Q.   When you took your plea, you've learned from either Mr.

7    Perkins or just from somewhere that there's things called

8    sentencing guidelines, am I right?

9    A.   Yes, sir.

10   Q.   And you also know, as we've discussed, about mandatory

11   minimums.

12        MR. FISHMAN:  You can -- you can take that down.

13   Thanks.

14   BY MR. FISHMAN:

15   Q.   Mandatory minimums, you knew about that too, correct?

16   A.   Yes, sir.

17   Q.   And you know, don't you, that your guideline range is 135

18   to 168 months, and that without some kind of motion to go

19   underneath the mandatory minimum, you would have been looking

20   at a minimum of 120 months, true?

21   A.   Yes, sir.  That's what my attorney said.

22   Q.   If you had your way, you would prefer not to do 135 to

23   168 months, agreed?

24   A.   If it my way, not even a day, sir, but you --

25   Q.   If it was your way --

1    A.   -- asked me.

2    Q.   If -- if you -- it was up to you, you'd walk out of here,

3    go back in the streets and not do one day in jail, wouldn't

4    you?

5    A.   I mean if that's what -- the way you think, yeah, but I

6    know I'm not.

7    Q.   So the answer to my question is yes, you did not -- no,

8    you do not want to do a mandatory minimum sentence of

9    120 months, right?

10   A.   I don't want to do a day, sir.

11   Q.   Okay.  And as part of your desire not to want to do -- or

12   not to do a day, you agreed and you entered into a Cooperation

13   Agreement with the government, correct?

14   A.   True.

15   Q.   And you've said more than once that you expect to get

16   76 months, correct?

17   A.   That's the agreement, but the judge has the final say,

18   sir.

19   Q.   Okay.  So you don't have any expectation of what you might

20   get, right?

21   A.   Well, I'm just saying that's what the agreement says, sir.

22   Q.   What the agreement says --

23   A.   Seventy-six months.

24   Q.   -- what the agreement says, sir, and you correct me if I'm

25   wrong, is that the government will recommend to Judge Hood a

1    sentence of 76 months, right?

2    A.   True.

3    Q.   And you don't know, of course, what she might do, correct?

4    A.   Yes, sir.

5    Q.   In your Cooperation Agreement --

6             MR. FISHMAN:  And do -- do we have -- is that an

7    exhibit?

8             MS. KOCH:  As an exhibit?

9             MR. BUCKLEY:  It's attached to 1100.

10            MR. FISHMAN:  1100?

11            MR. BUCKLEY:  Yeah.  Yes, sir.

12            MR. FISHMAN:  If you can find that, Ms. Koch, that'd

13   be great.

14            MR. BUCKLEY:  Right at the end of 1100.

15   BY MR. FISHMAN:

16   Q.   You recognize that as the Cooperation Agreement that you

17   signed?

18   A.   Yes, sir.

19   Q.   And you see --

20            MR. FISHMAN:  I don't think we need to enlarge it.

21   BY MR. FISHMAN:

22   Q.   You -- you agreed you'd provide truthful information and

23   testimony concerning all the facts of your case known to you.

24   See that underlined?

25   A.   Yes, sir.

1   Q.   And again, we're talking about your case, which is your

2   drug case where you and Mr. Tucker are charged, correct?

3   A.   True.

4   Q.   Okay.

5        MR. FISHMAN:   Can we go to the second page please and

6   can we enlarge the "Active Cooperation" part?

7   BY MR. FISHMAN:

8   Q.   Mr. Jackson, you agreed to something called Active

9   Cooperation, correct?

10  A.   Yes.  I see it right here, sir.

11  Q.   And you understood Active Cooperation to mean at least

12  providing testimony against other people, correct?

13  A.   True.

14  Q.   And in that paragraph you agreed, did you not, to provide

15  complete and truthful testimony against Fred Tucker, right?

16  A.   True.

17  Q.   Who is referred to as co-defendant on your case, right?

18  A.   True.

19  Q.   And you agreed to provide testimony as to certain

20  co-conspirators, correct?

21  A.   True.

22  Q.   All right.  Now, I'm -- I'm not going to ask you what role

23  any of them played in whatever it was y'all were doing, but you

24  agreed to testify against William Campbell, also known as Dub,

25  right?

1    A.   True.

2    Q.   You agreed to testify against Tony Anderson, correct?

3    A.   True.

4    Q.   You agreed to testify against Mr. Metcalf, also known as

5    Hook?

6    A.   True.

7    Q.   You agreed to testify against Orlando Perez, correct?

8    A.   True.

9    Q.   You agreed to testify to somebody -- against someone known

10   as Little Dub, correct?

11   A.   True.

12   Q.   And you agreed to testify against your friend Calvin

13   Turner who people call Kemp, am I right?

14   A.   True.

15   Q.   You also agreed to testify about other unnamed and

16   unindicted conspirators and to provide testimony against

17   Leavells and Watson and Hansberry, correct?

18   A.   No, sir.  I mean the ones on this paper, yeah, but I don't

19   know where you going with -- with so many other people than the

20   ones --

21   Q.   Didn't --

22   A.   -- on this paper.

23   Q.   I'm looking at the paper.  Didn't you also agree --

24   A.   Go ahead.

25   Q.   -- that by the bottom of the page --

1    A.   Uh-huh.

2    Q.   -- you agreed to provide testimony against these two

3    defendants and Mr. Leavells, correct?

4    A.   True.

5    Q.   Okay.  So have you testified against Mr. Tucker, Mr.

6    Metcalf, Mr. Perez or Calvin Turner?

7    A.   Just against Mr. Tucker.  And are you saying this on the

8    grand jury testimony or are you just saying have I went to

9    court on them, sir?

10   Q.   Testifying either way, grand jury or trial.

11   A.   Well, I have went to the grand jury, sir.

12   Q.   And you testified against who?

13   A.   I'm just saying the names that's on here that I'm just

14   saying of our dealings.

