**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,** **CRIMINAL NO. 15-20217**

**-vs-** **HON. STEPHEN J. MURPHY, III**

**DAVID HANSBERRY, and**
**BRYAN WATSON,**

**Defendants.**
_____________________________/

# GOVERNMENT SENTENCING MEMORANDUM

NOW COMES Plaintiff United States of America, by and through Barbara McQuade, United States Attorney, J. Michael Buckley, Assistant United States Attorney, both for the Eastern District of Michigan, Southern Division, who submit the following Sentencing Memorandum:

## I. INTRODUCTION

Defendant Detroit Police officers David Hansberry and Bryan Watson were jointly charged in a superseding indictment with one count of Conspiracy to Commit Hobbs Act Extortion, in violation of 18 U.S.C. § 1951, one count of Conspiracy to Distribute Cocaine in violation of 21 U.S.C. § 846, one count of Possession With Intent to Distribution of Cocaine in violation of 21 U.S.C. § 841, and one count of Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation

of 18 U.S.C. § 924(c). Hansberry was charged with six substantive counts of Hobbs Act Extortion; Watson was charged in five of those Hobbs Act Extortion counts, (R. 79: Superseding Indictment).

Jury trial of this case commenced on June 7, 2016 and concluded on July 11, 2016, when the jury returned a verdict of guilty, as charged, on Count One, Conspiracy to Commit Hobbs Act Extortion and not guilty on the remaining counts. (R. 121: Verdict Form).

Defendants were convicted of a very serious felony offense, which involved conspiring with violent, kilo-weight drug traffickers to distribute cocaine and heroin on the streets of Detroit, and to steal drug proceeds from criminals, for Defendants' personal enrichment. To further their crime, Defendants stole seized drugs and drug money, wrote and filed false police reports, replaced stolen kilos of cocaine with sham or "dummy" kilos which they placed on evidence, and prepared fake search warrants with a forged judge's signature. Worst of all, Defendants willfully released kilo weight drug dealers whom they caught red-handed, to further their illegal enterprise and enrich themselves. Defendants made a mockery of the criminal justice system and further endangered Detroit neighborhoods.

The United States Probation Department conducted an investigation and issued its Presentence Investigation Reports ("PSR's") on October 24, 2016. Notwithstanding the fact that the PSR's did not take into account Defendants'

acquitted conduct, the Probation Department calculated Hansberry's Guideline range to be 235-240 months and Watson's to be 210-240 months. The United States urges this Court to take into account Defendants' acquitted conduct and sentence both Defendants to 240 months, accordingly.

Sentencing for Defendants is currently scheduled for February 22, 2017.

## II. FACTS

The evidence adduced at Trial showed that:

Hansberry and Watson, while Detroit Police officers assigned to the Narcotics Section, agreed to, and did, steal illegal drugs and drug monies from drug dealers in Detroit, for their own personal profit. The defendants pocketed and failed to report stolen drug proceeds, and had third parties (drug dealers themselves) sell the stolen drugs and return a portion of the profits from the drug sales to the defendants.

To further this illegal conspiracy, the evidence proved that the defendants prepared falsified police reports (which under-reported or willfully failed to report any seized drug proceeds), employed fake search warrants, and placed on evidence substituted sham kilograms of cocaine for actual, seized drugs. The defendants also willfully failed to arrest drug dealers they encountered during search warrant executions, and recruited them to work for defendants by supplying information on

other drug dealers, so that defendants could steal and share illegal drugs and drug money.

In so doing, Hansberry and Watson betrayed not only their sworn oaths of office, but they betrayed the very citizens they were sworn to protect, as well as all other honest law enforcement officers and the criminal justice system. Instead of removing kilograms of cocaine – and more importantly, kilo weight dealers- from the street, defendants worked in concert with kilo weight dealers to sell kilos of cocaine in Detroit.

The evidence at trial proved that Hansberry bought a Cadillac Escalade, a Corvette, and an Aston Martin automobile with the illegal proceeds of the charged conspiracy and that Watson purchased a Mercedes Benz. Hansberry spent thousands of dollars a week at the Ace of Spades strip club, where he was treated as a "VIP." IRS Special Agent Kevin Nalu testified that both defendants made substantial cash deposits to their respective bank accounts.

## III. SENTENCING

The Supreme Court has made the Sentencing Guidelines advisory in nature, and has held that a sentencing court is duty-bound to first calculate the Guidelines range, and then consider the Guidelines range along with the factors set forth in 18 U.S.C. § 3553(a) to fashion a sentence sufficient, but not greater than necessary,

to comply with the stated objectives of sentencing. *United States v. Booker*, 543 U.S. 220 (2005).

Generally speaking, the standard of proof on Sentencing Guidelines issues at sentencing is by a preponderance of the evidence. *United States v. Carroll*, 893 F.2d 1502 (6th Cir. 1990). The Sixth Circuit has held that, post-*Booker*, the preponderance standard on factual findings at sentencing governs. *United States v. Cook*, 453 F.3d 775 (6th Cir. 2006).