15   Q.   Right.  But you've testified --

16   A.   I haven't been on the stand against them, sir.

17   Q.   When you went to the grand jury, sir, you provided

18   testimony about all of those people, didn't you?

19   A.   Yes, sir.  That's what I said.

20   Q.   Okay.  You testified against them, and whatever happens to

21   'em happens to 'em, right?

22   A.   Well, I'm just telling the truth, sir.

23   Q.   You told part of that tape and then you told Mr. Buckley

24   you weren't testifying against the brothers, right?

25   A.   Oh, yes, sir.

1  Q.   You didn't want the brothers to go to jail, right?

2  A.   Yes, sir.

3  Q.   And everybody on that list except possibly Orlando Perez

4  is black?

5  A.   Oh, you can call him black.

6  Q.   Okay.  Then we'll call him black.  Everybody up there is

7  black, right?

8  A.   Yes, sir.

9  Q.   Okay.  I want to ask you some questions about that money

10 seizure, but I'm not going to go into near the detail that

11 either Mr. Buckley or Mr. Harrison did.  I'm just trying to

12 figure out, and you maybe can help me with this, whose money

13 was in that truck in terms of the proceeds of selling the

14 drugs?  I don't mean it was the cartel's money because the

15 truck pulled away.  Who put the money -- who contributed the

16 money that wound up in that truck?

17 A.   The cartel is a part, the SA that you said don't say

18 nothing about, and me myself, and a couple more people --

19 Q.   And those --

20 A.   -- that I already named.

21 Q.   And those were the people that you named, some with

22 nicknames and some with real names, right?

23 A.   Right.

24 Q.   Okay.  And none of those people that you named before are

25 related to you, correct?

1    A.   One is.

2    Q.   Is that L?

3    A.   Yes, it is, sir, your client.

4         MR. FISHMAN:  Judge, can we have -- if we were going

5    to take a break, this might be a good time.

6         THE COURT:  Let's take our mid-afternoon break.  It's

7    1:15.  Let's take about five minutes for comfort and water, and

8    we'll be back here in about five or ten minutes to finish out

9    the day.

10        Let's all rise for our jurors please.

11        (Whereupon the jury was excused at 1:14 p.m.)

12        MR. FISHMAN:  Judge, before you go, may I have a

13   second?

14        THE COURT:  Yeah.

15        MR. FISHMAN:  Could we excuse the witness please?

16        THE COURT:  Yeah.  You want to step down, Mr.

17   Jackson?

18        (Whereupon the witness was temporarily excused at

19        1:15 p.m.)

20        THE COURT:  Everybody can be seated.

21        MR. FISHMAN:  I'm asking the Court for a mistrial for

22   two reasons, both having to do with Mr. Jackson's volunteering

23   things, which I've been unable to successfully stop, nor has

24   the Court been able to do it either, even though we've tried.

25        THE COURT:  Okay.

1      MR. FISHMAN:  I specifically avoided on purpose and

2  intentionally ever mentioning anything about his nephew being a

3  client of mine, which he absolutely was and has been and

4  probably considers me to be his lawyer today, which would be

5  accurate.  And him bringing that up in the context of this case

6  and in the context of that seizure I believe prejudices Officer

7  Watson in the eyes of the jury.

8      And in addition, you may recall, I don't remember the

9  exact words but I'm sure Linda has it in her transcript, he

10 volunteered also something about I know as many drug dealers as

11 them or something along that line.

12     THE COURT:  I remember that.  And you said, "Whatever

13 that is supposed to mean."

14     MR. FISHMAN:  Right.

15     THE COURT:  Yeah.

16     MR. FISHMAN:  And here -- here -- here's the basis of

17 my objection.  Number one, Mr. Jackson is a very smart person

18 obviously and he's also very savvy, and he's also impossible

19 for anybody other than in the -- the government's thing when he

20 knows what's coming every time, it's impossible to keep him

21 from volunteering things.  The two things he's volunteered, I'm

22 in a position now where the jury is -- very justifiably might

23 thinking what is this?  He's cross-examining these guys.  He

24 represents drug dealers.  He represents this guy's nephew, even

25 though it didn't come out nephew.  And I just think that it

1    puts me in an impossible position and I think it puts Officer

2    Watson in an impossible position.

3           And I will say this.  I don't know what more I could

4    have done to control him as a witness without, you know,

5    appealing to the Court, which I don't think is a great idea for

6    defense lawyers.  The record will show I repeatedly over and

7    over again asked him to wait until I finish questions, not to

8    make speeches.  The Court interrupted him when he was making a

9    speech I think on the record and he --

10          THE COURT:  Yeah, I tried to do it a couple times.

11          MR. FISHMAN:  -- refused to do it.  Now he's -- now

12   he's crossed the line.

13          THE COURT:  Let me -- let me -- do you have the -- or

14   Linda, do you have the testimony on the representation of the

15   nephew?  That went past me pretty quickly and I don't -- I

16   don't have the exact --

17          MR. FISHMAN:  It would be right before I asked

18   for the -- as soon as -- it's the last answer and that's when

19   it happened.

20          THE COURT REPORTER:  Do you mean where he said your

21   client?

22          MR. FISHMAN:  Yeah, clients.

23          THE COURT:  All right.  Let me take -- let me take a

24   look here.  Okay.

25          THE COURT REPORTER:  It's --

1          THE COURT:  Oh, I got it, I got it.

2          THE COURT REPORTER:  -- page 155, line 18.

3          MR. FISHMAN:  Right before I asked for a break.

4          THE COURT:  Okay.  I got it.  I got it.  All right.

5    Okay.  All right.  I understand your argument.

6          MR. FISHMAN:  Well, can -- but can I say one other

7    thing, Judge?