At sentencing hearings, the Federal Rules of Evidence do not apply. FRE 1101(d)(3). The Confrontation Clause does not apply either, and so hearsay is admissible at sentencing hearings, provided it bears some minimum indicia of reliability. *United States v. Silverman*, 976 F.2d 1502 (6th Cir. 1992).

## **THE OFFENSE CONDUCT**

### ***The Defendants' Acquitted Conduct Should Be Included in the Court's Sentencing Guidelines Calculation***

Defendants incorrectly assert that the defendants' conduct supporting the acquitted counts should be completely disregarded and should not be considered in calculating the defendants' Guideline range.

The jury convicted the defendants of the single most important count, Conspiracy to Commit Hobbs Act Extortion, but acquitted the defendants of substantive Hobbs Act extortion counts which represented drug rips by the defendants in furtherance of the Hobbs conspiracy. Although Defendant Watson has

previously asserted that the overall verdict represents a "windfall for the government" (R. 126: Watson Motion for Judgment of Acquittal as to Count One, at page7), the Supreme Court has held that such a verdict may merely represent a windfall **to the defendants.** *United States v. Powell*, 469 U.S. 57, 64-65 (1984).

The Government sincerely appreciates the conscientious, hard work of the jury in this case. However, in *Powell*, the Supreme Court stated that such a verdict should not necessarily be interpreted as windfall to the Government at the defendant's expense, and that it is equally possible that the jury properly reached its conclusion of guilt on the compound offense, but then "through mistake, **compromise**, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Powell*, 469 U.S. at 65. (Emphasis added).

The Supreme Court (as well as an *en banc* panel of the Sixth Circuit) has held that "'a jury's verdict of acquittal does not prevent the sentencing court from considering the conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of evidence.' *United States v. Watts*, 519 U.S. 148, 157 (1997)(per curiam); *United States v. White,* 551 F. 3d 381, 383 (6th Cir. 2008) (en banc)." *United States v. Churn*, 800 F.3d768,780 (6th Cir. 2015) reh'g denied (Oct 23, 2015).

At trial, the Government presented testimony from six separate groups of individuals –who did not know one another- who all testified about different rips perpetrated against them by the defendants.

**<u>The Acquitted Conduct</u>**

The Renee Williams (Count Three), Nicholas Simmons (Count Four), Christopher Wilson (Count Five), Dwight Benson (Count Seven) and Rafael Vasquez (Count Eight) rips were charged against Hansberry and Watson. Hansberry and co-defendant Kevlin Brown were alone charged in the Chester Dwayne Browning rip (Count Six).

This acquitted conduct should all be used to calculate the defendants' Sentencing Guideline range, as it constitutes "relevant conduct" under Sentencing Guidelines Section 1B1.3 and because the standard of proof at sentencing is by a preponderance of evidence.

**Renee Williams** testified that the defendants seized $140,000 in drug proceeds from her. Defendants reported seizing only $55,000…which was ultimately returned to Williams by the Wayne County Prosecutor's Office. **Resulting net theft by defendants from Williams was $85,000.** The Oakland County Prosecutor ultimately *nolle pros'ed* Williams' criminal case.

**Nicholas Simmons** testified that defendants seized $300,000 in cash drug proceeds from him. Defendants reported no money seizure from Simmons, resulting in a **$300,000 theft by defendants.**

**Christopher Wilson** testified that defendants seized $140,000 in cash drug proceeds from him, and that they planted heroin on him. **Net theft by defendants: $140,000.**

**Chester Dwayne Browning** testified that police took approximately $40,000 in cash drug proceeds from him and Louis Mars. Mars testified that he was actually in on this "rip" with defendant Hansberry and Kevlin Brown.

**Fred Tucker** testified that he participated along with defendants Hansberry and Watson in a **rip of $47,000** in cash drug purchase money from Dwight "Don" Benson.

**Rafael Vasquez** testified that Detroit Police seized 7 kilos of cocaine from him. Unbeknownst to Vasquez, **Louis Mars** assisted defendants in this rip. Former Detroit police officer **Arthur Leavells** testified that he and the defendants took the stolen **Vasquez** kilos to **Calvin Turner**, who sold them and gave the proceeds to Leavells. Turner testified that he sold the kilos brought to him by the defendants and Leavells and gave the proceeds to Leavells. Leavells then gave the proceeds to the defendants. The street value of the ripped Vasquez kilos was **approximately $250,000.**

The money total of the acquitted rips is approximately **$862,000.**

Interestingly, Hansberry himself corroborated the acquitted conduct of Hansberry and Watson in a recorded undercover meeting with FBI cooperating witness Arthur Leavells. (Government Trial Exhibit 807/ Government Sentencing Memorandum Exhibit B). During this recorded meeting on September 7, 2014, Hansberry talked about several rips that he, Watson, and Leavells had participated in years earlier, including the **Renee Williams rip** (which evidence proved was $85,000 in drug proceeds), the **Nicholas Simmons rip** (which evidence proved was $300,000 in drug proceeds) and the **Christopher Wilson rip** (which evidence proved was $140,000 in drug proceeds). (Exhibit B at 14-16). Hansberry, who by that time had been promoted to Lieutenant and transferred out of Narcotics, stated that he was now "scared straight" and "no fun anymore." (Exhibit B at 46).