8          THE COURT:  Yes.

9          MR. FISHMAN:  When he said it, I stepped back from

10   the podium and I looked at the jurors, and I won't say who but

11   one of the jurors looked at me like, "Huh-huh, what happened

12   now?" like, "You've been pulling our legs all the way through

13   this trial?"  That's the way I anticipate -- that's the way I

14   took it.  I've had quite a bit of experience.  Obviously I

15   don't know what's in his mind, but that's still the way it

16   looked to me.

17         THE COURT:  All right.  Okay.

18         MR. HARRISON:  Judge, just for purpose of the record,

19   I join in that motion.  I believe the --

20         THE COURT:  There's no -- there's no grounds for any

21   mistrial for Hansberry or Brown.  I'm not going to consider

22   that.

23         I think the issues with regard to Watson are

24   legitimate.  Do you want to speak now, Mr. Buckley, or do you

25   want some time or...

1    MR. BUCKLEY:  No, absolutely, Judge.  I respectfully

2  request the motion be denied outright.  Mr. Fishman -- I didn't

3  see the visual exchange he had with the juror.  I make it a

4  practice not to look at the jury during the trial.  But, you

5  know, Mr. Fishman kept -- Mr. Fishman provoked that response,

6  Your Honor, and I say that with all due respect to him and the

7  system.  He didn't have to ask continuously about the

8  individuals in the drug case in which Mr. Jackson was charged

9  and cooperated.  He continued to probe and he provoked that

10  response.

11    Now, what the Court could do if the Court chose to is

12  give the jury a curative instruction and tell them to disregard

13  that answer, and I guess that would be -- I don't know whether

14  Mr. Fishman wants that or not, but there's no basis for a

15  mistrial here, Your Honor, and we're four weeks into trial.

16    Again, it was really unnecessary for Mr. Fishman to

17  probe as far as he did, and, quite frankly, I think he crossed

18  the line and actually provoked that kind of response from --

19  from the witness because Mr. Fishman knew, I submit, that Mr.

20  Jackson was aware that his nephew was Mr. Fishman's client.

21    THE COURT:  Well, I don't know about that.  But --

22  but -- okay.  I -- I need to determine legal standards for

23  witness testimony that may be non-germane, that is non-germane

24  and implicates defense attorney's relationship with others.  I

25  also need to look at the transcript more clearly.

1          Would you like to speak at all to the issue of Mr. --

2    Mr. Jackson's verbosity and, Mr. Buckley, you want to speak to

3    his volunteering the --

4          MR. BUCKLEY:  Judge, yes, sir.  In terms of

5    verbosity, you know, Mr. Fishman's a very experienced trial

6    lawyer, and at any time if he felt that he was not in control,

7    he could have asked the Court to admonish the witness.  There

8    have been other instances during the course of this trial where

9    the Court did admonish witnesses.  And, you know, Mr. Fishman,

10   again, is very experienced, and anytime he felt he needed help,

11   he could have simply said, "Judge, would the Court kindly

12   instruct the witness to answer my questions?"  Mr. Fishman

13   elected to handle the situation in the fashion that he did, and

14   again, there's no grounds for a mistrial here.

15         THE COURT:  Okay.

16         MR. FISHMAN:  Judge, may I be heard?

17         THE COURT:  Of course.  Go right ahead.

18         MR. FISHMAN:  I -- I invite the Court and I welcome

19   the Court's thoughts about looking at the transcript.  There's

20   nothing that provoked any of this.  In fact, I think you'll

21   see, with respect to the last answer, I asked him one question:

22   "Were any of them your relatives?"  That was it.  And I

23   specifically -- that was the only thing I talked about with

24   that.

25         And with respect to the other part about I know 'em

1    all, "You know as many dope dealers as I do," I think you're

2    going to find when you see it, it was another one of Mr.

3    Jackson's just lobbing something out there and it wasn't

4    responsive and it was just him talking.

5           So I -- I -- I hope that the Court does -- I think

6    the transcript will back up what I say.  I wouldn't mind taking

7    a look at the law too to see if --

8           THE COURT:  Well, I'll just read the -- the -- the --

9    the colloquy here that I have in front of me.  This is rough,

10   it isn't finished, and it's from my Sametime issue.  There's a

11   long question about questions about the money seizure.  "I'm

12   not going to go into the detail that either Mr. Buckley or Mr.

13   Harrison did.  Whose money was in that truck?  I mean -- I

14   don't mean it was the cartel's money because the truck pulled

15   away."  And then Mr. Fishman asked, "Who put the money -- who

16   contributed the money that wound up in that truck?"  Mr.

17   Jackson answers, "The cartel is a part, the SA said -- the SA

18   that you said don't say nothing about, and me myself, and a

19   couple more people that I already named."  Mr. Fishman says,

20   "And those were the people that you named, some with nicknames

21   and some with real names, right?"  "Right."  "Okay.  And none

22   of those people that you named before are related to you,

23   correct?"  "One is."  "Is that L?"  "Yes, it is, sir, your

24   client."  And then we asked -- Mr. Fishman asked for the break.

25   So that was the relevant colloquy as I -- as I saw it now.

1    MR. FISHMAN:  That's to that one, but remember

2    there's the original one.

3    THE COURT:  Right.  The other one was early on, very

4    early on, and I thought that was frankly troubling when I heard

5    it.

6    MR. FISHMAN:  Yes.

7    THE COURT:  But -- but we walked away from it when

8    Mr. -- when -- when Mr. Fishman said, "I don't -- I don't know

9    what you mean by that or whatever that's supposed to mean" and

10   then went on to a new topic.

11   So all right.  I know this is not the first time

12   we've had issues with witnesses volunteering information.  It

13   may be the first time I've seen where a witness volunteers

14   information that his nephew is represented by defense counsel.

15   I don't know exactly what the overall upshot or prejudice --

16   prejudice of it is necessarily going to be, but I'll give it

17   some thought and we'll -- we'll look into it and try to deliver

18   a decision as expeditiously as possible, okay?  All right.

19   Thank you all.  Let's take a quick five-minute break.

20   MR. FISHMAN:  Does the Court want me to continue with

21   him?