**The Hobbs Act Extortion Conspiracy Conviction Conduct**

If for any reason this Court should elect not consider the acquitted conduct in calculating the defendants' Guidelines range, there was sufficient evidence presented by the Government completely independent of the acquitted conduct to warrant a substantial Guidelines range of imprisonment for defendants.

**Lamont Calhoun** testified, among other things, about a **$54,000** cocaine drug money rip, and **Kelvin Pulley** testified about the defendants' rip of his two kilos of cocaine **worth $80,000**. The testimony of **Gary Jackson**, supported by

corroborating evidence (including a recording of his meeting with defendants), proved that defendants skimmed approximately **$916,000** of drug money off a Mexican cartel's $3 Million drug money shipment. A conservative view of the testimony of these witnesses alone, irrespective of the acquitted counts, brings defendants to **$1.05 Million** for Sentencing Guidelines purposes. (See U.S.S.G. 2B1.1).

The testimony of **Lamont Calhoun** did not relate to the evidence of the six (acquitted conduct) rips and was wholly independent of the testimony supporting the acquitted conduct. Calhoun testified that Defendant Watson recruited him to participate in the scheme. (R. 128: Calhoun at 16-18). Calhoun testified that on countless occasions (dating back to the 1990's), he supplied Watson with information concerning other drug traffickers. (R. 128: Calhoun at 16-18). Watson would then seize drugs and drug proceeds from the other drug traffickers, and share drug proceeds or seized illegal drugs with Calhoun. (R. 128: Calhoun at 19-22; 26-37).

Calhoun testified that Watson helped him obtain a false driver's license from the Michigan Secretary of State in the name of "Marquise McCartha". (R. 128: Calhoun at 13-15; 64-65; 97). Calhoun also testified that Watson employed sham kilograms of cocaine to trick other drug dealers who brought buy money to locations intending to buy kilos of cocaine…only to have Watson appear at the

scene of the "drug deal" to, as a police officer, seize the drug purchase money. (R. 128: Calhoun at 42-53).

Calhoun testified that on one occasion, Watson and he planned to do a drug money rip-off ("rip") of a drug dealer named "Vito." (R. 128: Calhoun at 42; 119). Watson and Calhoun agreed that Calhoun would tell Vito that Calhoun had two kilos of cocaine for sale, at $27,000 per kilo **for a total of $54,000.** (R. 128: Calhoun at 43). Watson made available two sham kilos of cocaine to show to the buyer.

Vito and two of his associates appeared at Calhoun's home with the $54,000 in cash; **Watson appeared as a police officer and seized the money,** which he later split with Calhoun and another individual. (R. 128: Calhoun at 49-53). Calhoun had been promised a share of $27,000 by Watson, but received only approximately $13,000. (R. 128: Calhoun at 53-57).

Calhoun testified that on another occasion, Watson and he agreed to do a rip on another drug dealer, Hightower. (R. 128: Calhoun at 66; 127-28). Hightower brought to Calhoun's home on Snowden in Detroit one half kilo of cocaine, which he "fronted" to Calhoun. (R. 128: Calhoun at 66-68). Watson then followed Hightower home to his house on Monte Vista Street, where he executed a search warrant. (R. 128: Calhoun at 69-70).

Calhoun testified that Watson told him that nothing to share had been seized at Hightower's home on Monte Vista, a claim that Calhoun knew to be untrue. (R. 128: Calhoun at 70-71; 76-77). Hightower then pressed Calhoun for the return of the half kilo of cocaine he had fronted to Calhoun, or the proceeds from the sale thereof. (R. 128: Calhoun at 70).

Calhoun told Watson that he needed something to show to Hightower to convince him that the police had searched his Snowden home and seized the half kilogram of cocaine. Calhoun testified that Watson and his boss, then-Sgt. Hansberry, then brought Calhoun a fake search warrant for Calhoun's home at 15747 Snowden, in Detroit. (R. 128: Calhoun at 72; Government Trial Exhibit 711B). Attached to the fake warrant was a piece of paper upon which was written "Call Bullet" with a phone number. "Bullet" was Watson's police code name and the phone number was Watson's phone number. (Government Trial Exhibit 711B).

At trial FBI Forensic Document Examiner Peter Belcastro opined that Watson wrote "Call Bullet" on the paper attached to the warrant. Detroit Police Sgt. Mark Henning testified that although the listed affiant on the Snowden warrant was police officer "Robert Jordan," no Robert Jordan was ever employed by the Detroit police department. Judge Michael Wagner testified that the signature purported to be his on the Snowden warrant was in fact not his signature.

Calhoun testified that, during the timeframe of the charged conspiracy, Watson had earlier provided him with similar like fake search warrants for this purpose on several occasions. (R. 128: Calhoun at 75).

Calhoun called the FBI tip line in January, 2013 and reported Watson and Hansberry. (R. 128: Calhoun at 78-79). Calhoun also presented FBI agents with the fake Snowden search warrant provided him by Hansberry and Watson. (R. 128: Calhoun at 72-76).