22   THE COURT:  Yeah, I think you should continue,

23   mm-hmm.

24   (Court in recess at 1:25 p.m.)

25   (Proceedings resumed at 1:34 p.m., all parties

1          present, witness Gary Jackson resumes the stand, jury

2          not present)

3          THE COURT:  Okay.  Everybody may be seated.

4          Can we get -- we should get the witness back in.

5   Will, I think we should also line up the jurors.

6          Briefly, could I ask or did our clerk ask the United

7   States to admonish or instruct the witness not to -- not to

8   engage in extraneous personal remarks that might affect

9   relationship with the defense attorney or anything like that?

10         MR. BUCKLEY:  Yes, Your Honor.  Mr. -- Mr. O'Hara

11  conveyed that request to me and I did so in the presence of the

12  Special Agent Mark Kreig of the FBI.

13         THE COURT:  Okay.  I'll probably give Jackson a --

14  a -- just a -- an admonition of my own, so I appreciate you

15  doing that.

16         I don't have a good sense of this.  My -- my instinct

17  is that -- is that -- is that both lawyers are -- you know,

18  have -- have merit to their argument.  I think the

19  defendant's -- or the witness's statement obviously was out of

20  bounds.  I didn't look at the jury either.  I take Mr. Fishman

21  at his word if he said there was some sort of reaction after

22  the -- the statement.  Whether it rises to the level of a due

23  process or some other sort of violation that would require a

24  mistrial and a restart, I'm not sure of.

25         I know for a fact everything I saw wouldn't put

1    either of the other defendants on trial in jeopardy.  And then

2    you have the issue of can you sever a defendant in the middle

3    of a trial?  I don't know the answer to that one either.

4         I would urge the lawyers to -- to file any

5    authorities that you -- that you want to have the Court take a

6    look at.  And I'd say as late as, you know, midnight tonight,

7    if you want to file anything electronically, we'll take a look

8    at that and make a conclusive decision in the morning.

9         I don't feel comfortable making a final decision now,

10   but I -- I feel in terms of efficiency and the fact that we can

11   hopefully after I read a few cases rectify this with some sort

12   of an instruction, if desired, and an ad -- admonition to the

13   witness, I -- I -- I think that we should finish out the day,

14   which doesn't have a lot of time left in it, and then -- and

15   then make -- make a -- a ruling and figure out where to go

16   tomorrow morning, okay?

17        MR. BUCKLEY:  Certainly, Your Honor.  And just one

18   request.  If the Court is going to admonish the witness, I ask

19   that it be done outside the presence of the jury.

20        THE COURT:  Yes, of course.  I agree a hundred

21   percent.

22        MR. BUCKLEY:  Thank you, Your Honor.

23        THE COURT:  Anything else?

24        MR. BUCKLEY:  No, sir.  Thank you.

25        THE COURT:  Listen, Mr. Jackson, the U.S. Attorney's

1    Office told me that they spoke with you, and I'm going to speak

2    to you directly.  You are not to, first of all, argue with the

3    counsel, go beyond the question that's asked by the counsel or

4    volunteer information.  You just simply have to listen to the

5    question that the counsel asks and then answers it.  And you

6    are absolutely not under any circumstances to refer to any

7    relationships between others that you know and the counsel in

8    the case that are not germane or -- or -- or involved in the

9    trial of this case, okay?  So I'm going to tell -- tell you

10   that.

11             THE WITNESS:  I'm sorry for that, sir.

12             THE COURT:  No, that's all right.  I -- I under --

13   I'm not asking for an apology.  What I'm asking for is that you

14   abide by my an -- admonition going forward, okay?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Very good.  Ready to get back

17   to it then?

18             MR. BUCKLEY:  Yes, Your Honor.

19             THE COURT:  All right.  Okay.  All right.  Let's

20   bring the jury in.  Let's all rise.

21             (Whereupon the jury entered the courtroom at

22             1:38 p.m.)

23             THE COURT:  Okay.  Everybody's back.  Everyone may be

24   seated.

25             And let's keep moving forward.  Mr. Fishman has got

1    the floor.  Go right ahead.

2    BY MR. FISHMAN:

3    Q.   Mr. Jackson, we were talking about the large money seizure

4    that happened July 26th, 2010.  You recall that?

5    A.   Yes, sir.

6    Q.   You told us that you contacted Curly to let him know that

7    there was going to be a lot of money that might be available

8    for seizure, correct?

9    A.   True.

10   Q.   And at some point in time you had a conversation with

11   Curly and also Officer Watson, you talked about more of the

12   details, is that correct?

13   A.   True.

14   Q.   And then at some point in time, in fact, the truck was

15   loaded up and it was getting ready to leave, correct?

16   A.   True.

17   Q.   You told us about the Burger King, you went there and you

18   called Curly, correct?

19   A.   True.

20   Q.   And you told us earlier this morning that before the truck

21   was actually leaving, when you were having conversation with

22   the police officers, Curly and Officer Watson, you told them

23   that you expected some money off the top, is that true?

24   A.   That was promised to me, sir.

25   Q.   I understand.  Did you request it or did they bring it up

1    on their own?

2    A.   No, they brought it up on their own.

3    Q.   All right.  And was it Watson that brought it up?

4    A.   Yes, sir.

5    Q.   And what he told you was, "Look, you'll get 300,000 off

6    the top and then the police department will give you 500,000

7    legally," is that about right?

8    A.   True.

9    Q.   And you believed him, correct?

10   A.   Yes, I did.

11   Q.   You didn't know whether he was telling you the truth or

12   whether he was lying, did you?

13   A.   I thought one way, the truth.

14   Q.   And you believed him because he was a police officer?

15   A.   Yes, sir.

16   Q.   Did you know at the time you were talking to him he was an

17   undercover narcotics officer?

18   A.   Yes, sir.

19   Q.   And you know from your experience or from just talking to

20   other people that undercover narcotics officers have to lie

21   routinely to people, right?