**Kelvin Pulley** testified that on or about March 3, 2013, he went to 20521 Ohio Street in Detroit, with two kilograms of cocaine. (R. 127: Pulley at 6-8). Government witness Arthur Knuckles testified that he owned the Ohio Street house and rented it to one Dante Sattler, who had ordered up the two kilos at the direction of Knuckles, who was conspiring with Hansberry and Watson to "rip" Pulley.

While walking up to the Ohio Street house with a bag containing the two kilos, Pulley was approached by Detroit police officers. Police reports showed that the police involved were Sgt. Hansberry and his crew. (R. 127: Pulley at 9-12).

Pulley testified, and Detroit police reports confirmed, that Hansberry and his crew seized the two kilos from Pulley. However, the police reports falsely stated that Pulley was arrested. Pulley testified that although he was detained for hours and pressed to "work with" Hansberry by providing information concerning other drug dealers, he was never arrested. (R. 127: Pulley at 22; 50-51). Detroit Police

stationhouse records (or a lack thereof) corroborated Pulley's testimony that he was never arrested. Pulley believed, by virtue of the fact that he was not arrested, that the Hansberry and crew were "dirty police" (R. 127: Pulley at 23-24) and he refused to give information. (R. 127: Pulley at 23; 50).

Arthur Knuckles testified that he sold the two kilos of cocaine actually seized from Pulley and split the proceeds with the defendants. Pulley testified that **the kilos were worth $40,000 apiece, for a total of $80,000.** (Pulley, at 8-9).

The evidence at trial showed that two sham kilos purporting to be the kilos seized from Pulley were placed on Detroit Police evidence by defendants.

In furtherance of this investigation, the FBI years later asked Detroit Police Sgt. Tyrone Spencer to see if the two kilos were still on evidence. Sgt. Spencer checked a Detroit Police data base which showed that the "Pulley kilos" had been requested destroyed. However, Sgt. Spencer went to the evidence room and found that the kilos had not been destroyed.

The FBI had the two "Pulley kilos" that the defendants had put on evidence (Government Trial Exhibits 703A and 703B) tested for purity to see if they were in fact sham kilos substituted by Hansberry and or Watson for the real kilos seized from Pulley in March, 2013. DEA Forensic Chemist Tim Anderson's analysis revealed that the Pulley kilos placed on evidence by the defendants were sham… consisting of only 3% and 6% cocaine, respectively. Chemist Anderson testified

that these were the weakest kilograms of cocaine in purity that he had ever analyzed.

Government witness **Gary Jackson** testified that in 2010 he was a drug trafficker in Detroit. (R. 129: Jackson at 14-16). Jackson was introduced to Detroit Narcotics officer and cooperating co-defendant Arthur Leavells and Watson by Calvin Turner in June or July, 2010. (R. 129: Jackson at 19). Jackson had asked Turner for the introduction for the purpose of providing a tip concerning a $3 Million drug money shipment from Detroit to Texas, and ultimately to Mexico. (R. 129: Jackson at 16-20). Jackson planned to provide this information in the hope of receiving an official reward payment from the Detroit Police Department.

Watson told Jackson if Jackson provided the information leading to the $3 Million seizure, Jackson would receive $300,000 of the money secretly skimmed off the top, as well as an official DPD award payment of $500,000. (R. 129: Jackson at 20-21).

On July 26, 2010, Jackson watched the $3 Million being loaded into the cab of a semi-truck at a truck wash in Detroit. (R. 129: Jackson at 23).[1] Jackson called

[1] Contrary to Hansberry's assertions, Gary Jackson has never wavered from his position that the amount of the Mexican cartel drug proceeds shipment from which Defendants stole was $3 Million. Jackson's testimony in this regard was corroborated by prior consistent statements to that effect to Arthur Leavells (R. 132: Leavells at 38-39; R. 133: Leavells at 147-148) and Calvin Turner. Further corroboration can be found that Little-who showed Leavells photos- was also adamant that the amount was $3 Million. ((R. 132: Leavells at 38-39; R. 133:

Watson's partner, police officer Arthur Leavells, and advised him. (R. 129: Jackson at 25). Based upon Jackson's tip, Hansberry, Watson, and crew effected a traffic stop of the semi cab at Gratiot and Conner, and seized the $3 Million in drug proceeds. (R. 129: Jackson at 27).

Hansberry's report (Government Trial Exhibit 721.4) of the incident claims that once the money was seized, he alone personally found a "tally sheet" in one of the duffel bags containing the drug money. Despite the fact that $3 Million was seized, the tally sheet Hansberry reported "finding" listed only $2,370,000. (Government Trial Exhibit 721.2) Interestingly, Hansberry's report claimed a count of only $2,100,190. (Government Trial Exhibit 721.5). By the time the seized drug money was deposited at Comerica Bank, the bank reported only $2,084,000 as being actually deposited. (Government Trial Exhibits 721.6-9).