22   A.   No, sir.

23   Q.   You don't know about undercover officers --

24   A.   No, sir.

25   Q.   Just hang on a second.

1    You don't know about them going and making buys

2  pretending that they're junkies or pretending that they're

3  street guys even though they're the police, you don't know

4  anything about that?

5  A.   Well, I know they're undercover, sir, but this wasn't

6  undercover.

7  Q.   Okay.  You agree with me, do you, sir, that undercover

8  police officers routinely lie while they're acting as

9  undercover officers, you agree with that?

10  A.   I'm not going to say that they lie.  I know they make

11  buys, sir.

12  Q.   Okay.  Without beating a dead horse, you know they don't

13  say they're the police when they're making a buy, right?

14  A.   True.

15  Q.   Which means it's a lie, right?  Right?

16  A.   Yes.

17  Q.   All right.  So you were operating under the assumption

18  that if you set this deal up, that you're going to get 300,000

19  bad money off the top money and 500,000 from the city, right?

20  A.   True.

21  Q.   And that's what you were counting on when you made that

22  call to Curly, am I right?

23  A.   True.

24  Q.   And when you found out, either from the media or from

25  somewhere else, that there wasn't really -- they didn't say

1   there was 3 million, they said there was only 2.1, you felt

2   like they stole from you, right?

3   A.   I knew it.

4   Q.   But you felt it was thievery from you, correct?

5   A.   True.

6   Q.   Because some of that money, at least based on what you

7   were telling us earlier, some of the money in the truck was

8   your money, wasn't it?

9   A.   No.  It was the cartel's money, sir.

10  Q.   But didn't you tell us, Mr. Jackson, that you and some

11  other people sold the dope and that money was included in the

12  money that was going back to the cartel, didn't you tell us

13  that?

14  A.   Yes, but it wasn't my money.  It was the cartel's money.

15  Q.   Right, after you put it on the truck?

16  A.   The proceeds, yes.

17  Q.   But the money, some of it at least, came from you as a

18  result of drug sales, true?

19  A.   True.

20  Q.   Okay.  So you believed, once you heard about this number,

21  you believed that you got screwed, right?

22  A.   I knew it.

23  Q.   And you didn't trust them from there on, right?

24  A.   True.

25  Q.   Because they had lied to you, correct?

1   A.   True.

2   Q.   Okay.  And when all was said and done, you wound up

3   getting a payment from the Detroit Police Department, correct?

4   A.   True.

5   Q.   And that was all on the books, correct?

6   A.   True.

7   Q.   And the lady was there you told us about from the police

8   department and you signed the form that Mr. Buckley showed you,

9   correct?

10   A.   True.

11   Q.   And you received $250,000 cash money, correct?

12   A.   True.

13   Q.   Okay.  And you were still angry because as far as you were

14   concerned, the police officers had screwed you because you

15   didn't get $800,000, right?

16   A.   Wrong.  I was not angry.

17   Q.   You weren't angry.  Okay.  All right.  You were happy?

18   A.   Yeah.  Can you hear it?

19   Q.   Yeah.  Okay.  In the taped conversation that we listened

20   to this morning, you were talking about 100 or 150 kilos that

21   might be coming into the city, correct?

22   A.   True.

23   Q.   And were you telling the truth or were you lying?

24   A.   I was telling the truth.

25   Q.   And did the hundred or hundred and fifty kilos come?

1   A.   Never.

2   Q.   They never got there?

3   A.   Nope.

4   Q.   Okay.  And you certainly never called the police and told

5   them, "Hey, I've got a hundred and fifty kilos we can get," did

6   you?

7   A.   No, sir.

8   Q.   And with respect to getting your cash, you told us and the

9   exhibit showed that you got that cash on August the 14th of

10   2010, correct?

11   A.   True.

12   Q.   And that would have been by my count 19 days after the

13   seizure, correct?

14   A.   Yes, sir.

15   Q.   But you believed, and the reason that you arranged for the

16   meeting with the chief, you thought you were never going to get

17   any money, right?

18   A.   True.

19   Q.   So you thought not only do these guys lie, the cops, but

20   the city was going to lie too, the city would never give you

21   your money?

22   A.   No, I'm not going to say that after I finished talking to

23   Godbee.

24   Q.   Before you talked to Godbee, you were aware from Calvin

25   Turner that there was a program where if you were an informant,

1    you could get money, you knew that, right?

2    A.   True.

3    Q.   And Turner told you that he heard that from Curly, right?

4    A.   True.

5    Q.   So when you arranged for your meeting with Godbee, was it

6    your feeling that there really was no such program, the city

7    was going to screw you out of the money and that's why you

8    needed to talk to the chief?

9    A.   Well, what I was getting ready to do, sir, is go to Bingo,

10   and that's Derrick Coleman's friend, that's Dave Bing, to the

11   mayor if I couldn't get nowhere with the chief and go to the

12   news.

13   Q.   Okay.  But my question is -- you were going to go to the

14   news?

15   A.   Yes, I was.

16   Q.   And tell them you were a dope dealer?

17   A.   Sure was.

18   Q.   Okay.  But that didn't happen, did it?

19   A.   No, sir.

20   Q.   And you didn't go see -- you didn't go see Dave Bing

21   either, did you?

22   A.   No.  Godbee stopped it right there.

23   Q.   All right.  But my question is, if you could just answer

24   what I'm asking you, did you believe when you tried to -- or

25   when you arranged a meeting with Godbee, that the city was

Case 2:15-cr-20217-SJM-APP   ECF No. 129, PageID.1053   Filed 07/20/16   Page 191 of 206
Jury Trial: Volume 15 - Testimony of Gary Jackson • Wednesday, June 29, 2016

191

1    going to screw you too, just like what the cops did, is that

2    what you believed?

3    A.   No, I didn't.

4    Q.   Okay.  You agree I think, sir, do you not, that various

5    people close to you got arrested by the Detroit Police during

6    this time period?