Watson relies on a DPD Internal Affairs ("IA") report, claiming that IA made a finding that "no larceny" occurred. (Watson's Brief Exhibit 1). This is a false claim, and is seriously misleading. Even a cursory reading of the IA report reveals that it pertains **only to the $15,000 shortage** from the amount Hansberry originally reported seizing and the amount received by the bank. (See Page 2 of the IA report). In fact, IA never even knew at the time that Hansberry and crew had

---

Leavells at 147-148); Government Trial Exhibit 807/Government Sentencing Memorandum Exhibit B, at 18-19).

stolen $1 Million dollars off the top…. that (truthful) allegation was never investigated by DPD Internal Affairs at the time. The Hansberry/Watson jury obviously believed Gary Jackson, as evidenced by its guilty verdict on the most serious offense contained in the indictment.

Jackson testified that immediately after the traffic stop, Leavells called him to advise that they were "sweet." (R. 129: Jackson at 28). Watson could be heard by Jackson in the background, saying they were "sweet," and telling Leavells to ask Jackson if the money was "in sequence." (R. 129: Jackson at 28).

Jackson rented a hotel room near the airport to await the delivery of the $300,000 "off the top" as promised by the defendants. (R. 129: Jackson at 28). While waiting at the hotel, Jackson received a phone call from Leavells advising that the defendants were unable to skim the $300,000 because a supervisor had arrived at the scene of the traffic stop. (R. 129: Jackson at 29).

Jackson testified that he then saw a television news report that the seizure was only of "$2 Million" in drug proceeds and he felt cheated by the defendants. (R. 129: Jackson at 29-30). Jackson felt that the defendants were not going to facilitate his official DPD reward payment either. (R. 129: Jackson at 33).

To ensure and expedite his receipt of the official DPD "premium payment," Jackson testified that he arranged a meeting with then-Detroit Police Chief Ralph Godbee and Derrick Coleman at a restaurant in Troy, Michigan to discuss the

reward payment. (R. 129: Jackson at 33-35). Jackson testified that he told Godbee that Hansberry and crew had actually seized $3 Million (and not a mere $2 Million) in drug proceeds. (R. 129: Jackson at 34).

Ralph Godbee testified as a defense witness and **corroborated** Gary Jackson's testimony. Godbee confirmed that he met with Gary Jackson and Derrick Coleman in a private, curtained-off room at a restaurant in Troy, shortly after the money seizure. (R. 153: Godbee at 13). Godbee admitted that this was the only time he ever met personally with a source of information to discuss a reward payment. (R. 153: Godbee at 35). At trial, although Godbee claimed "no recall" of Jackson telling him that the money seized actually amounted to $3 Million, or Jackson's stated intention of going to the mayor and the press, Godbee did not dispute it. (R. 153: Godbee at 34). Godbee also testified that very shortly after the meeting with Jackson, he personally approved an official DPD premium payment of $250,000 in cash to Jackson. (R. 153: Godbee at 35-37).

Gary Jackson and DPD Fiscal Officer Lavondria Herbert testified that on August 14, 2010, Jackson received an official DPD premium payment of $250,000 in cash at a hotel room meeting in Southfield. Both testified that Hansberry, Watson, and Leavells were present at the meeting. Jackson and Herbert both testified that after the money was counted in Jackson's presence and presented to him, Hansberry excused Herbert from the hotel room.

Unbeknownst to the defendants, Jackson surreptitiously recorded the August 14, 2010 meeting[2]. (R. 129: Jackson at 34-37; Government Trial Exhibit 722/Government Sentencing Memorandum Exhibit A). After excusing Herbert from the room (R. 129: Jackson at 45), Hansberry told Jackson that he had to "do it this way" (i.e., no $300,000 skim off the top) because Hansberry had to assure himself that Jackson was not working with the "feds… the FBI, the DEA, setting me up." (R. 129: Jackson at 48; Exhibit A at 13).

Hansberry went on to tell Jackson that in the future, he would get his money off the top, "brown bag style" with no "red tape". (R. 129: Jackson at 49; Government Trial Exhibit 722/Government Sentencing Memorandum Exhibit A at 13-14;17). Hansberry told Jackson repeatedly that he was interested primarily in money-and not drug-seizures, and that if Jackson worked for him, neither Jackson nor his underlings would be prosecuted if caught dealing in Detroit. (R. 129: Jackson at 49; 54; Exhibit A at 13; 14; 15; 16; 17; 22; 23; 25). Hansberry also told Jackson that he could provide Jackson with seized drugs for distribution by Jackson. (R. 129: Jackson at 52; Exhibit A at 19). Watson told Jackson that they could substitute sham kilograms for real kilos to further the enterprise, and that

[2] In its Order Denying Defendants' Motions for Acquittal, this Court noted that the Jackson recording of the August 14, 2010 meeting with Hansberry and Watson was alone likely sufficient evidence to support Defendants' convictions. (R. 139: Order Denying Defendants' Motions of Acquittal, at 5-6).

Watson would show Jackson how to make dummy kilos. (R. 129: Jackson at 56-57; Exhibit A at 32).

Jackson testified that thereafter, the defendants provided him with seized drugs which he sold and that he provided defendants with a portion of the proceeds from these drug sales. (R. 129: Jackson at 59-61).