7    A.   Yes, sir.

8    Q.   You agree that Tone Anderson had 250 grams of I think

9    heroin, might have been cocaine seized from him, you know about

10   that?

11   A.   I knew about it but I didn't have any doings with it.

12   Q.   All right.  But -- but Mr. Anderson was close enough to

13   you that he was included on the list of people you were

14   cooperating against, right?

15   A.   Yeah.  He used to run for me.

16   Q.   Okay.  And you knew that he was also the subject of a

17   search warrant where money and some guns were seized, did you

18   know that too?

19   A.   From Mr. Anderson, no, I didn't.

20   Q.   Okay.  You know that your nephew, Jermaine Rooks, was

21   arrested with a kilo, correct?

22   A.   Yes.

23   Q.   And the reason you know it is you're the one who told on

24   him, right?

25   A.   True.

1   Q.   And that's because you were mad at him, right?

2   A.   No.

3   Q.   No?

4   A.   No, I wasn't.

5   Q.   Did you ever listen to any of the phone calls that you had

6   on your tape?

7   A.   You may listen to it afterwards, not before.  I wasn't

8   really mad at him.

9   Q.   Have you listened to the conversation you had with

10  Jermaine Rooks about him supposedly getting rid of a shotgun

11  you left with him?

12  A.   A shotgun?  Yeah.

13  Q.   Yeah.  And did you remember -- do you listen to that phone

14  call?  Do you remember telling Jermaine Rooks that if he wasn't

15  your nephew, you'd kill him?

16  A.   Yeah, I might have said something, but it was no

17  intention, sir.

18  Q.   Okay.

19  A.   I was just angry at the time.

20  Q.   Angry.  And as you told us earlier, if you get angry with

21  somebody, that's when you got to get even with them, right?

22  A.   Not in those words, sir, but I --

23  Q.   Okay.  Whatever --

24  A.   -- just would back off.

25  Q.   -- whatever words you pick, would you agree with me, you

1   hold a grudge, you're going to get even?

2   A.   No, I'm not going to say that.   I just say when you're

3   dishonest, it just makes me look at you twice, sir.

4   Q.   Okay.   Was that the reason that you set your own nephew up

5   on a kilo arrest?

6   A.   No, sir.

7   Q.   Okay.   I think Mr. Harrison referred to a guy, Ben-Ben.

8   You -- that means -- that's Benny Doughrity, D-O-U-G-H-R-I-T-Y,

9   right?

10   A.   Yes, sir.

11   Q.   And you told us about your actions with respect to the

12   arrest of Benny Doughrity.   Remember telling us about that

13   earlier?

14   A.   Go ahead.

15   Q.   That means yes, right?

16   A.   Yes.

17   Q.   You wanted to help your nephew, that nephew, if you could,

18   right?

19   A.   True.

20   Q.   So you contacted Curly, am I right?

21   A.   Yeah, Super Friends.

22   Q.   Yeah, Curly is a Super Friend?

23   A.   Yes, mm-hmm.

24   Q.   Right?

25   A.   Yes, sir.

1   Q.   And you contacted him and you asked him to basically

2   figure out a way to help your nephew, right?

3   A.   True.

4   Q.   And you supplied the fake dope that went into the

5   Whitewood address?

6   A.   Yes.

7   Q.   And you don't remember whether you supplied the gun that

8   was also found there?

9   A.   No, I can't recall on that one, sir.

10  Q.   Did you believe that by doing that, that the police would

11  go in with a search warrant, either a phony one or real one?

12  A.   Right.

13  Q.   And find the stuff?

14  A.   Yes.

15  Q.   You told Mr. Harrison you didn't know if there was a

16  search warrant or do you know?

17  A.   It had to be one.

18  Q.   All right.  And you don't know whether the search warrant

19  was made up, the affidavit was filled with lies by Curly, you

20  don't know that one way or the other or do you know?

21  A.   Well, I knew that he had to put a search warrant.  I don't

22  know what he put on there, sir.

23  Q.   Okay.  And you expected, or you hoped at least, that

24  something good would happen for Benny Doughrity if you all put

25  the fake dope in the house and the police seized it, true?

1    A.   True.

2    Q.   And Benny Doughrity today is in the middle of serving his

3    five-year sentence on the gun case, true?

4    A.   True.

5    Q.   And that gun case is the case that you were trying to help

6    him on, right?

7    A.   True.

8    Q.   And you said you don't know if Sergeant Hansberry had

9    something to do with keeping that from happening, you don't

10   know that?

11   A.   That's the first time I'm hearing it today, sir.

12   Q.   Okay.  Who lived at 2424 Glynn, G-L-Y-N-N?

13   A.   Deke.

14   Q.   And that's Mr. Tucker, correct?

15   A.   True.

16   Q.   And did you have something to do with fake drugs being

17   placed in 2424 Glynn Court?

18   A.   Fake and real, both.

19   Q.   Okay.  Fake and real.

20        That was you and Curly again, correct?

21   A.   Yes, sir.

22   Q.   And did you know that Curly was going to obtain a phony

23   search warrant from a judge in state court to go into 2424

24   Glynn?

25   A.   Well, Curly didn't know if it was any fake to it.  Just

1    being honest.

2    Q.   Curly didn't know but you knew?

3    A.   True.

4    Q.   And Fred Tucker or Deke was not at home at the time?

5    A.   No, he wasn't, sir.

6    Q.   And as a result -- you're saying that -- that you gave

7    information to Curly about the 2424 Glynn address, correct?

8    A.   True.

9    Q.   But you didn't tell Curly that the dope would be fake?

10   A.   No.

11   Q.   Again, you -- you weren't here when Curly testified, you

12   don't know what he said about this?

13   A.   At the end of the day, he probably after -- afterwards,

14   you know what I mean, but not before time like that.  That's

15   just -- I had it hid over here.