In June 2014, Jackson began cooperating with federal authorities. The evidence at trial showed that Arthur Leavells was arrested by the FBI during a sting in which Leavells believed he had perpetrated a drug rip with Jackson. Leavells in turn cooperated with the FBI and on September 7, 2014, recorded a meeting with Hansberry (Government Trial Exhibit 807/ Government Sentencing Memorandum Exhibit B). Hansberry talked about several rips that he, Watson, and Leavells had participated in, including the Renee Williams rip (which evidence proved was $85,000 in drug proceeds), the Nicholas Simmons rip (which evidence proved was $300,000 in drug proceeds) and the Christopher Wilson rip (which evidence proved was $140,000 in drug proceeds). (Exhibit B at 14-16). Hansberry, who by that time had been promoted to Lieutenant and transferred out of Narcotics, stated that he was now “scared straight” and “no fun anymore.” (Exhibit B at 46).

Hansberry’s desperation to undermine the credibility of Gary Jackson-whom the jury obviously believed-is best exemplified by his outlandish and

incorrect reliance on a DEA TIII wiretap call, that was never played-nor ever even offered into evidence-at trial. Hansberry "incorrectly" asserts that in the call, Jackson admits to Calvin Turner that "Little" (and not Defendants) stole from the $3 Million cartel shipment of drug proceeds. (R. 164: Hansberry Sentencing Memorandum at 5).

Hansberry's claim is outlandish: not only he does misrepresent the time of the call, he misrepresents the contents of the call (transcript attached as Exhibit D), and he even incorrectly identifies the parties to the conversation.[3]

On September 11, 2014, Leavells also recorded an undercover meeting with Watson, during which they discussed another planned future rip, and during which Watson accepted from Leavells $5,000 in FBI undercover cash which Watson believed to be from Jackson for a pre-existing drug debt. (Government Trial Exhibit 808/ Government Sentencing Memorandum Exhibit C, at page 4).

As previously set forth, the defendants' acquitted conduct totaled approximately **$862,000.** The Hobbs Act conspiracy (conviction) conduct alone totaled **$1.05 Million.** Accordingly, if the Court includes the defendants' acquitted

---

[3] See Attached Exhibit D, a transcript of the conversation as well as the report of FBI Special Agent Michael Fitzgerald who located the call and listened to it. A search of the DEA T III logs revealed that there was no call at 8:25 p.m. on May 6, 2014, as claimed by Hansberry, and that the call he references was at 8:25 a.m. that day and was between Gary Jackson and "Deke" (Fred Tucker) and not Jackson and Calvin Turner… and that nowhere in the call does anyone say that Little- and not the Defendants- stole the money in question.

conduct, for Guidelines calculation purposes, the defendants are responsible for **$1.867 Million** in drugs and drug proceeds. (See U.S.S.G. 2B1.1(b)(1)(I)).

## IV. DISCUSSION

Again, the Supreme Court has made the Sentencing Guidelines advisory in nature, and has held that a sentencing court is duty-bound to first calculate the Guidelines range, and then consider the Guidelines range along with the factors set forth in 18 U.S.C. § 3553(a) to fashion a sentence sufficient, but not greater than necessary, to comply with the stated objectives of sentencing. *United States v. Booker*, 543 U.S. 220 (2005).

### The Defendants' Sentencing Guidelines Ranges

### A.) The Defendants' Base Offense Level(s) are 14

As Detroit Police officers at the time of the offense, the defendants were public officials and their Base Offense Level is 14. (U.S.S. G. 2C1.1(a)(1)).

### B.) The Offense Involved More Than One Extortion

Whether or not the Court includes acquitted conduct, the offense involved more than one extortion, supported the testimony of Lamont Calhoun, Gary Jackson, and Kelvin Pulley, and an additional two levels are assessed, bringing the defendants' adjusted offense level to 16. (U.S.S. G. 2C1.1(b)(1)).

**C.) The Extortion Was Over $1.5 Million and the Adjusted Offense Level is 32**

If the Court includes the defendants' acquitted conduct in its Sentencing Guidelines calculations, the defendants are responsible for $1.867 Million in drug proceeds and illegal drugs, and an increase of 16 offense levels, for an adjusted offense level of 32. (U.S.S.G. 2C1.1(b)(2) cross-references to Section 2B1.1(b)(1)(I)- more than $1.5 Million but less than $3.5 Million).

If the Court elects not to include acquitted conduct, the defendants adjusted offense level is 30, as U.S.S.G.2C1.1(b)(2) cross-references to Section 2B1.1(b)(1)(H)- more than $550,000 but less than $1.5 Million).

**D.) Both Defendants Had Sensitive Positions At The Time of Offense**

Defendant Hansberry was a DPD Narcotics Raid Commander and Defendant Watson his Crew Chief or second-in-command. There was plenty of testimony to the effect that the Raid Commander decides what houses to raid, what gets seized, and who gets arrested for prosecution.