16   Q.   Okay.  And you did that so that Curly -- Curly was your

17   control person, the one who signed you up as an SOI, am I

18   right?

19   A.   Yes, sir.

20   Q.   And as a result of this raid, did you get a payment from

21   the police?

22   A.   $5,000.

23   Q.   And that came from the Detroit Police Department, correct?

24   A.   True.

25   Q.   And you knew when you got it, that the whole thing was

1   phony, right?

2   A.   No, whole thing wasn't phony.  That's what I told you.  It

3   was real and just a couple wasn't, that's all.

4   Q.   And that -- whatever it was that was over there, that was

5   the subject, was it not, of the conversations that you had with

6   Fred Tucker and Calvin Turner when this entire Dante Mitchell

7   holding Fred Tucker hostage with the pistol situation came up,

8   right?

9   A.   You talking a couple different incidents, sir.

10  Q.   No, I'm only talking one.

11       All right.  Let me break it down for you, okay?  You

12  haven't heard your phone conversations from May the 2nd, May

13  the 3rd, May the 4th of 2014 that were part of the wiretap,

14  have you?

15  A.   No, sir.

16  Q.   So you don't know -- well, you haven't heard yourself then

17  talking to Fred Tucker, Calvin Turner, you haven't heard

18  yourself talking those days, correct?

19  A.   Is that -- if I can ask you, is that with Dante or is that

20  the seizure of this house?  I just want to know which one are

21  you talking about?

22  Q.   The first question is, I think you've answered, you've not

23  heard any of your conversations from those dates?

24  A.   No, sir.

25  Q.   All right.  If I tell you that May the 2nd, 2014 is the

1    day that there were conversations about Dante Mitchell holding

2    Fred Tucker at gunpoint, does that sound right to you, May 2nd?

3    A.   I don't know exact date, but yeah.

4    Q.   Spring of 2014?

5    A.   Yes.

6    Q.   While the wiretap was up?

7    A.   Yes, sir.

8    Q.   Okay.  You were told by Tucker, he gets on the phone and

9    he tells you, "Dante Mitchell's got a gun on me," right?

10   A.   Yes, I think --

11   Q.   You don't know Dante Mitchell from Adam's housecat at the

12   time, do you?

13   A.   I don't know him.

14   Q.   And Mr. Tucker tells you that Dante wants his drugs and

15   wants his money back, right?

16   A.   I think one or the other.

17   Q.   Well, you gave Tucker drugs to give to Dante, correct?

18   A.   True.

19   Q.   And it was heroin, correct?

20   A.   True.

21   Q.   And you know from your experience that sometimes, I'm not

22   saying it happened here, sometimes the person who gets it from

23   somebody else steps on it on his way over to deliver, correct?

24   A.   True, yes.

25   Q.   And steps on it, I think we've said it before, just so the

1   jury's clear, you put some non-drugs with it, correct?

2   A.   Well, I never did, sir.  That's why you said if I brought

3   it.  I'm just being pacific with you.  If I brought it.  I

4   didn't bring anything.  It's already at Mr. Tucker's house.

5   Q.   Okay.  But my -- my point is, you'd agree with me that

6   stepping on it means adding more mix to it which makes it less

7   potent and sometimes people don't want to buy it, right?

8   A.   Think you know the chemistry.  That's good, sir.

9   Q.   So when Mr. Tucker tells you this guy's got a pistol on

10  him, the first thing you tell him, "Well, he's got to give you

11  the drugs back," right?

12  A.   If that's what it said, yeah.

13  Q.   And you know that Deke is sitting there being held at

14  gunpoint, correct?

15  A.   True.

16  Q.   So you call Curly, as you told us, correct?

17  A.   True.

18  Q.   And eventually the police get Tucker and also I think the

19  person you called Hook, which is Metcalf, right?

20  A.   Yes.

21  Q.   They get them out of there, correct?

22  A.   Yes, sir.  Excuse me.

23  Q.   Do -- do you agree with me that after that happened, that

24  you and Calvin Turner and Fred Tucker had a number of phone

25  conversations talking about what should Mr. Tucker tell the

1  Prosecutor's Office and the police?  Do you agree with that?

2  A.   I -- I don't know so much as Calvin -- I know I was

3  talking to Calvin, then I can't say, but I know Mr. Tucker for

4  sure.

5  Q.   And didn't -- isn't it true that in those conversations,

6  you and Mr. Tucker came up with a story for him to tell the

7  police where you could get Dante Mitchell charged with a crime

8  and maybe go to jail?

9  A.   I can't recollect everything, sir, but if that's in there,

10  that's in there.

11  Q.   Do you remember telling Fred Tucker to come up with a

12  story that didn't involve him selling Dante Mitchell heroin,

13  rather he should say something like he owed him money or

14  something along those lines?

15  A.   I might have said that, sir.  I don't know exactly.

16  Q.   And -- and do you remember saying at any time, along with

17  Mr. Tucker, that, "Hey, you can tell the police that the dope

18  that was found on Glynn Street was Dante Mitchell's."  Do you

19  remember that being part of conversations?

20  A.   I can't recall, but if that's in there, okay.

21  Q.   Okay.  And do -- do you know today that Fred Tucker

22  actually went to court as the complaining witness charging

23  Dante Mitchell with whatever it was for holding him at

24  gunpoint, do you know about that?

25  A.   Yes, sir.

1   Q.   And you know today, you know Fred Tucker went there and

2   lied his behind off, you know that, don't you?

3   A.   No, sir.

4   Q.   Okay.  All right, Mr. Jackson.  That's it.

5           THE COURT:  Okay.  Thank you.  Mr. Sasse?

6           MR. SASSE:  No questions, Your Honor.

7           THE COURT:  Anything else, Mr. Buckley?

8           MR. BUCKLEY:  Nothing further of Mr. Jackson, Your

9   Honor.

10          THE COURT:  Let me see the lawyers up here real

11   quick.