Application Note 4 concerning Sentencing Guideline 2C1.1(b)(3) provides that examples of a public official holding a sensitive position include law enforcement officers. Accordingly, both defendants should be assessed an additional 4 offense levels, pursuant to U.S.S.G. 2C1.1(b)(3).

Therefore, with acquitted conduct included, defendants both have an offense level 36; without consideration of the acquitted conduct, both defendants are a Level 34.

**E.) Defendant Hansberry Was an Organizer/Leader of Five or More**

Hansberry was a DPD Narcotics Raid Commander. He supervised a raid crew, including co-defendants Watson and Arthur Leavells. Leavells testified that, but for two officers, Hansberry's entire raid crew was corrupt. (132: Leavells at 55-57). Hansberry also oversaw the illegal dealings with Lamont Calhoun, Gary Jackson, and Kelvin Pulley, as well as the drug dealers involved in the acquitted counts. Pursuant to U.S.S.G. 3B1.1(a), Hansberry should receive an additional 4 offense levels for an adjusted offense level of 40 if acquitted conduct is included, or 38 if acquitted conduct is not included.

The Probation Department did not include acquitted conduct and has calculated Defendant Hansberry's adjusted offense level as 38.

**F.) Defendant Watson Was a Manager/Supervisor of Five or More**

Watson, as Defendant Hansberry's Crew Chief, was Hansberry's second-in-command, and Watson managed the crew. (132: Leavells at 18-19; 55). The criminal conspiracy included co-defendants Hansberry and Arthur Leavells. Watson also oversaw the illegal dealings with Lamont Calhoun, Gary Jackson, and Kelvin Pulley, as well as the drug dealers involved in the acquitted counts. Pursuant to U.S.S.G.

3B1.1(a), Watson should receive an additional 3 offense levels for an adjusted offense level of 39 if acquitted conduct is included, or 37 if acquitted conduct is not included.

The Probation Department did not include acquitted conduct and has calculated Defendant Watson's adjusted offense level as 37.

**Defendant David Hansberry's Sentencing Guidelines Range Calls for 293-365 Months Imprisonment**

Defendant Hansberry has a criminal history category of I. If the Court includes Hansberry's acquitted conduct in calculating the Sentencing Guidelines, then Hansberry is a Level 40, CHC I with a resulting Guidelines range of 293-365 months. Since the count of conviction carries a statutory maximum sentence of 240 months, Hansberry's Guidelines sentence range is 240 months.

If acquitted conduct is not considered, Hansberry is a CHC I, Level 38 with a Guidelines range of 235-293 months. Since the count of conviction carries a statutory maximum sentence of 240 months, Hansberry's Guidelines sentence range is effectively 235-240 months. The Probation Department agrees with this calculation.

**Defendant Bryan Watson's Sentencing Guidelines Range Calls for 262-327 Months Imprisonment.**

Defendant Watson has a criminal history category of I. If the Court includes Watson's acquitted conduct in calculating the Sentencing Guidelines, then

Hansberry is a Level 39, CHC I with a resulting Guidelines range of 262-327 months. Since the count of conviction carries a statutory maximum sentence of 240 months, Watson's Guidelines sentence range is 240 months.

If acquitted conduct is not considered, Watson is a CHC I, Level 37 with a Guidelines range of 210-262 months. Since the count of conviction carries a statutory maximum sentence of 240 months, Watson's Guidelines sentence range is effectively 210-240 months. The Probation Department agrees with this calculation.

**The 18 U.S.C. § 3553(a) Factors Warrant a Substantial Sentence.**

The factors set forth in Section 3553(a) include, *inter alia*:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and....

18 U.S.C. § 3553(a).

Analysis of the 3553(a) factors warrants a substantial sentence for both Defendant Hansberry and Defendant Watson, who not only cheated the public out of legitimate efforts to enforce the drug laws, but joined forces with kilo weight

cocaine dealers and further endangered the community. Just as importantly, defendants undermined public trust and confidence in law enforcement in general and in the Detroit Police Department in particular.

The conspiracy offense conviction is especially serious, in light of the fact that the defendants were police officers, who swore to uphold the law. Instead of upholding the law, the defendants stole over a million dollars in drug proceeds. Instead of placing seized drugs on evidence, the defendants sold them or had them sold for personal profit. Instead of locking up drug dealers, defendants recruited them to sell illegal drugs stolen from other drug dealers. In effect, the defendants were merely drug dealers, thugs, who carried badges. A significant sentence is warranted in this case to promote respect for the law and to provide just punishment for a very serious offense. (Section 3553(a)(2)(A)).

Defendants' persistent and repeated claims that the jury "rejected the government's case" (R. 163: Watson Sentencing Memorandum at 1) underscores Defendant's failure to take this case seriously. Furthermore, Defendants' claim of trial victory is a little unrealistic, given that both face 20 year sentences for their heinous, scandalous crimes of betrayal.

Given the current tension between law enforcement and some communities, it is important to impose a stiff sentence in this case to promote respect for the law

and to restore public confidence in law enforcement and in our criminal justice system. (Section 3553(a)(2)(A)).

The Hansberry/Watson case was followed closely here in Detroit by many in the law enforcement community as well as people in the neighborhoods. A substantial sentence of imprisonment is also critical to deterring others from committing similar crimes. (Section 3553(a)(2)(B)).

The evidence of defendants' guilt of this serious felony was very strong. Hence, the Section 3553(a) factors, as well as the Sentencing Guidelines, warrant a substantial sentence of imprisonment for Defendants David Hansberry and Bryan Watson, to reflect the seriousness of their crime, to promote respect for the law, and to deter others.

Defendant Watson decries "sentencing disparity" where none exists. Firstly, the disparity provision, of Section 3553(a)(6) provides for avoiding unwarranted disparities among defendants "... with similar records…found guilty of similar conduct…" This provision of Section 3553 is primarily aimed at national disparities, rather than those between co-defendants. *United States v. Rivera-Gonzalez,* 626 F.3d 639, 648 (1st Cir. 2010).

Secondly, comparing Defendants, sworn police officers, to the drug dealers they conspired with and allowed to operate in Detroit, is comparing criminals who

are not similarly situated: the fact that Defendants were dirty cops makes **all** the difference.

Thirdly, courts have recognized that when a cooperating co-defendant receives a lesser sentence than an equally culpable defendant, there is no forbidden "disparity." *United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006).

Finally, any sentencing disparity claim concerning Arthur Leavells, Gary Jackson, or Calvin Turner is unripe and speculative, as none of them have yet been sentenced.

In closing, Defendants submit letters from sympathetic friends, the vast majority of whom did not see or hear the trial testimony, begging for leniency. Unfortunately, it is literally impossible for the Government to provide letters from the hundreds of thousands of Detroit residents who were victimized by drug trafficking and the Defendants' willful complicity in drug trafficking.

There is no question that drug trafficking has been, for decades, a plague upon the City of Detroit; drug trafficking results in homicides. Drug trafficking has fueled countless assaults, robberies, and carjackings. Drug trafficking has destroyed families; drug trafficking has decimated entire Detroit neighborhoods, like a neutron bomb.

The Defendants, sworn to fight drug trafficking, instead agreed to profit from it. Let this sentencing memorandum serve as a letter from the thousands of

Detroiters harmed by the Defendants' release of violent, kilo weight drug traffickers into the community, by willfully failing to arrest them.

## V. REQUEST FOR REMAND

In July, 2016- over seven months ago- Defendants were convicted of a very serious felony offense, which involved conspiring with violent, kilo-weight drug traffickers to distribute cocaine and heroin on the streets of Detroit, and to steal drug proceeds from criminals, for Defendants' personal enrichment. To further their crime, Defendants stole seized drugs and drug money, wrote and filed false police reports, replaced stolen kilos of cocaine with sham or "dummy" kilos which they placed in evidence, and prepared fake search warrants with a forged judge's signature. Worst of all, Defendants willfully released kilo weight drug dealers whom they caught red-handed, to further their illegal enterprise and enrich themselves. Defendants made a mockery of the criminal justice system and further endangered Detroit neighborhoods.

Defendants have been permitted release pending trial and pending sentencing. Defendants have had more than seven months post-conviction to get their personal affairs in order.

The Bail Reform Act, 18 U.S.C. 3141, *et. seq*., contains a presumption of post-conviction detention. 18 U.S.C.3143(a). To fulfill the objectives of sentencing set forth in 18 U.S.C. 3553(a), and because the Defendants, convicted and

sentenced, and facing a term of years of imprisonment, pose a risk of flight the United States seeks remand.

The Defendants also pose a danger to some in the community. One Government witness was shot and seriously wounded shortly after his cooperation was made known during the course of pre-trial discovery. Additionally, during a recorded undercover meeting, Defendant Hansberry said that he would kill witness Louis Mars if Mars appeared on Hansberry's porch. (Government Trial Exhibit 807; Government Sentencing Memorandum Exhibit B, at 55). Another Government cooperating witness testified that Defendant Watson knew where the witness lived and would appear in front of his house during the timeframe of the charged conspiracy count of conviction.

Although Defendants have been on bond, their respective convictions on the most serious count in the indictment without question constitute a material change in circumstances. Now facing lengthy prison sentences, Defendants pose a risk of flight.

Given the serious nature of Defendants' crime, to protect the community and prevent flight, and to promote respect for the law, to deter others, and to reinforce respect for the integrity of the criminal justice system, it is respectfully requested that Defendants be remanded at sentencing to begin to serve their respective sentences.

## VI. CONCLUSION

WHEREFORE, for all of the reasons discussed above, the United States respectfully requests this Court to impose a sentence of 240 months' imprisonment upon Defendant David Hansberry, and a sentence of 240 months' imprisonment upon Defendant Bryan Watson, and remand at sentencing.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

*s/J. Michael Buckley*
J. MICHAEL BUCKLEY
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9581
Michael.Buckley@usdoj.gov

Dated: February 15, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to:

Michael J. Harrison
Attorney for David Hansberry

Steven F. Fishman
Attorney for Bryan Watson

*s/J. Michael Buckley*
J. MICHAEL BUCKLEY
Assistant United States Attorney

Dated: February 15, 2017