12          (Side-bar discussion as follows):

13          THE COURT:  The cases say that my obligation when I

14   learn of or see the witness going into improper territory is to

15   cut it off and instruct the jury as soon as possible that the

16   matters of which the witness testified were improper and should

17   be ignored, if not strike the testimony.

18          As I mentioned in our earlier colloquy, Jackson's

19   statement went by me so fast that in the -- in the line of

20   questioning that was going on and trying to figure out the

21   names, looking at the other material in the transcript, I

22   didn't -- I didn't catch the impropriety immediately, but Mr.

23   Fishman did and he asked for a break.  We adjourned court

24   and -- and had our discussion.

25          There's certainly First Circuit if not Sixth Circuit

1   authority, which we haven't found yet, that when this happens,

2   a curative instruction and striking the testimony would

3   properly redress the situation for a wide variety of reasons,

4   including the jury's presumptive attention to the presiding

5   judge's admonitions.  I would have done this right now or at

6   the end of the day, but I -- I don't want to -- I want to ask

7   Mr. Fishman, do you want me to give a curative instruction

8   or -- I -- I don't think a mistrial is appropriate if I do, but

9   strategically you may not want me to highlight all this, so I

10  wanted to defer to you in terms of what you think.

11          MR. FISHMAN:  Case law is amazing.  It always puts

12  the weight right back on the defense lawyer.

13          THE COURT:  Yeah.

14          MR. FISHMAN:  What I would prefer to do, since I am

15  totally unaware of the case law, is wait until morning.

16          THE COURT:  Yeah.

17          MR. FISHMAN:  And after looking, I'm going to ask

18  Will to -- I wish I had someone like Will so I'd have all these

19  cases at my fingertips.

20          THE COURT:  We're very lucky, we're very lucky, yeah.

21          MR. FISHMAN:  But I'd like that.  I'd like him to --

22  if he'll give me the cases he's looked at.  I'd just like to

23  take a look and see.

24          THE COURT:  Okay.

25          MR. FISHMAN:  I don't see any harm.

```
 1            THE COURT:  I'll -- I'll say something at the end of

 2   the day, that witness -- witness testimony beyond the relevant

 3   matters of the case should -- should never be considered and

 4   that -- you know, do my usual thing about paying attention.

 5            MR. FISHMAN:  But I would -- I don't want the

 6   specifics explained.  Maybe just give them a warning as to --

 7            THE COURT:  No, I'm not going to go into specifics.

 8            MR. BUCKLEY:  Well, I don't think Mr. Fishman's

 9   entitled to a double dip, Judge, so I mean --

10            MR. FISHMAN:  It can wait til tomorrow is what I'm --

11            MR. BUCKLEY:  Is that what you plan?

12            MR. FISHMAN:  Yeah.

13            THE COURT: All right.  Okay.  All right.  Good,

14   good, good, good.  We'll split the difference, so to speak.

15   All right.  Thank you all.

16            MR. BUCKLEY:  Thank you, Judge.

17            (End of side-bar discussion)

18            THE COURT:  Okay.  Very good.  Mr. Jackson, that

19   completes your testimony.  You may step down and be on your

20   way.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  And thank you, and thanks for staying on

23   time and with us during the breaks, okay?  Okay.  Have a good

24   afternoon.

25            (Whereupon the witness was excused at 2:00 p.m.)
```

1        THE COURT:  Well, it's 2:00 o'clock.  We ought to

2   break, huh?  All right.  Okay.  All right.

3        Well, I have -- I've prepared a -- I didn't give you

4   all the admonitions over and over today but I did prepare a

5   little -- little chart.  Don't discuss the case.  These are

6   your jurors' obligations.  Don't talk about it among yourselves

7   or with others on your break.  Don't read or listen or engage

8   in any electronic communication or investigation about the

9   case.  Don't do any research or investigation on your own.

10  Don't form any opinions until the evidence is all in and you

11  begin deliberating.

12       We want you to keep your eyes on the evidence and

13  remember what I told you at the beginning of the case what was

14  and was not evidence.  At the end you will have the full and

15  fair opportunity to deliberate on all the evidence in the case

16  and to -- and to make your decision, but your time for that has

17  not come yet, okay?

18       So with all those admonitions about your duties in

19  mind, we will set you free for the day and ask you to be back

20  here at 8:30.  Thanks again for your timeliness, especially

21  when you got here on time this morning, but being compliant

22  with the schedule on the breaks too.  I think -- I think we --

23  we've had a good several days and we've got a couple of more

24  next -- left this week and then we'll see where we go, okay?

25  All right.  Thank you all.

1          Let's all rise for our jury.

2          (Whereupon the jury was excused at 2:02 p.m.)

3          THE COURT:  Okay.  Everybody may be seated.  All

4    right.  We'll be in recess.

5          MR. BUCKLEY:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          (Whereupon proceedings in the above-entitled matter

8          were adjourned to Thursday, June 30, 2016)

9                         —  —  —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | C E R T I F I C A T I O N |
| 2 | I, Linda M. Cavanagh, Official Court Reporter of the |
| 3 | United States District Court, Eastern District of Michigan, |
| 4 | appointed pursuant to the provisions of Title 28, United States |
| 5 | Code, Section 753, do hereby certify that the foregoing pages 1 |
| 6 | through 205 comprise a full, true and correct transcript of the |
| 7 | proceedings held in the matter of United States of America vs. |
| 8 | David Hansberry, Bryan Watson and Kevlin Omar Brown, Case No. |
| 9 | 15-20217, on Wednesday, June 29, 2016. |
| 10 | |
| 11 | |
| 12 | s/Linda M. Cavanagh |
| | Linda M. Cavanagh, CSR-131, RPR, RMR, CRR |
| 13 | Federal Official Court Reporter |
| | United States District Court |
| 14 | Eastern District of Michigan |
| 15 | |
| 16 | |
| 17 | Date: July 20, 2016 |
| | Detroit, Michigan |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |