1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN
2               SOUTHERN DIVISION

3
UNITED STATES OF AMERICA,
4
                    Plaintiff,
5   vs.                              Case No. 15-20217
                                     Hon. Stephen J. Murphy, III
6   D-1 DAVID HANSBERRY

7                   Defendant.
    _____/
8
                         **SENTENCING**
9
         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
10              United States District Judge
         Theodore Levin United States Courthouse
11            231 West Lafayette Boulevard
               Detroit, Michigan 48226
12            Wednesday, February 22, 2017

13  APPEARANCES:

14  For the Plaintiff          J. MICHAEL BUCKLEY
    United States of America:  U.S. Attorney's Office
15                             211 W. Fort Street
                               Suite 2001
16                             Detroit, Michigan 48226
                               313-226-9732
17
    For the Defendant          MICHAEL J. HARRISON
18  David Hansberry:           Harrison Law PLC
                               240 Daines Street
19                             Birmingham, Michigan 48009
                               248-430-6421
20

21

22

23
         To obtain a copy of this official transcript, contact:
24          Linda M. Cavanagh, Official Court Reporter
         (313) 234-2616 • linda_cavanagh@mied.uscourts.gov
25

```
 1                    TABLE OF CONTENTS

 2                                                    Page

 3   OBJECTIONS TO THE PRE-SENTENCE REPORT:

 4   Government Objection Numbers 1 and 2:

 5   Comments by the Court............................13
     Comments by Mr. Buckley.........................13
 6   Comments by Mr. Harrison........................16
     Ruling by the Court.............................19
 7
     Defense Objection Numbers 1 and 2:
 8
     Comments by the Court............................20
 9
     Defense Objection Numbers 3(1) and (2):
10
     Comments by the Court............................22
11   Comments by Mr. Harrison........................23
     Comments by Mr. Buckley.........................24
12   Further Comments by Mr. Harrison................27
     Ruling by the Court.............................28
13   Further Comments by the Court...................30

14   Defense Objection Number 3(3):

15   Comments by the Court............................31
     Comments by Mr. Harrison........................32
16   Comments by Mr. Buckley.........................32
     Ruling by the Court.............................33
17
     Defense Objection Number 3(4):
18
     Comments by Mr. Harrison........................34
19   Comments by Mr. Buckley.........................35
     Ruling by the Court.............................36
20
     Defense Objection Number 5:
21
     Comments by the Court............................38
22
     SENTENCING:
23
     Allocution by Mr. Harrison......................42
24   Allocution by Defendant David Hansberry.........46
     Allocution by Mr. Buckley.......................68
25   Comments/Sentencing by the Court................73
```

1                                                                   Page

2      MOTION FOR REMAND:

3      Motion by Mr. Buckley..............................78
       Response by Mr. Harrison...........................79
4      Ruling of the Court................................80

5

6

7

8

9

10

11

12                            EXHIBITS

13     Identification                        Offered   Received

14     NONE

15

16

17

18

19

20

21

22

23

24

25

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1953   Page 4 of 84
Sentencing • Wednesday, February 22, 2017

4

```
 1          Detroit, Michigan
 2          Wednesday, February 22, 2017
 3                          –  –  –
 4          (Proceedings commenced at 10:16 a.m., all parties
 5          present)
 6          THE CASE MANGER:  The Court calls Case No. 15-20217,
 7   United States of America versus David Hansberry and Bryan
 8   Watson.
 9          Counsel, please state your appearances for the
10   record.
11          MR. BUCKLEY:  Good morning, Your Honor.  May it
12   please the Court, Michael Buckley appearing on behalf of the
13   United States.  Seated with me are our paralegal, Mrs. Maria
14   Koch, and the case agent, Michael Fitzgerald of the FBI.
15          THE COURT:  Okay.  Good morning to you.
16          AGENT FITZGERALD:  Good morning, Judge.
17          MR. HARRISON:  Good morning, Your Honor.  Michael
18   Harrison appearing on behalf of David Hansberry together with
19   Joshua Kushnereit.
20          MR. FISHMAN:  Good morning, Judge.  Steve Fishman on
21   behalf of Mr. Watson.
22          THE COURT:  Okay.  Good morning to you as well, and
23   good morning to all the counsel.  Sorry for being a short bit
24   late, and thanks for being on time.
25          We're going to do sentencings for Mr. Hansberry and
```

Sentencing • Wednesday, February 22, 2017

5

```
 1    Mr. -- Mr.  Watson and we're going to start with Mr. Hansberry,
 2    so let me invite Mr. Buckley and Mr. Harrison to come forth and
 3    we can talk about legal issues to begin with.
 4          Before I do that, the Court received three letters
 5    that were literally thrown on the courthouse steps from some
 6    citizens, and the citizens' names are Shawniqua Smith, Martiese
 7    Lindsay and I believe K.C. Smith, and I've read all this.  And
 8    essentially these letters suggest that the officers made
 9    criminal choices and seek the highest punishment available to
10    the officers.  Have both counsel gotten copies of these?
11          MR. BUCKLEY:  I have not.  Thank you, Your Honor.
12          MR. HARRISON:  No, Your Honor.
13          THE COURT:  Okay.  Well, I have extra copies, and I'm
14    going to pass these out to you and let you read them before
15    we -- before we enter any sentences.  But I've got one for the
16    United States and one for Mr. Harrison, if you would pass those
17    out, and if you hang on to those, I'll get you copies on the
18    break, but those are my only two copies, okay?
19          MR. BUCKLEY:  Thank you, Judge.
20          MR. HARRISON:  Thank you, Your Honor.
21          THE COURT:  All right.  Thank you both very much.  So
22    you can read those before we go to allocution.
23          I received a letter from Tharadrous White on behalf
24    of Mr. Hansberry.  I received a number of letters that were
25    relevant to both defendants that I read in support of their
```

1  character and lesser sentencing, a large stack.  I know that

2  Mr. Harrison supplied those all to the Court.

3          You've seen all those, correct, Mr. Buckley?

4          MR. BUCKLEY:  I have.  Thank you, Your Honor.

5          THE COURT:  Okay.  All right.  And then I have an

6  exhibit, which I'm not exactly sure how it got in the file or

7  where it came from, but it's a internal office memorandum from

8  the Internal Affairs Unit dated April 15, 2015.  I haven't

9  considered this and I frankly don't know why it's there, but it

10  appears to be an exhibit to a memo or something.  So can

11  anybody give any me guidance on this?  It's from

12  Commander Brian Stair -- excuse me, from Sergeant Dietrich

13  Lever to Commander Brian Stair, and it's Exhibit No. 1,

14  Inter-Office Memorandum from Internal Affairs.

15          MR. HARRISON:  May I, Your Honor?

16          THE COURT:  Yeah, of course.

17          MR. HARRISON:  Your Honor, I believe that was

18  attached to Defendant Hansberry's Sentencing Memorandum as

19  Exhibit I.

20          THE COURT:  Okay.

21          MR. HARRISON:  And it was an exhibit that was

22  provided to the Court for consideration of --

23          THE COURT:  Okay.

24          MR. HARRISON:  -- the arguments made in the

25  Sentencing Memorandum.

1          THE COURT:  Okay.  All right.  Very good.  All right.

2     Very good.  Thank you.  I -- I have it; it just wasn't -- it

3     wasn't attached.

4          So there are a number of -- a number of letters that

5     I have read attached to Mr. Harrison's Sentence Memorandum,

6     numbers -- pages 1 through 27, from police officers and --

7     and -- and the like.

8          So I also have the United States Sentence Memorandum,

9     its Exhibits A, B and C and D, which include transcripts and an

10    FBI report of Agent Fitzgerald.

11         So I have Defendant Hansberry's Sentencing --

12    Sentencing Memorandum and I have the officer, William

13    Hampstead's, report, so I think I have everything.  Am I

14    missing anything that I should have -- I've read all this.  Is

15    there anything I haven't gotten that I should be aware of or --

16         MR. HARRISON:  Well, Your Honor, there -- there was a

17    reply memorandum filed on behalf of Defendant Hansberry to the

18    government's motion, and on that, for purposes of the record, I

19    do need to make a correction to the Court.

20         THE COURT:  I don't know if I have a printed copy of

21    that, but I can -- I can get it online and determine whether or

22    not I've read that.  When did you file that, Mr. Harrison?

23         MR. HARRISON:  That was filed Monday, I believe late

24    morning, of this week contemporaneous -- or not contemporaneous

25    but soon followed by motion for a new trial that was joined by

1  co- -- the co-defendant.

2          THE COURT:  All right.  I've got the motion.  The

3  government hasn't had any chance to respond to that so we're

4  not going to deal with that right now.

5          But let me try to get your reply to the government's

6  Sentence Memorandum because I haven't looked at that, to be

7  quite honest with you.

8          (Brief pause)

9          Okay.  February 20, 2017, docket number 167, Response

10  to Government's Sentence Memorandum.  I have that in front of

11  me.

12          MR. HARRISON:  Your Honor, for purposes of the

13  record, may I inform the Court and -- and for the Court, may I

14  inform you as to an error that I made in that memorandum --

15          THE COURT:  Yeah.

16          MR. HARRISON:  -- at this time?

17          THE COURT:  What page?

18          MR. HARRISON:  Thank you, Judge.  Your Honor, in that

19  memorandum, I -- although not the crux of what was being

20  argued, the argument had to do with the credibility of Gary

21  Jackson for purposes of attributing money for the guidelines

22  using his testimony.

23          But in there I questioned the timing of the FBI

24  report, which I believe was January 12th.  I didn't -- as I

25  explained in there, I didn't understand how the report could

Sentencing • Wednesday, February 22, 2017

9

1    have been generated prior to my Sentencing Memorandum being

2    filed in February.

3            I since then, actually just last night, reviewed my

4    objection, my original objections to the Pre-Sentence

5    Investigation Report, and noted that I had made the same error

6    describing the participants, the conversation.  The

7    participants were actually Gary Jackson and Frederick Tucker,

8    and I had made the error both in the Sentencing Memorandum and

9    in the previous objections that the conversation was between

10   Gary Jackson and Calvin Turner, and there also was a typo as to

11   a.m. versus p.m.

12           I brought this to Mr. Buckley's attention this

13   morning, my -- my realization that I made that error, and I

14   apologized for any inference that may have been brought from

15   that.  I did in -- in -- in there suggest that perhaps it was a

16   typographical error as to -- as to the date in the FBI 302.

17   But I extended my apologies to Mr. Buckley and to -- indirectly

18   to Mr. -- Agent Fitzgerald, and I apologize to the Court for

19   that oversight.

20           Otherwise the reply memorandum, the crux of it is the

21   credibility of Gary Jackson for purposes of attributing acts

22   of -- of conduct that should be relevant conduct for purposes

23   of -- of 2B1.1(b)(1)(H), which would be the amount of money

24   involved in the alleged -- or the -- actually not alleged --

25   the conspiracy.

```
 1          THE COURT:  So -- so it looks like starting bottom of
 2   page 3, top of page 4, the error is that you're suggesting
 3   there was recordings that captured Gary Jackson and Calvin
 4   Turner.  That's an error.  The -- the fact, presumably the FBI
 5   report and my recollection of what went on in the trial of the
 6   case, was that the conversation was between Gary Jackson and
 7   Fred Turner, otherwise known as Deke, and you -- you are --
 8   are -- are making that correction now in open court, right?
 9          MR. HARRISON:  Well, Judge, actually it's more than
10   that.  I made the correction I believe in quoting the
11   transcript of Gary Jackson, which was page 117 of his -- of his
12   testimony, lines 1 to 4 and lines 18 to 19.  In court I
13   correctly identified the call by time and participants, but in
14   my subsequent objections to the Pretrial Report and in my
15   Sentencing Memorandum, I mischaracterized the parties.
16          And beyond that, I suggested that -- not realizing I
17   had made the prior mistake, I suggested that I didn't
18   understand how the report could have been generated in January
19   because I made the mistake in the Sentencing Memorandum filed
20   in February, not realizing I made the same mistake in November
21   in my objections.
22          THE COURT:  You got -- you got way out ahead of
23   yourself and -- and made arguments and said things in reliance
24   on -- on something that you later learned was mistaken, right?
25          MR. HARRISON:  I did.
```

Sentencing • Wednesday, February 22, 2017

```
 1          THE COURT:  All right.  Okay.  All right.  Well, I'll
 2   note the correction in the -- in the document.  Again, the
 3   document was apparently filed on a federal holiday two -- two
 4   days ago, so candidly I knew there was a motion but I haven't
 5   seen that reply.  I'm going to have to read it more thoroughly,
 6   and I'll do so in light of the correction you just made.
 7          But Mr. Buckley, do you want to speak to this at all?
 8          MR. BUCKLEY:  Thank you, Judge.  Just briefly, to the
 9   extent Mr. Harrison has apologized for maligning my character
10   for integrity, I accept his apology in that regard.
11          THE COURT:  Okay.  Well, I -- I did see that there's
12   some, you know, personal statements made on -- on -- on page 4,
13   and I find that to be uncommon between counsel, but it appears
14   that it was driven by, as I said before, Mr. Harrison getting
15   ahead of himself and making a mistake.  He called that out in
16   open court, apologized, Mr. Buckley accepted the apology.  So I
17   don't think we have any more issue about the reply, do we?
18          MR. HARRISON:  Not on my behalf, Your Honor.
19          MR. BUCKLEY:  No, not at this time, Judge.
20          The government is in the process of responding to the
21   motion for a new trial, which I believe should be denied on
22   both procedural and substantive grounds, but we're preparing a
23   response.
24          THE COURT:  Well, I'm not going to say anything about
25   that other than that I'll read everything when it's fully
```

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1961   Page 12 of 84
Sentencing • Wednesday, February 22, 2017

12

1    briefed, and if we need to have a hearing, we will, and if we

2    don't, we'll just grant or deny the motion, okay?

3              MR. BUCKLEY:  Yes, sir.  Thank you.

4              THE COURT:  All right.  We'll go from there.  All

5    right.  Good.  Well, I think we're ready to get to work.

6              The Court has recited everything that it has in front

7    of it.  I am going to take a minute before -- we'll take a

8    short break so I can read the reply that was filed on the 20th,

9    acquaint myself with that.

10             But let's talk about these government objections.  I

11   read them extensively.  I looked at the law in support and

12   everything else.  My sense, Mr. Buckley, of Objection Number 1

13   and Number 2 is that with regard to Number 1, you want Mr.

14   Hansberry's amount of loss increased by $862,000 because under

15   the law, acquitted conduct, if proven by a preponderance of the

16   evidence, can be -- can be counted by the Court.

17             And then with regard to Objection Number 2, it seems

18   that you support and -- and corroborate that argument with the

19   testimony of Lamar Calhoun, among others.  And then I believe

20   you want a -- an additional $54,000 included, for a total of

21   1,000 -- I'm sorry, you want $996,000 extra on the basis of

22   that testimony as well as the $54,000 that I mentioned from

23   Calhoun, for a total of $1,050,000 as the loss figure.

24             Doing that would get us to a overall Offense Level of

25   40 and a proposed guideline range, according to the government,

1    of 292 to 365 months.

2           And if you'd like to correct or illuminate me on

3    anything I said and augment your objection, you go right ahead

4    and do so now.

5           MR. BUCKLEY:  Thank you, Your Honor.

6           May it please the Court, the Court's quite correct

7    with regard to acquitted conduct.  The cases cited in the

8    government's pleadings accurately state that the Supreme Court

9    has held that conduct underlying acquitted counts may be

10   considered by the Court in fashioning sentence if they were

11   proved by a preponderance of the evidence at sentencing.

12          And, Judge, my point is simply this.  This Court sat

13   through a weeks-long trial.  The Court heard testimony

14   concerning six separate rips during which the defendants agreed

15   to steal drugs and drug proceeds from drug dealers.  I

16   respectfully suggest to the Court that the testimony of these

17   witnesses was compelling and -- and it appeared to be credible

18   and it was corroborated in various ways.

19          And one thing I'd ask the Court to consider is that

20   there were six separate rips charged, and although those counts

21   were acquitted, none of those drug dealers knew each other, but

22   all of them said that they had been wronged by police officers

23   and by these two defendants, these same two police officers.

24          Furthermore, Judge, the -- the acquitted conduct was

25   corroborated by an undercover recording captured by former

 1   police officer and cooperating witness Arthur Leavells.  Arthur
 2   Leavells began to cooperate with the FBI.  And during a meeting
 3   with Mr. Hansberry on September 7th of 2014, Mr. Hansberry,
 4   without any prompting, starts reminiscing.  He starts
 5   reminiscing about some of the search warrant executions he and
 6   his crew, including Mr. Leavells, conducted.  And along with
 7   hundreds and hundreds, if not over a thousand, search warrants
 8   executed by Hansberry's crew, the search warrant executions
 9   that he would bring up, Judge, years later relate to these
10   acquitted counts.  He mentions by name Renee Williams, Count 3.
11   He mentions by name Nicholas Simmons, Count 4.  He mentions
12   indirectly the house where Knuck, Arthur Knuckles, set up those
13   guys that ran in the basement.  That was Christopher Wilson,
14   Judge, Count 5 I believe that was.
15          And if the Court would like to hear it, I'm prepared
16   to play a portion of -- of that recording.  I've provided
17   transcripts of the clips I plan to play to defense counsel this
18   morning.  And I know the Court presided over trial, I know the
19   Court was attentive.  We're prepared to play a couple clips
20   today, Judge, and they total about 21 or 22 minutes.  But --
21          THE COURT:  I don't think that's necessary.  I mean
22   if you would insist or have a legal basis for playing tapes,
23   I'd -- I'd go along with you, but I have a -- frankly, with all
24   due respect, I have a very, very good handle on the testimony.
25   I've looked at some transcripts myself, I'm -- I've read all

1   your memos, and I -- believe me, I remember the testimony in --

2   in -- in the trial.  So that's what I would -- and I -- and

3   I -- I -- I think in -- in terms of -- in terms of time and

4   efficiency and -- and the Court's calendar, I -- I would

5   probably say we don't need to do that, but if you insist or

6   have a legal -- legal reason, we -- we can do that.

7        MR. BUCKLEY:  Your Honor, it's your courtroom and

8   I'll proceed in any fashion that the Court deems appropriate.

9        THE COURT:  Okay.  I -- I guess I'd prefer to proceed

10  in the fashion that I recollect the -- all the testimony you

11  just referenced, and -- and we've seen transcripts and I don't

12  think we need to have those 21 minutes worth of tapes played

13  this morning.  That would be my --

14       MR. BUCKLEY:  I understand, Judge, and I accept that.

15       THE COURT:  Okay.

16       MR. BUCKLEY:  So lastly, Judge, with regard to that

17  meeting, Hansberry does say, "If they had Kemp and Deke, it

18  would be so easy.  What they need to be up on my phone for?

19  You can just tap him and just come in there and to talk to

20  you."  Kemp was Calvin Turner who did testify at trial, and

21  Deke was Fred Tucker who did testify at trial.

22       So it's our position, Your Honor, that the acquitted

23  conduct was proven by more than a preponderance of the

24  evidence, and we would ask the Court to include it in

25  calculating the appropriate guidelines range.

1           THE COURT:  Okay.  Excellent.  Thank you very much.

2           Mr. Harrison, of course you may respond to any and

3      all of that.

4           MR. HARRISON:  Well, thank you, Your Honor.  Your

5      Honor, it's true, as the government correctly notes, that

6      *United States vs. Watts*, the Supreme Court in a per curiam

7      opinion, and the Sixth Circuit in *United States vs. White*, the

8      Court is free to consider acquitted conduct, Your Honor.

9           But, however, we did cite some case law to the Court.

10     In a denial of writ of certiorari, three of the justices, I

11     believe it was Scalia who wrote the opinion and it was joined

12     by Clarence Thomas and Justice Ginsberg, were very concerned in

13     the case that we cited that the Court at that time did not take

14     this issue up for further clarification after the Court's

15     decision that made the guidelines non-mandatory to the Court.

16     They were concerned that judicial fact finding could fly in the

17     face of the Fifth and Sixth Amendment.  I believe the issue is

18     ripe and still may be addressed.

19          But it's not a matter of whether this Court can

20     attribute acquitted conduct but whether it should under

21     circumstances such as these where virtually all of the wrongful

22     conduct that was alleged was charged in specific counts, and

23     those counts were unequivocally tossed out and discredited by

24     the jury in their verdict.

25          And out of respect for the defendant's Fifth and

1   Sixth Amendment rights, out of respect for the jury's verdict
2   itself, Your Honor, I would respectfully suggest that the Court
3   shouldn't do that, especially when we look at the witnesses
4   that we're talking about.  These were witnesses that were all
5   repeatedly impeached.  These were witnesses that were mostly
6   all over the place in terms of the money.  I remember to -- one
7   specific instance, Nicholas Simmons, how many different -- how
8   many different versions of how much money was in that bag did
9   we hear?  "300,000.  200,000.  250.  I don't know.  I took some
10  out for my birthday.  I'm trying to -- I'm trying to add money
11  on to get the man."  We heard all sorts of things about that.
12          But, you know, all of these people, Williams,
13  Simmons, Wilson, Browning, Tucker, Vasquez, this is all
14  acquitted conduct, Your Honor, and acquitted because, I would
15  suggest, the very testimony that the Court received and the
16  jury received was inherently incredible.
17          I would go beyond that, Your Honor, and -- and, as I
18  have in my memorandum and my reply brief, suggest to the Court
19  that the attribution of any money under these circumstances is
20  inappropriate or at least should not be done under these
21  circumstances.
22          Beyond the additional moneys, the I believe it's
23  996,000 that the government wishes to have you attribute,
24  probation in the Pre-Sentence Investigation Report attributed
25  essentially the -- the difference between the $3 million from

1    the 2010 truck seizure that Mr. Jackson claimed was on the

2    truck and the amount seized together with the -- I believe it

3    was -- I believe it was the claim of Calvin Pulley I believe

4    for an additional amount of money.

5           Judge, we would object to the inclusion of that if --

6    as I've -- I've cited some transcript from Mr. Jackson.  Mr.

7    Jackson begrudgingly admitted on cross-examination that he

8    personally didn't know how much money was there.  I've provided

9    the Court with other examples of why Mr. Jackson is not a

10   witness who should be relied upon for much of anything.

11          And the only testimony we had about allegedly money

12   being taken from that truck was his testimony and this

13   incredible testimony from Officer Leavells, a man who admitted

14   that he had on numerous, numerous occasions sworn to tell the

15   truth and perjured himself to other judges and to prosecutors,

16   who claimed that he saw another officer with big things under

17   his shirt.  The Court may remember we saw photographs of those

18   packages of money, and the idea that the money could have been

19   under an officer's shirt given the size of the bundles is

20   ridiculous.

21          THE COURT:  Okay.

22          MR. HARRISON:  Also the Court may remember there was

23   testimony that there were multiple law enforcement agencies

24   that responded to that scene almost immediately.

25          And I would ask the Court on behalf of Defendant

```
 1    Hansberry to attribute no money under 2B1.1(b)(H).
 2          THE COURT:  All right.  We're going to get to that in
 3    a minute, but any other legal argument on the objection that
 4    Mr. Buckley's lodged to the Pre-Sentence Report?  Because I'm
 5    ready to rule on that.
 6          MR. HARRISON:  No other legal argument, Your Honor.
 7          THE COURT:  Okay.  All right.  Look, my sense of the
 8    case is, quite simply, that Mr. Buckley may very well be right.
 9    The -- the case was extremely ably presented and contested, and
10    there was evidence that was indeed corroborated.  There was
11    independence of actors.  There -- there was in many ways all
12    the government could do to prove the -- the substantive counts,
13    but the jury acquitted on those counts, and why they did that,
14    I don't know.
15          The -- the issue Mr. Buckley raises, quite honestly,
16    was addressed by Mr. Harrison and comes down to me as a very
17    straightforward legal issue.  And I am and have been -- and I
18    read this case when it came out because I was very concerned
19    and interested that a situation like this one might come up --
20    convinced by the concerns of Justices Scalia, Thomas and
21    Ginsberg about whether or not the Sixth Amendment is violated
22    when courts impose sentences that but for a judge-found fact
23    would be reversed for substantive unreasonableness.
24          My concern is that agree or disagree, and Mr. Buckley
25    agrees and Mr. Harrison doesn't because that's their respective
```

1    roles, I am a manager of the courtroom.  I am a ruler on the

2    evidence.  I am not a finder of fact in a criminal trial, and I

3    don't think it's for me to find facts, even though they were

4    proven, I do believe, by a preponderance of the evidence.  And

5    even more so, it's not my job to find facts.  It's the jury's

6    job to find facts.  They did not find facts to support

7    conviction on the substantive counts, and therefore I am not

8    going to consider conduct and I'm going to, with respect for

9    the compelling way they were presented, overrule the

10   government's objection and not impose any additional guidelines

11   calculations on the basis of them.  So that will be the Court's

12   ruling on government Objections Number 1 and Number 2.

13        Let's get then to the objections of the defendant and

14   try to streamline these if we can.  Objection Number 1 and

15   Objection Number 2 by Mr. Harrison essentially take issue with

16   the information set forth in paragraphs 6 through 8, 9 through

17   26 and paragraph 27, and I have -- I have encountered these

18   types of situations before.  The -- the simple fact of the

19   matter is that the probation officer wrote the version of the

20   offense based on the information that was supplied by the

21   government.  The defendant was interviewed by the probation

22   officer and had an opportunity to give a -- his side of the

23   story.

24        I don't find anything in the paragraphs that Mr.

25   Harrison objected to either unstated by the evidence or not

1    touched upon within the case.  It's certainly Mr. Harrison's

2    job and obligation on behalf of his clients to -- client to

3    object to materials that he don't -- he doesn't believe would

4    be factual, but the probation officer's work is supported by

5    fact and the materials supplied by the government.

6           I would note the objections, incorporate them into

7    the Pre-Sentence Report by means of the addendum that was

8    supplied by Mr. Hampstead, and state that the probation

9    officer's work is contested -- excuse me, correct but highly

10   contested by the defense.

11          And I don't think any of these things necessarily go

12   to the -- the -- the next objections I'm going to get to go to

13   the overall compilation of the guidelines score, but I would

14   note the objections on the factual matter, not sustain the

15   objection or deny it but allow the report to continue to

16   contain the objections so that the Bureau of Prisons and the

17   Sentencing Commission know the overall thrust of what the

18   government and the defense believe was the offense conduct

19   here.  And that would be my ruling on Objection Number 1 and

20   Number 2.

21          Anything else beyond that, Mr. Harrison?

22          MR. HARRISON:  No, Your Honor.  Thank you.

23          THE COURT:  Mr. Buckley, do you want to speak to any

24   of those matters?

25          MR. BUCKLEY:  No, sir.  Thank you, Your Honor.

```
 1              THE COURT:  Okay.  All right.  Let's get then to the
 2    heart of the matter.  Objection Number 3, two-level enhancement
 3    under 2C1.1 -- all right.  Here's the issue on all these things
 4    that I can tell.  The defendants were con -- convicted of
 5    conspiracy to extort.  A conspiracy is an agreement with a
 6    number of -- well, with -- with -- with overt acts.  We know
 7    the instructions said that.  We know that the jury took that
 8    seriously.
 9              Mr. Harrison wants to say that the conspiracy -- I
10    don't want to put words in your mouth and you'll get to speak
11    to this, but Mr. Harrison wants to say that the conspiracy was
12    an agreement, maybe one or two things were done that would
13    support conviction on that count, but these multiple acts of
14    extortion, the amount of loss, including some of the -- the
15    moneys that -- some of the co-defendants who were involved in
16    the acquitted conduct but necessarily had to be involved in
17    conviction on Count 1 were -- do not support the enhancements
18    under 2C1.1(b)(1) or 2B1.1(b)(1)(H).
19              I respect the objection and I'm -- I'm -- I've read
20    everything.  I just don't know how we get to the point where we
21    say there was a conspiracy and overt acts but there was no --
22    especially in wake of the entire evidentiary record lodged by
23    the government, how we say there was no additional evidence
24    beyond an agreement and -- and -- and -- and maybe some sort of
25    overt act to carry it out that wouldn't support these
```

 1    objections.  Go ahead, Mr. Harris -- or enhancements.  Go

 2    ahead, Mr. Harrison.

 3            MR. HARRISON:  Thank you, Your Honor.

 4            Well, you know, again, I think we're left to

 5    speculate, and unfortunately it puts the Court in the -- the

 6    same difficult position that it -- that the Court was in in

 7    looking at acquitted conduct because, of course, the

 8    instruction requires an overt act in furtherance of the

 9    conspiracy.  It doesn't require a substantive crime be

10    committed by anyone.

11            And my concern is that whereas here virtually all of

12    the imagined crimes were charged substantively and rejected by

13    the jury, that the Court is left to -- to speculate what --

14    what -- what specific overt acts and how many were committed,

15    you know, but the -- the enhancement of two levels requires

16    more than one.  And, Judge, I -- I -- again, I think that the

17    Court has to reach conclusions here that may conflict with the

18    verdict that we received and that I know this Court and I

19    certainly respect.

20            With regard to the second one, 2B1.1(b)(1)(H), the

21    amount of money, again, as I argued earlier, I'm concerned that

22    it would require, to get where probation got, basically to

23    accept Gary Jackson and I suppose Arthur Leavells' testimony

24    that there was this 8 or $900,000 stolen from the truck in

25    2010.

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1973   Page 24 of 84
Sentencing • Wednesday, February 22, 2017

24

1          And when I -- when I look closely at the testimony

2     that was received, the Court -- you know, I agree with the

3     Court.  You heard all the evidence, Judge, you heard it all,

4     and you -- you probably know it -- know it as well or better

5     than any of us.  But I hope, Judge, that you struggle with

6     accepting Mr. Jackson's testimony with regard to the amount of

7     loss when he himself admitted on cross-examination, again, that

8     he didn't really even see the money being packed on the truck.

9     He's assuming that it was 3 million, but he admitted that the

10    money was turned over to the cartel ten days before it was

11    loaded on the truck.  It was out of his possession and control.

12    It requires not only that Mr. Jackson speculate but then, on

13    top of that, this Court to speculate as to the amount of money

14    that was there.  And while the Court, of course, is free to do

15    that, Judge, I would just caution that it would be

16    inappropriate under these circumstances.

17          THE COURT:  Okay.  Let me -- let me stop you there.

18    I think you've spoken to Objection Number 3, sub-paragraphs 1

19    and 2, which is exactly where I'm at.  And I'd like to hear Mr.

20    Buckley's response, unless you have anything else to say.

21          MR. HARRISON:  I don't.  Thank you, Your Honor.

22          THE COURT:  Go ahead, Mr. Buckley.

23          MR. BUCKLEY:  Thank you, Your Honor.

24          Very briefly, with -- with regard to -- to Gary

25    Jackson, Mr. Harrison's recollection of his testimony and,

1   again, the slant of it is far different than mine.  Gary

2   Jackson, Judge, never wavered, never wavered on the fact that

3   the money shipment to the cartel was $3 million.  That

4   testimony was corroborated, Judge, by prior consistent

5   statements that he made to Calvin Turner, and there were

6   statements of Arthur Leavells that were recorded made to

7   Hansberry saying, "Little always said it was 3 million."  He

8   was adamant.  So, Your Honor, there were prior consistent

9   statements which corroborate Gary Jackson's position that it

10  was $3 million.  I don't believe he said the money was turned

11  over to the cartel ten days before the shipment.  If he did, he

12  did.  But in any event, he has always been steadfast in his

13  assertion that it was $3 million.

14          And, Judge, to the point, I don't think that this

15  decision for the Court on this enhancement for more than one

16  act of extortion is as difficult as Mr. Harrison would portray

17  it because I'm going to give the Court some examples of acts of

18  extortion which were wholly unaffected by the acquittals.  One

19  obviously was the -- the theft of the nearly $1 million by the

20  defendants on July 26th of 2010.

21          Mr. Harrison's also forgotten the testimony of Lamont

22  Calhoun.  Lamont Calhoun, the Court will recall, was

23  wheelchair-bound; he had been shot off his motorcycle on the

24  Lodge Freeway.  And he testified about a rip he participated in

25  of a man named Hightower on Monte Vista Street.  And he said

1   that after -- after Mr. Watson raided the Monte Vista home, and

2   Mr. Watson was a member of Mr. Hansberry's crew at that time,

3   Hightower pressured Calhoun, said, "Hey, I want money for the

4   half a kilo that I fronted you."  And Mr. Calhoun testified

5   that he said to Mr. Watson, "I need something to show

6   Hightower."  And if the Court will recall, Mr. Watson,

7   accompanied by Mr. Hansberry, introduced as Watson's boss, gave

8   Lamont Calhoun the fake Snowden search warrant with the forged

9   judge's signature and a fake name of a police officer as the

10  affiant.

11           So you have the $3 million money seizure.  We have

12  the Monte Vista rip.

13           Also Lamont Calhoun testified that at one point

14  Hansberry, Watson and he planned a ten-kilo rip and that Mr.

15  Hansberry suggested the use of a GPS tracker on the victim

16  dealer's car.  That would be three acts of extortion.

17           And then, Judge, we have the Calvin Pulley two-kilo

18  rip on Ohio Street on March 3rd of 2013.  And if the Court will

19  recall, that was the rip which the FBI was able to demonstrate

20  that the defendants placed two dummy kilos, two sham kilos of

21  cocaine on evidence and that the -- the two kilos stolen from

22  Calvin Pulley were sold by Arthur Knuckles.

23           So, Judge, that's at least four acts of extortion.  I

24  think the Court can also consider some of the acts based on

25  acquitted conduct, but the Court need not do that.

```
 1            THE COURT:  Okay.  All right.  You know --
 2            MR. HARRISON:  May I -- may I briefly respond, Your
 3    Honor?
 4            THE COURT:  Yeah, of course.  Go right ahead.
 5            MR. HARRISON:  Just -- thank you, Judge.
 6            THE COURT:  Go right ahead.
 7            MR. HARRISON:  Judge, just quoting from our
 8    Sentencing Memorandum, with regard to the ten days, Answer,
 9    Gary Jackson, "10 days before the money was already accounted
10    for and pushed over to the cartel.  Question, "Okay.  And so
11    you gave the 1.5 million to the cartel some days before the day
12    the money was forfeited?"  Answer, "True."  That's Gary Jackson
13    transcript, page 99, lines 4 through 8.
14            So again, Judge, in terms of Jackson, the most -- the
15    most money he had possession and control over was 1.5.  He gave
16    that to the cartel ten days before.  The Court may recall, the
17    other 1.5 was cartel-generated money.  Jackson testified he
18    wasn't actually physically present when they were loading it
19    and counting it.  It's very speculative, Judge.
20            And then in terms of the overt acts that Mr. Buckley
21    has addressed, I would just suggest to this Court that the
22    Court heard the testimony as Lamont Calhoun, and Mr. Calhoun I
23    believe expressly said he didn't have dealings with Mr.
24    Hansberry beyond talking about things -- or the day -- the
25    question of the search warrant.
```

```
 1            THE COURT:  Okay.  All right.

 2            MR. FISHMAN:  Judge, excuse me for one second.  I

 3   don't mean to interrupt.  If the Court is prepared to rule on

 4   the Gary Jackson 900 and some thousand, would it be possible

 5   for me to be heard on that before you do that, or are you going

 6   to defer that ruling until --

 7            THE COURT:  I'm going to defer that because I -- I

 8   might make a different ruling in -- in different cases,

 9   frankly.

10            MR. FISHMAN:  I understand.

11            THE COURT:  Okay?

12            MR. FISHMAN:  Okay.

13            THE COURT:  All right.  Just thinking about that now.

14            All right.  Look, here I've tried to stay as

15   open-minded as possible on -- on all these things.  And -- and

16   the -- the problem with guideline sentencing, in my view, is

17   that, you know, the Court has to -- and it's not comfortable

18   for the Court to do, but the Court has to make some difficult

19   decisions about these types of things.

20            In fairness, as a legal matter, what I would say, and

21   this will be my ruling, is that I -- I believe the probation

22   officer's report and the analysis of 2B1.1(b)(1)(H), in light

23   of Mr. Harrison's objections and in light of Mr. Buckley's

24   argument, should be applied.  And the reason I think it should

25   be applied is that as a legal matter, I am able to find under
```

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1978   Page 29 of 84
Sentencing • Wednesday, February 22, 2017

29

1    the guidelines scenario as a matter of sentencing that the

2    $960,000 and two kilograms were extorted and diverted, and I

3    can say that for the reasons that were argued in the papers as

4    well as by Mr. Buckley in open court.  But I can -- I -- I can

5    also find, and I remember this very vividly, the tape that Mr.

6    Jackson made of Mr. Hansberry that corroborated what had

7    happened and what was going to happen in the future.

8            So Objection Number 3, sub-paragraph 2, is overruled.

9            With regard to 2C1.1(b)(1), I can hardly differ from

10   the facts that Mr. Buckley lodged with the Court.  But looking

11   at them in light of the arguments made by Mr. Harrison, I can't

12   say that the jury found all of those acts to have been

13   committed.  There is some corroboration, although not the

14   strength of the sort that supported my ruling on Objection

15   Number 3, sub-paragraph 2.  And I would certainly say that

16   the -- that the act of the diversion of the $960,000 cash found

17   by the probation officer is -- is supportable, but I feel, as

18   a -- a -- a jurist attempting to apply the guidelines,

19   uncomfortable with saying that there are multiple acts beyond

20   that in light of the verdict of the jury which acquitted the

21   defendant of many multiple counts and acts of extortion.

22           So therefore, Objection Number 3, sub-paragraph 1

23   is -- is sustained.  And as of right now, going forward with

24   the probation officer's report, will be reduced by the two

25   levels that were found under that enhancement, all right?

```
 1        MR. BUCKLEY:  Judge, Judge, may I just be heard on --
 2   on one last --
 3        THE COURT:  Of course.
 4        MR. BUCKLEY:  I understand you've ruled, Judge.
 5        THE COURT:  Of course.
 6        MR. BUCKLEY:  But just so the record is clear, the
 7   Calhoun Monte Vista rip and his conversation with Hansberry
 8   about the ten-kilo rip and the Pulley rip were not affected by
 9   the acquittals, they were not acquitted conduct, just so the
10   record's clear.
11        THE COURT:  Well, why do you say that?  I -- I'm --
12   I'm -- I respect your position, but what -- what -- what --
13   what -- why do you say that?
14        MR. BUCKLEY:  Because those acts had nothing to do
15   with the counts that were acquitted.  You had the Renee
16   Williams rip that was acquitted; you had the Chris Wilson rip
17   that was acquitted; you had the Nick Simmons rip acquitted;
18   Chester Dwayne Browning rip acquitted.
19        THE COURT:  Okay.
20        MR. BUCKLEY:  And gosh, there was the Vasquez rip
21   that was acquitted.  There was one more, the name escapes me.
22   But -- but these acts which I've explained to the Court --
23        THE COURT:  Yes.
24        MR. BUCKLEY:  -- were totally independent of the
25   acquitted counts.
```

```
 1              THE COURT:  I guess my --

 2              MR. BUCKLEY:  Totally.

 3              THE COURT:  I guess my discomfort is -- and I looked

 4    at the charging document actually -- is that I don't think

 5    those were specifically set forth in the indictment in Count 1.

 6    So that's why I -- you might have seen me going through this

 7    during Mr. Harrison's argument, but --

 8              MR. BUCKLEY:  Judge, you're right, they weren't

 9    expressly set forth in the indictment, but with all due

10    respect, I don't think there's a legal requirement that that --

11    they be.

12              THE COURT:  Okay.

13              MR. BUCKLEY:  Uh --

14              THE COURT:  Okay.  All right.  Maybe there will be a

15    government and a defense appeal, but I'm going to go with --

16    I'm going to go with overruling 3, sub-paragraph 2, and

17    sustaining 3, sub-paragraph 1.  And Mr. Hampstead's calculation

18    is currently reduced by two, okay?

19              MR. BUCKLEY:  Thank you for letting me be heard,

20    Judge.

21              THE COURT:  Yeah, no problem.  Thank you both.

22              Let's go to paragraph 35.  I don't -- with all due

23    respect, Mr. -- Mr. Harrison, this is a difficult one for you.

24    I have looked at *Partida*, I have looked at *Powers*, but I have

25    also looked at -- I've also looked at 2C1.1(b)(3), and it seems
```

```
 1    that even a -- an officer, but especially one here who is a
 2    lieutenant and somewhat active in the community, would qualify
 3    for a public official enhancement under that particular
 4    section.  Go right ahead.
 5              MR. HARRISON:  Thank you, Judge.
 6              Judge, the argument is simply Mr. Hansberry's --
 7    Lieutenant Hansberry's position was a necessary element in the
 8    extortion conviction.  He had to be who -- he had to have his
 9    position to have been convicted of what he was convicted, and
10    that therefore, the argument is that one of double-dipping.
11    It's improper to have to be a certain type of official and then
12    to get an enhancement --
13              THE COURT:  Okay.
14              MR. HARRISON:  -- for being that official.
15              THE COURT:  Okay.  In other words, if he weren't a
16    public official, he couldn't have extorted.  The fact that he
17    was a public official supported the conviction substantively.
18    If you go ahead and enhance the sentence based on his status,
19    that's -- as you correctly stated it, would be double-dipping
20    that was addressed by the two cases that I mentioned.
21              Mr. Buckley, response?
22              MR. BUCKLEY:  Judge, simply that it's our position
23    that Application Note 4 of the pertinent guideline section
24    expressly states that a law enforcement officer is one deemed
25    to hold a sensitive position, and I think it recognizes the
```

1    Sentencing Commission's recognition of the fact that it's an

2    especially serious offense when a police officer commits the

3    crime that Mr. Hansberry committed.

4          THE COURT:  Okay.  I am going to overrule paragraph

5    3 -- excuse me, objection 3, sub-paragraph 3 on the authority

6    of *U.S. versus Partida*.  I believe that's the Sixth Circuit's

7    latest discussion about double-dipping in the guidelines.  We

8    see this from time to time.  I recognize the argument, but the

9    Court's rationale, which I'm bound to follow, is that

10    sentencing is a different idea than -- than charging, and

11    whereas Mr. Harrison is conceptually and argumentatively

12    correct, as a matter of law, the Sixth Circuit has disagreed

13    with him, and I don't think that I'm able to go beyond that --

14    go beyond that authority to find something different.  So that

15    takes care of Objection Number 3.

16          Objection Number 4, if I can find it -- do I have

17    Objection Number 4?

18          MR. HARRISON:  3B1.1(a), organizer, leader

19    enhancement, four points, Your Honor, role in the offense.

20          THE COURT:  My -- my report -- oh, there it is.  I'm

21    sorry.  Okay.  Oh, I see.  That's -- okay.  All right.  I

22    apologize.  Objection Number 3, sub-paragraph number 4.  My

23    apology to you.  My -- it's obscured on my copy here.  All

24    right.  There's a four-level enhancement in paragraph 7 -- 37

25    for being an organizer or leader of criminal activity that

Sentencing • Wednesday, February 22, 2017

1   involved five or more participants.

2          Go right ahead, Mr. Harrison.

3          MR. HARRISON:  Thank you, Your Honor.  Your Honor,

4   the thrust of the argument here is that if there were leaders,

5   the evidence shows the leaders were Art Leavells and Gary

6   Jackson.  And I've cited some case -- case law for the Court,

7   *Vandeberg*, that says, you know, even being an -- having an

8   essential role or some sort of control in the conspiracy isn't

9   sufficient to -- to assess four points for control or authority

10  over the conspiracy itself.

11         Judge, we heard -- we heard testimony, Jackson, 123,

12  lines -- page 123, lines 16 to 25, explaining that even after

13  Hansberry -- Lieutenant Hansberry was no longer working with

14  Jackson or Leavells, that Leavells continued his relationship

15  with Jackson; that whenever Jackson had a problem, he would

16  direct it to Leavells for assistance; he helped out a couple of

17  relatives of -- of Mr. Jackson's.  He was -- Jackson testified

18  that his contact was, I believe he -- he said, 60/40, meaning

19  60 percent with Leavells, 40 percent with Hansberry and/or

20  Bryan Watson.

21         And that, Judge, you know, the case law makes it I

22  think clear that just because of Sergeant -- Lieutenant

23  Hansberry's rank, then-sergeant, that's not sufficient to get

24  points for organizing or leadership in the conspiracy itself,

25  and for that reason, Your Honor, we're objecting to the

 1     four-point enhancement.

 2              THE COURT:  Okay.  Let me take a look at something

 3     briefly.  As I do that, Mr. Buckley, if you want to get

 4     started, the question is if -- if Lieutenant Hansberry was the

 5     leader, who would be the five or more participants in criminal

 6     activity under 3B1.1(a) that would support the four-level

 7     enhancement set forth in paragraph 37?  Go -- go right ahead.

 8              MR. BUCKLEY:  Thank you, Your Honor.

 9              We feel rather strongly that this enhancement is

10     appropriate, and it has nothing really to do with the fact of

11     rank alone.  The Court may recall the testimony in this case.

12     There was extensive testimony that as sergeant and raid

13     commander, Mr. Hansberry was the man on the street.  He decided

14     what was seized, he decided who would be arrested and who would

15     be released.

16              There was testimony from Arthur Leavells that

17     everyone in the crew except for Officers Bray and Beasley were

18     involved in this activity.  So if the Court takes into

19     consideration Hansberry himself, Mr. Watson, Mr. Leavells,

20     Police Officer Larry Barnett and -- and Officer Leavells

21     testified about one specific instance when Officer Barnett

22     stole a quantity of cocaine.  Also other individuals were one

23     Officer James Napier, who is deceased, Officer Tourville and

24     Officer Geelhood.  There were also other individuals, Your

25     Honor: Lamont Calhoun, Gary Jackson and Calvin Pulley.

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1985   Page 36 of 84
Sentencing • Wednesday, February 22, 2017

36

1           And if the Court will just think back to what I call

2     the power moves recording, the meeting recorded by Gary

3     Jackson, when as soon, as soon as Hansberry, the leader,

4     excuses Officer Herbert from the room and another woman and

5     tells them to leave, he's alone with his -- his co-conspirators

6     and with Mr. Jackson, the first thing he says is, "I had to do

7     it this way to make sure you weren't with the feds, the DEA or

8     the FBI setting me up."  He said, "I'm telling you this.  I'm

9     telling you we can do it brown-bag style.  I'm telling you that

10    we can give you money off the top."  He says in the meeting,

11    "I'm telling you that if you or your people get arrested for

12    selling drugs, I'm gonna come and get you."  I, I, I, I, I.

13          Judge, there's no question that Mr. Hansberry was the

14    organizer or leader of criminal activity involving more than

15    five participants, and so we think that the enhancement is

16    appropriate.

17          THE COURT:  Okay.  All right.  Very good.  Thank you

18    both.

19          I'm going to make a ruling here, and I've looked at

20    this very carefully.  Again, Mr. Buckley has persuasively

21    argued the position of the United States, and yes, there was

22    testimony to support much, if not everything, that he had to

23    say.

24          As a matter of law, I guess what I have to look at is

25    my recollection of the evidence in light of the jury verdict

1    and make an application under 3B1.1 that's proper.

2          What I did, in looking at the totality of the case,

3    and I relied extensively on the quotes from the tapes that Mr.

4    Buckley just put forth before the Court, was to determine that

5    Hansberry was at the top of the -- at the top of the chain.  It

6    would certainly appear, based on all the testimony involving

7    that particular episode with Jackson out -- outside of the

8    search warrant area where he was interviewed and taped, the

9    conversation would involve Watson, Leavells by his own

10   testimony was involved in that, and certainly Jackson.

11         The other -- other individuals I'm -- I'm -- I don't

12   have the same level of -- of confidence in.  Mr. Buckley's

13   position may very well and possibly and maybe even probably is

14   correct, but as a matter of law, I think I have to be careful.

15         And so accordingly, my judgment with regard to 3B1.1

16   is that Hansberry was the supervisor and leader of criminal

17   activity and he qualifies for leadership enhancement

18   adjustment, but -- but I can only find those four people to be

19   reliably beyond preponderance of the evidence those that I

20   could consider.

21         So what I'm going to do is I'm going to adjust the

22   probation officer 's report to find a two-level enhancement

23   which says that "if the defendant was an organizer, leader,

24   manager or supervisor in any criminal activity," which I think

25   he was, "other than described in (a) or (b)," which details the

1    five people, which I haven't been able to find, then he should

2    get a two-level enhancement.  So I would say I sustain the

3    objection in part and I will find that 3B1.1(a) does not apply

4    but 3B1.1(c) does apply.

5         And Mr. Hampstead's report now is a net minus four in

6    the overall Offense Level based on the rulings I made with

7    regard to Mr. Harrison's objections set forth in paragraph --

8    paragraph 3, 1 through 4.

9         All right.  Now, that gets us to Objection -- unless

10   I'm missing something, that gets us to Objection Number 5 where

11   Mr. Harrison on behalf of his client requests Level -- if all

12   of his objections had been sustained, he'd be at Level 14,

13   Criminal History Category I, and a range of 15 to 21 months.  I

14   would overrule that objection because based on the computations

15   the Court made, I have a different view of the guideline range.

16        Is there anything further you'd like to be heard on

17   with regard to that objection, Mr. Harrison?

18        MR. HARRISON:  Not with regard to that objection, no,

19   Your Honor.

20        THE COURT:  Mr. Buckley?

21        MR. BUCKLEY:  No.  Thank you, Your Honor.

22        THE COURT:  Okay.  Then the Court has entertained

23   argument on and resolved all objections to the Pre-Sentence

24   Report.  The factual findings or, excuse me, the legal findings

25   of the Court is that the overall Offense Level is 38, the

1   Criminal History Category is I, the sentencing range is 151 to

2   188 months.

3           The factual findings of Mr. Hampstead will be

4   considered by the Court but will be considered in light of the

5   factual objections raised by Mr. Harrison, and the Court will

6   rely on the overall record of the trial which it had the

7   benefit and privilege of hearing over the course of six, seven

8   weeks this past summer.

9           And that will be the -- that will be the Court's

10  rulings on all the objections.  Any --

11          MR. HARRISON:  Your Honor?

12          THE COURT:  Yes.

13          MR. HARRISON:  I -- I'm sorry.  I believe -- or did

14  the Court -- Court misspeak?  I believe the level, Offense

15  Level would be 34, for a guideline range of 151 to 188.

16          THE COURT:  Right.

17          MR. HARRISON:  I thought I heard the Court --

18          THE COURT:  If I -- if I didn't say that, I was

19  wrong.  I netted out four -- I -- I sustained two objections.

20  I netted out four points as a result, and I came down at 34,

21  Criminal History Category I, 151 to 188.  Everybody clear on

22  that?

23          MR. HARRISON:  Yes.  Thank you.

24          MR. BUCKLEY:  All right.  Thank you, Your Honor.

25          THE COURT:  All right.  Thank you both very much for

1    those compelling and well-argued positions on your objections.

2         Now, let me see what else we need to do here.

3    There's no -- let me see if I have this correct, because I read

4    your Sentence Memorandum and I think you wrote your Sentence

5    Memorandum on the basis of what we just resolved.  But you're

6    not -- you're not asking for a -- a departure, but you're going

7    to ask for a -- a variance when you allocute, is that correct,

8    Mr. Harrison?

9         MR. HARRISON:  That's correct, Your Honor.

10        THE COURT:  Okay.  So then I find there's no

11   departure authorized, none's been made by the United States,

12   and none would lie under the law.

13        I would like to talk very briefly about a fine.

14   There's a potential fine of $250,000 maximum on this particular

15   count.  Guidelines suggest a -- a 25 to $250,000 fine, but my

16   overall sense is that there's no upside or even necessarily

17   ability to pay any sort of fine, so I'm not going to impose

18   one.

19        Which then leads to forfeiture and restitution, and

20   I -- I don't know what the government's position is at present

21   on those matters.  If you'd like to be heard now, Mr. Buckley.

22        MR. BUCKLEY:  We would leave it to the Court's

23   discretion, Judge.  I -- I would respectfully request the Court

24   to consider at least a nominal fine.  When one considers the --

25   the amount of money, and our position is it was well over a

1    million dollars in drug proceeds that Mr. Hansberry stole and

2    used for his own personal enrichment, and there was testimony

3    that he essentially lived large based upon his extortion.

4            THE COURT:  Right.

5            MR. BUCKLEY:  There was testimony that he spent

6    thousands of dollars a week at the Ace of Spades Club where he

7    was considered a VIP.  He -- he purchased an Aston Martin, an

8    Escalade, a Corvette.  And I don't believe that all of the

9    money that was stolen has been accounted for.  There was

10   testimony from Special Agent Kevin Nalu of the IRS.  I would

11   ask the Court to at least consider imposing at least a nominal

12   fine in this case.

13           THE COURT:  Okay.  All right.  I appreciate that and

14   I will order restitution and/or a fine as well as -- there's no

15   forfeiture, right, that's all been taken care of?

16           MR. BUCKLEY:  That's correct, Your Honor.

17           THE COURT:  Okay.  All right.  Then I'll take care of

18   those financial matters in my discretion.

19           MR. HARRISON:  May I be heard?

20           THE COURT:  Yes, of course.  You want to speak to the

21   fine issue?

22           MR. HARRISON:  If I -- if I could.

23           THE COURT:  Go right ahead.

24           MR. HARRISON:  Thank you, Judge.

25           THE COURT:  I -- I -- I -- I read -- you know, I

```
 1   respect Mr. Buckley and his position, as you well know.  My
 2   problem there is that the probation officer found as a matter
 3   of law or suggested to me there's no ability to pay.  If I
 4   ordered a fine in light of that finding, I'd -- I'd be in a
 5   little bit of trouble, so I'm not inclined to impose one, okay?
 6            MR. HARRISON:  Fair enough.  Thank you, Your Honor.
 7            THE COURT:  All right.  Okay.  All right.  Okay.
 8   Very good.  Let's have Mr. Hansberry come up to the microphone
 9   and we'll get going on the various arguments that counsel wish
10   to make at this time.  Okay.  Mr. Hansberry's here in court.
11   He's now joined his lawyer at the microphone.
12            Mr. Hansberry has a right to make any statement or
13   present any information to mitigate the sentence.  I would
14   recognize, first of all, Mr. Harrison on behalf of his client
15   for any remarks he'd like to make on behalf of the defendant.
16   Again, I sat through the trial.  I read through the entire body
17   of the sentencing portion of the case.  I've read all the
18   memos.  I've read all the letters.  And -- and I'm not
19   precluding or saying don't repeat, but you should bear in mind
20   that I do have a good idea of many things.  And you go ahead
21   and say anything else you'd like to say, Mr. Harrison.
22            MR. HARRISON:  Thank you, Your Honor.
23            And I -- I'll do my best not to restate.  You know,
24   obviously, Your Honor, I brought up a number of issues to the
25   Court for the Court to consider with regard to a variance in
```

1   sentence, including concern over unwarranted disparities in

2   sentence given the sentences -- the plea offers, the sentence

3   agreements.  And then, in addition to that, 5K1 motions on

4   behalf of the co-defendants in this case are astronomically

5   different from the range that we're talking about here, and

6   that pursuant to 18 USC 3553(a)(6), the Court should consider

7   unwanted -- unwarranted disparities.

8           And these -- all -- all Mr. Hansberry did was

9   exercise his constitutional right to a trial in this matter.

10  He didn't get on the stand, he didn't perjure himself; he asked

11  for trial.  And I understand that there would be a benefit of

12  cooperating, but I -- I would think that that's typically

13  contemplated in a 5K1 motion, and if you look at the pleas that

14  were given the other defendants, there is a significant

15  disparity.

16          Secondly, Your Honor, I'm concerned over

17  vulnerability of my client to abuse in the corrections system.

18  The Court heard testimony my client's been a police -- before

19  he was a police officer at 17 years of age, he was a -- he was

20  a Police Explorer.  It's -- his entire adult and preadult

21  identity has been law enforcement.  He has put lots and lots

22  and lots of dangerous individuals into the prison system, both

23  state and federal.  We heard testimony, we had an actual cartel

24  member I believe testify as a witness here.  These were very

25  dangerous people that they were targeting and pursuing, and I

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1993   Page 44 of 84
Sentencing • Wednesday, February 22, 2017

44

1    have great concern for him in the -- in the corrections system.

2    I'd ask you to take that into consideration.

3        Collateral consequences is another issue that we

4    brought up.  David has known nothing in his entire life but law

5    enforcement.  He's forever precluded from any -- any even

6    remotely related career as a result of this conviction, Your

7    Honor.

8        And he's got a young daughter.  He -- who -- who --

9    who -- who is -- who is going to be injured.  And -- and in

10   terms of collateral consequences and vulnerability to abuse, I

11   would ask the Court to consider the potential risk that his

12   daughter and fiancee may be under as a result of the facts and

13   evidence that came out in this case as a collateral,

14   additional, horrific punishment that he has to suffer as a

15   result of all of this.

16       Judge, the other thing I ask you to consider, and

17   while it may seem on one level ironic given the fact that Mr.

18   Hansberry is convicted in relation to his employment, but this

19   is a man who was a police officer for many, many years, and for

20   a great, I believe even majority of them, unrelated to the

21   narcotics field at all.  I know that he ran a shooting team

22   that was overseen by the Attorney General's Office under the

23   Joshua Project; subsequently a Detroit task force, Swift, that

24   was all non-fatal shootings and violent crimes, carjackings,

25   armed robbery.

1          We've attached commendations that he received for his

2     work.  You heard from people in varieties -- a variety of

3     different seg -- segments of public service that have written

4     letters on behalf of Mr. Hansberry, not in their official

5     capacity but in their personal capacities, how they knew him.

6     They knew him through work, how they knew him, the work ethic

7     that he had, his thoroughness, his dedication.

8          Even in light of this conviction, Judge, I would

9     respectfully suggest that this Court should give him some

10    credit for all those years of good work that he's done that's

11    been supported by members of that community.

12         Judge, that goes to the other issue which is the good

13    deeds and past integrity.  I think it's supported by the

14    attachments that we've provided.

15         And finally, as I mentioned, he is a chronic

16    asthmatic.  The Court probably noticed throughout the trial he

17    had to be medicated, and that's a health concern which the

18    cases say is another issue that the Court can consider.

19         I'd ask that you consider all of these factors,

20    Judge, and that you depart from the guideline range and fashion

21    a sentence that's fair and equitable, that's a deterrent, but

22    also takes into account the particular vulnerabilities of

23    Lieutenant Hansberry and the particular collateral issues that

24    he faces.

25         THE COURT:  Very good.  Thank you very much for those

 1    words, Mr. Harrison.  Greatly appreciated as always.

 2              And now, Mr. Hansberry, I would recognize you

 3    personally to state any remarks on your own behalf that you'd

 4    like to make to the Court in support of the sentence it should

 5    impose.  Go right ahead.

 6              DEFENDANT HANSBERRY:  Thank you, Your Honor.

 7              Your Honor, I understand that, based on the federal

 8    rules and procedure, I am allowed to address the Court in

 9    effect to mitigate my sentence.  With your permission I would

10    like to proceed.

11              THE COURT:  Of course.

12              DEFENDANT HANSBERRY:  Thank you.

13              Early life.  I was born in northwest Detroit right

14    outside of Rosedale Park.  I have two parents, they're still

15    living and that are approaching their 70s.  They've been

16    married for 45 years I want to say.  I have a brother and a

17    sister.  I have two nieces and two nephews.  The family of my

18    own, Your Honor, I have is a fiancee named Sierra and a

19    daughter named Madison.  I am also partially raising the two

20    sons, Cameron and Austin, of my deceased best friend.

21              I was educated at Redford High School.  Shortly after

22    graduating from Redford High School, I attended Henry Ford

23    Community College where I received a scholarship to attend

24    University of Michigan in Dearborn.

25              When I was 14 years of age, I had the opportunity to

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.1996   Page 47 of 84
Sentencing • Wednesday, February 22, 2017

47

1    go to San Diego, California.  I had a cousin who's older than

2    me so I call him my uncle.  He was pretty high ranking in the

3    navy.  During that experience I had an opportunity to meet and

4    befriend a Navy Seal.  That is what I wanted to do with my

5    life.  I admired the service, the dedication and the commitment

6    and the willing to give it all, not for money, not for fame,

7    but for the opportunity to do things that other people could

8    not do.  Everyone can't protect themselves, and there are

9    people in this country that have to protect those that cannot

10   protect themself.

11          I learned everything that I needed to learn about

12   becoming a Navy Seal by the time I was 15 years old, and I

13   realized that I did not have the opportunity or I would not be

14   physically capable to complete the strenuous task of becoming a

15   Navy Seal due to my chronic asthma.

16          So the next best -- the next best thing, Your Honor,

17   that I wanted to do was join the police department.  That was

18   my alternative to serve this country.  Without delay, I joined

19   the Law Enforcement Explorers Program through the Detroit

20   Police Department at the age of 15.  Through that program,

21   it's -- it's situated similarly to the police department with a

22   rank structure.  I reached the rank of lieutenant by the time I

23   was 17 years old in the Detroit Police Explorers Program.

24          Shortly after, I graduated out of that program and

25   was hired by the Detroit Police Department as a student police

1  officer.  I graduated at the age of 18 years old.  I was a

2  sworn, armed, certified police officer for the City of Detroit

3  at the age of 18.

4       Your Honor, because of my youthful appearance, I

5  started to go undercover as a crack dealer at the age of 18 and

6  19.  That is where I learned all the nuances of posing as

7  someone who sells illegal narcotics.  Primarily my function was

8  to target buyers and suburbanites who came down here who would

9  feel comfortable and willing to deal with me because I looked

10  so youthful that the thought that I may be -- may be a police

11  officer never crossed their mind, and I had great success at

12  that.  From 18 to 19 I did that.

13       By the age of 21 I was working with the Special

14  Operations Unit, and that unit is to investigate and apprehend

15  high profile cases with dangerous offenders such as criminal

16  sexual conduct offenses, any high profile shootings.  If a

17  shooting happened at a skating rink or multiple victims or

18  kids, we would go after that.  We worked often with the Violent

19  Crimes Task Force and we would work to apprehend those

20  dangerous offenders.

21       I had some success in that unit, Your Honor, and at

22  the age of 22 to 23 I was recruited to join the Narcotics

23  Enforcement Unit, again, partially and based on my

24  youthfulness, that my superiors felt that I had an edge on

25  other officers because I was youthful, I would fit in, I would

1    blend, I would learn how to talk the talk, how to walk the

2    walk, and basically be -- how to hide in plain sight from drug

3    dealers or the -- from drug dealers or the detection of police

4    personnel.

5            And joining at 22 to 23, Your Honor, I was formally

6    trained.  Previously when I went undercover as a crack dealer,

7    that was very kind of trial by fire.  You know, I taught myself

8    what I needed to know based on dealing with people on the

9    streets.  Well, at this point in my career, Your Honor, I was

10   formally trained, and in some of those trainings I received was

11   undercover tactics, how to recruit, how to handle, how to

12   manipulate, how to use informants and cooperating defendants,

13   how to apply for search warrants, the probable cause standard,

14   the methods that I needed to go through to get them authorized.

15   I was also trained in tactical and dynamic entry which, in

16   short, is raiding and clearing a house.

17            While assigned to this unit, Your Honor, I had the

18   opportunity to go undercover literally several hundreds of

19   times.  I -- I conducted surveillance over a thousand times.

20   I've -- I've participated in over a thousand controlled buys,

21   which is me being a controlling officer and having an informant

22   purchase the drugs and being in close proximity to this

23   happening.  And I also had the opportunity, Your Honor, to do

24   hundreds of undercover purchases myself where I would go in,

25   directly engage with the drug dealer and purchase the narcotics

1   myself.  Your Honor, this gave me the ability to emulate,

2   behave and learn the minds of people in the narcotics trade.

3          In 2006, Your Honor, I was promoted to detective

4   sergeant, the youngest to note.  I was placed in charge of a

5   task force named the Joshua Project.  This task force consisted

6   of Detroit Police Department, the prosecutors from the Attorney

7   General's Office, Special Agents from the Attorney General's

8   Office and the Michigan Department of Corrections.  Here I

9   learned how to do crime group identification.  I learned a lot

10  about interviewing and interrogation, warrant requests with the

11  Prosecutor's Office, case presentation to a prosecutor to get a

12  warrant authorized, and also case presentation in the courtroom

13  where I would assist the officer in charge in presenting the

14  case and the facts for the jury in the best way we could to

15  ensure conviction, Your Honor.

16         I've conducted over a thousand interrogations, Your

17  Honor, and I maintain personally that I have about a 90 percent

18  conviction rate.

19         While attending a department-sponsored interrogation

20  school through the Eastern Michigan University, I learned

21  something about myself, which was one of my best qualities of

22  interrogating, and that is I'm an emotional person.  It was a

23  study during that time, Your Honor, this was around 2008, when

24  we were taking a look at re-approaching interrogations, and the

25  study determined, Your Honor, through Eastern Michigan that

1    people with high EQ, similar to intelligence quota, is

2    emotional quota, and that people with emotional quota make

3    better investigators because they actually care about people,

4    and they make better interrogations because they reach people

5    in a place not from fear or not from power or not from

6    leverage, but they reach people in their hearts and in their

7    minds, and you have a higher success rate and a higher chance

8    of getting a conviction if you can reach someone's heart and

9    someone's mind.

10          During my tenure as a detective sergeant and working

11   with the Swift Unit and the Joshua Project, I closed four of

12   the biggest armed robbery sprees in the department's history.

13   These sprees ranged from attempted murder, carjacking, armed

14   robbery and unarmed robberies.  And these were crime groups,

15   Your Honor, and a lot of times these same groups would be

16   perpetrating all of these acts.  Those are the crimes that I

17   would focus on mainly.

18          When Chief Warren Evans became the chief of police,

19   he created a new mandate for Narcotics Division, to out the top

20   tier narcotic traffickers.  I was -- I was recruited to return

21   as a raid and tactical commander of Code 2913, Western

22   Enforcement District, which would later be promoted to

23   Conspiracy West.

24          While assigned to the Narcotics Conspiracy Division,

25   Conspiracy West had the highest stats and highest

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2001   Page 52 of 84
Sentencing • Wednesday, February 22, 2017

52

1   accomplishments in the history of Narcotics.  We had to change

2   the tactics, Your Honor.  We realized that buying crack from a

3   crack house and raiding it was not effective.  The crack house

4   would go right back up the next day or sometimes the -- that

5   exact same day.  So we had to change our tactics, Your Honor.

6   We had to master source manipulation, flipping defendants into

7   cooperators, using subterfuge for informants, using deception

8   and using police psychology.

9           Which brings me to two important points, Your Honor.

10  Not to belabor the Gary Jackson recordings, Your Honor, but I

11  want to express to the Court, and I would be remiss if I

12  didn't, Your Honor, I was a Detroit Police sergeant.  By law, I

13  had the legal authority to talk to drug dealers.  By law, I had

14  the legal ability to lie to drug dealers if it was in the best

15  interest of the city to remove more drugs off of the street.

16          It would be disingenuous for me to tell this Court

17  that every drug dealer that I come in contact with, it is

18  appropriate to lie, deceive or make false promises to them.

19  But there are certain circumstances, Your Honor, where that is

20  a appropriate and a necessary action or a necessary evil, and

21  that is when you have an opportunity to take two million

22  dollars worth of drug money off of the street, that is an

23  appropriate time.  When you can seize a hundred kilos of

24  cocaine and stop them from hitting the cit -- hitting the

25  streets of the citizens of Detroit, Your Honor, that is an

1    appropriate time.

2          I am telling this Court, Your Honor, the conversation

3    you hear between me and Gary Jackson, I am in total control.

4    The conversation was documented, Your Honor, through activity

5    logs, through paperwork that Gary Jackson signed, Your Honor,

6    and also through a police report, none of these things which

7    were admitted by the government but was omitted.  All of these

8    documents exist.  So I exercised my legal right as a police

9    officer to use some deception.  I went back and made my

10   superiors aware of it and I documented that activity, the

11   location it happened and what occurred, on official department

12   paperwork, Your Honor.

13         And I'll move on from Gary Jackson.  Thank you for

14   giving me the opportunity.

15         Secondly, Your Honor, and I'll be real brief, is the

16   conversation with Arthur Leavells.  Again, Your Honor, I was a

17   sworn police officer for the City of Detroit.  I had the

18   authority to investigate crime.  As a police lieutenant, Your

19   Honor, I had the departmental rank to investigate other police

20   officers.  When this allegation was brought to me by Bryan

21   Watson, I believed I owed both of them.  I believed I owed Mr.

22   Watson an opportunity to create some space between Leavells and

23   going directly to Internal Affairs or the FBI so it would not

24   be telegraphed that he was the one making the complaint, and I

25   believe I owed it to Arthur Leavells, as a former colleague, a

Sentencing • Wednesday, February 22, 2017

54

1    former friend, to interview him and to see exactly what was

2    going on before I took this complaint to Internal Affairs,

3    which would cause, as I am going through now, massive

4    destruction of a person's life, and I believe -- I believe I

5    owed it to them to make sure I knew what I had before I went.

6            I would like to commend Officer Watson, Your Honor,

7    because it's a very difficult thing to turn in a friend, a

8    colleague that you've worked with for ten years.  To be honest,

9    Your Honor, I would have a hard time doing that.  That is a

10   hard thing to do.

11           Your Honor, after having a meeting with Arthur

12   Leavells, I know that the call -- I know that the tape sounds

13   convincing.  There's over 30 years of undercover experience in

14   a hour and a half worth -- worth of tapes that this Court and

15   that this jury heard, it's over 30 years.  The tapes are going

16   to sound convincing, Your Honor.  The recordings are going to

17   sound convincing.

18           But I believe what is more important, Your Honor, is

19   the action that occurred after the recordings, and that action

20   is, and this Court heard testimony, that I called Internal

21   Affairs, I made an appointment, I showed up for that

22   appointment, and I emotionally -- it was emotional, it was an

23   emotional moment for me -- I emotionally shared the contents

24   and the activities of Arthur Leavells with Investigator Timothy

25   Ewald of the Public Corruption Unit, Your Honor.

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2004   Page 55 of 84
Sentencing • Wednesday, February 22, 2017

55

1        And I will move on from that.  Thank you for allowing

2    me to touch base, to revisit that.

3        THE COURT:  Of course, mm-hmm.

4        DEFENDANT HANSBERRY:  Quite frankly, Your Honor,

5    candidly speaking, to get a hundred kilos off of the street,

6    Your Honor, and to seize a million dollars worth of drug money,

7    I would have told Gary Jackson whatever I needed to tell him to

8    get that information, and I would have not under any

9    circumstances followed up with any promises, Your Honor.  And I

10   believe the Court record shows that Gary Jackson was not given

11   a penny of the money from that truck and he was paid legally

12   through the Detroit Police Department $250,000, which is

13   paperwork that I generated and sent up through channels to the

14   chief of police, and when the chief of police sent it back down

15   and approved it, that is when he was paid, Your Honor.  And any

16   circumstances equivalent or similar to that, Your Honor, is

17   exactly how he would have been paid until Gary Jackson decided

18   in his mind he did not want to deal with me anymore.

19        Your Honor, the record is clear that Gary Jackson

20   accuses me of selling drugs, of stealing money and of helping

21   him steal money, Your Honor.  And then the record becomes even

22   clearer, Your Honor, in the point where he testifies that, "I

23   never saw Hansberry again after that day.  I don't know him.  I

24   don't have any problems with him."  That's the truth when

25   questioned by Michael Harrison if me and him had a rocky

1   relationship.

2         Your Honor, I always took my investigations as they

3   came.  When one of Gary Jackson's nephews I came across, I did

4   Gary Jackson's nephew no favor.  I arrested him and I put him

5   in prison.  When I caught Gary Jackson's top lieutenant, Your

6   Honor, with heroin and a gun and money, Your Honor, I made him

7   work.  He had to produce a kilo of cocaine, Your Honor, to get

8   out of his case.  I did no favors for Gary Jackson knowing what

9   I have.

10         And I'll move on.  Thank you for allowing me to

11   revisit Gary Jackson again.

12         THE COURT:  Mm-hmm, of course.

13         DEFENDANT HANSBERRY:  I'm finishing up here, Your

14   Honor, and I would like to share with you some things.  What

15   hurts me the most -- well, I'm heartbroken, Your Honor, as I

16   stand here today, and I'm -- I'm heartbroken, and what hurts me

17   the most is my proudest accomplishments that should have been

18   famous, Your Honor, has made to be infamous.  The seizure of

19   $2.1 million, Your Honor, was one of my proudest

20   accomplishments.  Before I even -- the first person I called

21   from that scene that day was my mom and dad, and you know what

22   I told them?  "Your son is going to be on the news tonight.  I

23   just got the biggest cash seizure ever in the history of the

24   Detroit Police Department."  I let them -- I told them, "Call

25   all the family, set the recorders to tape, because this is the

1  proudest moment of my life."  And that moment, Your Honor, has

2  been turned against me and incriminated me and now has me

3  looking at a substantial prison sentence.

4       Your Honor, the FBI, the DEA, Border Patrol and the

5  command staff was at that location for one and one reason

6  alone, Your Honor:  Because I was the commander at that scene

7  and I notified them.  If I wanted to keep that scene isolated

8  and in a vacuum, Your Honor, I didn't have to make one phone

9  call.  But I was trying to be transparent and I was trying to

10  minimize any opportunities for theft by inviting the federal

11  government to that scene.

12       In addition to inviting the federal government to

13  that scene, Your Honor, I attempted to turn the case over to

14  the DEA.  They told me in response -- and I can still -- I

15  still remember the task force officer's name, Sergeant Darren

16  Johnson -- that they had another big investigation going and

17  they would not have the time or the manpower to put into this

18  seizure involving Gary Jackson.  But right at that scene, Your

19  Honor, I was willing to turn over Gary Jackson as the

20  informant; I was willing to turn over the driver who we seized

21  the money from; and I was also willing to turn over the money

22  to the federal government.  And these are facts, Your Honor,

23  that could be checked.

24       The second proudest accomplishment, Your Honor, is

25  something that is being used against me not in the proper

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2007   Page 58 of 84
Sentencing • Wednesday, February 22, 2017

58

1    context, and that is the conversation that I'm having with

2    Arthur Leavells about Renee Williams, about the Robson location

3    and about Nicholas Simmons.

4            Your Honor, if you recalled it correctly, I told

5    Arthur Leavells that all of the dope and all of the money we

6    put on the table at Narcotics and we only had four complaints.

7    That is -- excuse my language -- that expletive, starting with

8    the "S" word, is not easy to do so.  Your Honor, through my

9    whole tenure at Narcotics, I turned in almost $50 million in

10   drugs and almost $5 million in cash, and, Your Honor, I did

11   that with the lowest complaint record ever, four notable

12   complaints.

13           Renee Williams, Your Honor, I was aware of because I

14   was investigated by Internal Affairs and cleared.

15           The Robson location, Your Honor, I worked tirelessly

16   with the DEA.  Christopher Rosen is a source for the Drug

17   Enforcement Administration.  I worked tirelessly.  I turned

18   over reports, documentation, search warrants with the Special

19   Agent who was in charge of operating, Christopher Wilson, Your

20   Honor.  And me and these agents came to the conclusion that we

21   believe, Your Honor, that all of the right players were in that

22   house and that there was money in that house.  Whoever got out

23   of the back door with it escaped with the money or we could not

24   find it.  The agents were more concerned with Christopher

25   Wilson conducting narcotics transactions without them knowing

1  about it.  I worked tirelessly with them, Your Honor.  I

2  vividly remember five to six, what do you call them, conference

3  calls with agents, with Special Agents, with group supervisors

4  and with my bosses, Your Honor.

5           Nicholas Simmons, Your Honor, that recording and the

6  way it's been presented to the Court today, Your Honor, is

7  taken out of context.  I actually, Your Honor, felt bad for

8  Nicholas Simmons.  I actually liked him and I felt bad for

9  him -- it goes back to my emotional EQ -- because he was thrust

10  into a role at 20 years old by his father to be the Mexican --

11  to deal -- to be the direct connection to the Mexican cartel, a

12  21-year-old.  I wanted nothing more than to get him out of that

13  line of work.  I believe that if you recall the tape properly,

14  I told Arthur Leavells, I offered him a legitimate way out, and

15  he turned it down.  I said there's no way he would have been

16  indicted if he would have worked with me and gave up Alex, the

17  supplier out of Southgate, but instead, Your Honor, he turned

18  me down.

19           I went to the deputy chief of Management Services

20  Bureau named Benjamin Lee.  I had Nicholas Simmons approved for

21  $1.4 million bonus payment, which dwarfs the payment of Gary

22  Jackson, 1.4 million if he would have gave up the Sinaloa

23  cartel, and he looked me in my face, Your Honor, and told me he

24  needs 10 million, and that's when we went our separate ways.

25  But I really felt bad for Nicholas Simmons because he was just

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2009   Page 60 of 84
Sentencing • Wednesday, February 22, 2017

60

1    a kid and he had no choice.  He couldn't tell his father no.

2    He was thrust into that world.

3           Your Honor, those were some of my proudest

4    accomplishments.  Those are things that I wore and I looked at

5    as a -- somewhat of a protection.  I always looked at the fact

6    that if I ever got investigated or if I ever got looked into,

7    that people would look at my record and see that I don't have

8    any complaints.  They would look at how transparent that I have

9    always been with any federal agents.

10          Your Honor, I don't know if Agent Christopher Hess is

11   here or not.  Me and Agent Christopher Hess worked a case out

12   of East Detroit with a Lawrence Montgomery who was prosecuted

13   right in this business -- right in this building and he got

14   18 years.  I would have took a bullet for Agent Hess and any

15   agent that I worked with.

16          And these things, Your Honor, have been turned

17   against me and I'm really heartbroken about it.

18          Your Honor, for eight city cops, seven police

19   officers and one sergeant, to effectively have intercepted

20   money from a Sinaloa cartel, and on two occasions, Your Honor,

21   was one person away from the Sinaloa cartel, that's without any

22   wiretaps, Your Honor, that's without any federal grand juries.

23   That is from hanging out at clubs like the Ace of Spades and

24   jewelry shops like Zeidman's and Guchason's (sic) at Northland,

25   running plates, hanging around, writing plates down, hard

1    boots-on-the-ground, pencil-and-paper police work to get to the

2    level where you have effectively disrupted the Sinaloa cartel,

3    and you were -- at two times, Your Honor, I was one person away

4    from the Sinaloa cartel, Your Honor.  It's unheard of for a

5    city police department, especially one as cash-strapped as the

6    City of Detroit, it's unheard of, Your Honor, and I wore those

7    things as badges of honor.

8          Your Honor, you had an opportunity to see my

9    finances.  And although, Your Honor, I was not a millionaire or

10   I wasn't making a quarter of a million dollars a year, Your

11   Honor, I made enough money to sustain my lifestyle.  My

12   roommate is here today.  I lived with a former Wayne County

13   sheriff, Your Honor, and I paid $1,200 a month for rent.  We

14   split it $600 down the middle, and I had a $60 phone bill, and

15   that was my overhead.  The place I stay in, Your Honor, had --

16   I was lucky enough, had no gas payment and no electric.  That

17   was my overhead, Your Honor.  I had no girlfriend, I was

18   single, and I had no children.

19         Some years, Your Honor, I made almost $150,000, and

20   in saying that, Your Honor, I was able to accumulate things.

21   To make that kind of money as a police officer, Your Honor, you

22   have to work so much.  Some years I doubled and/or tripled my

23   salary.  What comes along with that, the collateral that comes

24   along with that, Your Honor, is I missed every birthday party,

25   not some, I missed every one.  I missed every Thanksgiving

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2011   Page 62 of 84
Sentencing • Wednesday, February 22, 2017

62

```
 1    dinner.  I missed every Christmas dinner.  I missed every
 2    baseball game.  And I did it, Your Honor, not for the money but
 3    for the love of police work, for the love of the game, so I did
 4    it.  The money was a fringe benefit that came along with it,
 5    but I did it for the love of police work and for the love of
 6    the game.
 7         And the one silver lining that has came out of this
 8    for me is I've learned to appreciate my family more, to learn
 9    them more, to believe in them more, to have them around me
10    more, and to strengthen my relationship with God.  Because I'm
11    ashamed to admit, Your Honor, police work was first in my life,
12    before God, before family, before children, before parents.  I
13    was just one of those people.  I was a -- I was just a
14    policeman and that's the only thing that was important to me.
15         Your Honor, standing in front of you today, I still
16    represent myself as a law enforcement professional, even though
17    that may be hard to believe.  I give you some examples or maybe
18    you can deduce that for yourself.  Your Honor, I remember days
19    where I would get to court, I would get to court early because
20    the first day I was late and it upset you, so I would make
21    sure, Your Honor, I was the first one in court.  And, Your
22    Honor, sometimes I would see Ms. -- Ms. Koch or Ms. Couch (sic)
23    coming off of the elevator, Your Honor, carting a big cart of
24    evidence, Your Honor, that she was putting in this courtroom to
25    put me in prison, and you know what I would do as a law
```

1     enforcement professional, Your Honor?  I would run down here

2     and I would hold those doors open for her and I would hold

3     these galley doors open for her so she could get her evidence

4     to prosecute me in this courtroom because I'm a law enforcement

5     professional.

6            Since I've been suspended, Your Honor, I spent my

7     time tutoring young police officers and young sergeants.  I

8     tutored about a group of 20, and, Your Honor, I am proud to say

9     that every member that I tutored has either been promoted to

10    the rank of sergeant or lieutenant or are eligible to be

11    promoted to the rank of sergeant or lieutenant.  And I did that

12    free of cost because I still care about the future of the

13    Detroit Police Department and it becoming better and the

14    legitimacy of the Detroit Police Department.

15           When a police officer is shot or injured, Your Honor,

16    I'm the first person on the phone calling to make sure he's

17    okay.  I'm the first person sending condolences, Your Honor.  I

18    still carry myself as a law enforcement professional.

19           And I think the most dynamic of them all, and I think

20    the -- this Court will agree, is the people that took this

21    stand and testified against me, Your Honor, the drug dealers,

22    the people that cooperated, the people that turned on me so

23    they could get out of jail early, the people that made up all

24    of these false testimony about me, Your Honor, I live with

25    their secrets every day.  I've never went and broadcasted

1    anything in the newspaper.  I've never got on T.V. and outed

2    any of these people.  I live with their secrets, Your Honor,

3    secrets that would definitely put them in jeopardy and danger

4    and in peril.  But I live by a creed, believe it or not, Your

5    Honor, and that creed and that integrity will not allow me to

6    expose the many things, the sensitive information that they

7    share with me about their close friends and their close

8    relatives who they were informing on that would definitely,

9    Your Honor, get them hurt or put their lives in jeopardy.  I've

10   never shared one thing.  I take those secrets to me -- with me

11   to bed every night, Your Honor.

12           THE COURT:  Okay.

13           DEFENDANT HANSBERRY:  Your Honor, as I close out

14   here, I'm asking for a sentence, Your Honor, quite candidly,

15   that does not require incarceration.  Your Honor, I've lost

16   everything: my career, my reputation, relationships, hardships

17   with my family and significant financial damage.  Your Honor, I

18   had accumulated nice things and I had a pretty nice life for

19   myself as a young basically executive in the police department.

20   I had the lifestyle that came with it.  I had a nice condo, I

21   had a nice vehicle, I had money in the bank.  You know, I

22   wasn't stressed out, I wasn't living check to check.  You know,

23   I had opportunities.  I was saving to purchase a home and

24   extend my family.  I was planning to get married.  Your Honor,

25   now I own a bed, a television, a couch and a Honda CRV that has

1    200,000 miles on it.

2          Your Honor, I believe that winning nine out of ten

3    counts was a victory to some sort, but I believe being

4    convicted of one hurts me and has broken my heart.  I never

5    thought, Your Honor, through this entire trial -- I sat in this

6    courtroom, Your Honor, and I stayed there at this table and I

7    listened to people say unimaginable things and come up with

8    unimaginable amounts of money, Your Honor, and I sat there and

9    I respected this courtroom, I respected those witnesses, and I

10   acted and behaved like a true gentleman and a true law

11   enforcement professional for five and a half weeks.  I never

12   thought, Your Honor, for one minute that I would be convicted

13   of a crime.  I thought people would apply logic and see through

14   a lot of these things, Your Honor, and that's a surprise, Your

15   Honor.

16         Last but not least, and this probably will come as a

17   surprise to the Court, to the prosecution and to the defense, I

18   wanted to ask you for leniency for Arthur Leavells.  Your

19   Honor, I failed Arthur Leavells, and that is the truth.  I was

20   his leader, I was his supervisor, and when he started to show

21   signs that his loyalty was to Gary Jackson and not the police

22   department, I remember the exact moment and the exact day.  It

23   is when Fred Tucker and Gary Jackson placed a fake kilo of

24   cocaine, and he wanted a $5,000 bonus payment and I refused to

25   give it to him because it was a fake kilo of cocaine.

1          Arthur Leavells left my crew, Your Honor, within

2    three weeks, and now looking back on it, I understand what that

3    was.  That was he was choosing Gary Jackson over me and over

4    the police department, and I failed him because I should have

5    pushed, I should have talked to him, I should have tried to

6    reconcile, I should have pushed hard for him to be removed from

7    the Narcotics Enforcement Section.

8          But, Your Honor, I looked at it cavalier and said

9    he's not my problem anymore, him or Gary Jackson, and I'm going

10   to continue with my crew and we're going to continue to pursue

11   big drug dealers.  And in overlooking that, Your Honor, I

12   failed him as his leader.  I should have not allowed him to

13   continue to fester or to grow in that relationship that he had

14   with Gary Jackson, or at least I could have made it very

15   uncomfortable to the point where he had to choose being a

16   police officer or being involved with Gary Jackson.

17         Although Mr. Leavells did not truth -- testify

18   truthfully here, Your Honor, I ask on my behalf that when he

19   comes before your court, you give him leniency because he was a

20   man following a leader, and his leader had all of the

21   indications and all of the signs that he was on a slippery

22   slope and I didn't give him a pole or a life raft or anything

23   to pull him up from that slippery slope.

24         Thank you for letting me revisit certain things in

25   the case.  I know you certainly know the case and you didn't

1    want to hear them again, but I appreciate that, Your Honor.

2         And I respectfully, Your Honor, request for a

3    departure, Your Honor.  I've already secured a apprenticeship

4    with a heating and cooling company that I can start working

5    with if I am not incarcerated.  They will take me in as an

6    apprentice and I can start heating and cooling.

7         Your Honor, I haven't given up on the system.  I

8    still believe in the criminal justice system all the way

9    through the appeals court and all the way through the Supreme

10   Court, Your Honor.  And I would love one day to return to

11   police work or become a lawyer myself, Your Honor, and play on

12   the higher level and to represent and provide robust defense

13   for people who come in the criminal justice system on the

14   defense side of the table, Your Honor.

15        Any consideration, Your Honor, goes without saying

16   would be more than greatly appreciated.  It would give me a

17   chance to reconcile my life, to pick up some pieces, to start

18   over and to be a productive member of society.  I believe I

19   have a lot of equities to offer and a lot of unique

20   experiences, and I believe I can change lives and affect lives,

21   Your Honor.

22        Thank you very much.

23        THE COURT:  Okay.  Thank you very much.  I appreciate

24   all those words and the spirit that under -- underlied them and

25   they're very helpful to the Court.  Thank you again, Mr.

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2017   Page 68 of 84
Sentencing • Wednesday, February 22, 2017

68

1    Hansberry.

2           Of course, the government has the right to make

3    remarks on behalf of the United States as to any factors in

4    sentencing or other matters I should consider.  I read the

5    entire government's Sentence Memorandum and exhibits as well.

6    Mr. Buckley, go right ahead if you'd like to now.

7           MR. BUCKLEY:  Thank you, Your Honor.  I appreciate

8    that.  May it please the Court, and thank you for letting me be

9    heard.

10          I don't always speak at sentencings, Judge, but in

11   this particular case I feel compelled, and I feel compelled to

12   respond to the comments of counsel and to Mr. Hansberry.

13          Now, at the risk of injecting a small amount of

14   levity into the proceedings, there's one thing that I will

15   agree with Mr. Hansberry on, and that's that Mrs. Koch is the

16   hardest working person at the U.S. Attorney's Office.

17          Now, Judge, Mr. Harrison asked the Court to vary

18   downward based on Mr. Hansberry's health and security concerns.

19   I respectfully suggest to the Court that the Bureau of Prisons

20   will accommodate those concerns, and a variance should not be

21   granted on those bases.

22          Mr. Harrison also talked about the good that Mr.

23   Hansberry had done while he was a police officer.  Judge, in

24   response, the crime with which Mr. Hansberry was convicted,

25   which was, without question, the single most serious count in

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2018   Page 69 of 84
Sentencing • Wednesday, February 22, 2017

69

1   the indictment, was not reflective of an isolated instance of

2   bad judgment, it wasn't a mistake.  It was a years-long

3   conspiracy, it was calculated, it was well thought out, and he

4   was the leader.

5           You know, Mr. Hansberry said to the Court that his

6   true interest was in -- was in protecting others.  I think even

7   Mr. Hansberry would agree with me that drug trafficking is one

8   of the most serious problems that the City of Detroit faces.

9   Drug trafficking has been a plague upon the City of Detroit for

10  at least decades, Judge.  Drug trafficking is the root of

11  hundreds of homicides.  Drug trafficking is the motive for

12  countless assaults, robberies and carjackings.  It has

13  Detroit's hospitals -- filled hospitals, it's destroyed

14  families.  It has decimated entire neighborhoods with the same

15  efficiency as a nuclear blast.

16          And what's ironic, Judge, is who would know that

17  better than Mr. Hansberry himself?  Based on the experience

18  that he outlined for this Court, he was out there every day, he

19  was running and gunning, he was investigating drug traffickers,

20  he was talking to them, he was doing undercover work, et

21  cetera, et cetera, et cetera.

22          It is ironic, Judge, given how harmful drug

23  trafficking is, that Mr. Hansberry did what he did to find

24  himself in this situation today because, Judge, Mr. Hansberry

25  took an oath and he swore to fight drug trafficking.  He

```
 1   violated that oath, Judge, for his own personal enrichment.  He
 2   made that badge he talked about a badge of shame.  He brought
 3   shame upon himself, his department and that badge, and he did
 4   it for his own personal enrichment.  And the evidence at this
 5   trial showed, Your Honor -- again, this wasn't an isolated
 6   instance.  The evidence showed that he stole drugs and that he
 7   agreed to steal drugs for his personal enrichment, and for his
 8   enrichment, he agreed to steal over a million dollars in drug
 9   proceeds.
10            And the Court heard how he did it.  He talked about
11   employing deception legitimately as an undercover cop, but his
12   deception was not limited to his dealings with suspected
13   criminals.  Mr. Hansberry employed deception by preparing,
14   approving and filing false police reports, which willfully
15   underreported or failed to report the amount or the fact of
16   seizures of drugs and drug proceeds.  He used fake or
17   substitute kilos of cocaine to place on evidence to substitute
18   for the actual drugs that were seized and sold by him and his
19   co-conspirator and others.  And he also used fake search
20   warrants, Judge.  He made a mockery, a mockery of the justice
21   system; fake search warrant with a forged judge's signature on
22   it, bogo warrants.
23            Your Honor, the fact is that he, worst of all, failed
24   to arrest kilo eight drug dealers that he caught red-handed.
25   Those may include Nick Simmons.  He talks about Nick Simmons.
```

1   When Nick Simmons' house was raided, Nick Simmons said he had

2   $300,000 in drug proceeds there and guns and a quantity of

3   drugs.  Did Mr. Hansberry arrest him?  No, he didn't arrest

4   him.

5          There was testimony by Mr. Simmons that Mr. Hansberry

6   pressured him and nagged him to set up rip-offs of others, and

7   the nagging was so bad, Mr. Simmons in the end placed kilos and

8   cash in an abandoned house pursuant to Mr. Hansberry's

9   instructions so Mr. Hansberry could retrieve them, and Mr.

10  Simmons said he sat out and watched Mr. Hansberry go to that

11  abandoned house and pick up the drugs and money.

12         So my point is, Judge, that as a sworn narcotics

13  officer, this defendant, these defendants had an obligation, a

14  sworn duty to take drugs off the street and, more importantly,

15  Judge, even more importantly, to take drug dealers off the

16  street.  Mr. Hansberry agreed to allow drug dealers that he

17  caught red-handed to be released to set up rip-offs of other

18  drug dealers or to sell the drugs that was stolen by the

19  defendants.

20         Now, Mr. Hansberry talked at length about Gary

21  Jackson and he talked about the recording that was made.  I

22  think it's important to note the irony here, Judge, because

23  Gary Jackson only recorded that meeting because the defendants

24  stole from him.  They had promised him $300,000 off the top

25  plus a reward of $500,000, and he had to go to his own lengths

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2021   Page 72 of 84
Sentencing • Wednesday, February 22, 2017

72

1   to make sure that he got the premium payment, which was

2   $250,000 in cash, when that meeting was recorded.  But it's

3   ironic, if -- if Mr. Hansberry and Mr. Watson hadn't cheated

4   Jackson, they'd all still be out there doing this, without

5   doubt.

6          Now, one thing Mr. Hansberry said too was that he put

7   all these drug dealers in prison.  There were several that he

8   didn't, Judge: Nick Simmons, Louis Mars, Gary Jackson, Lamont

9   Calhoun.  With regard to Mr. Simmons, Mr. Mars and Mr. Jackson,

10  those gentlemen were all arrested, investigated and prosecuted

11  and convicted by the feds; by ATF, by DEA, by the FBI.  It was

12  Mr. Hansberry who chose to let them continue to operate with

13  impunity in the city and put those drugs back out on the street

14  and sell kilos of drugs in this city.

15         So, Your Honor, pursuant to Section 3553 and the

16  factors enunciated therein, we're asking the Court to consider

17  the gravity of the offense, the seriousness of the offense, the

18  need to promote respect for the law and the need to deter

19  others because this crime was about greed and -- and it was

20  about betrayal.  And I respectfully suggest to this Court that

21  Mr. Hansberry stole money out of greed, but worse than that, he

22  betrayed his badge, his oath, his department, the citizens of

23  the City of Detroit and all other honest law enforcement

24  officers who risk their lives every day.  For those reasons,

25  Judge, we ask for a sentence at the high end of the guidelines.

Case 2:15-cr-20217-SJM-APP   ECF No. 178   filed 02/27/17   PageID.2022   Page 73 of 84
Sentencing • Wednesday, February 22, 2017

73

```
 1            THE COURT:  All right.  Thank you very much, Mr.
 2    Buckley.  All right.  And thanks to both lawyers, as always,
 3    for their extremely hard work on this particular matter.
 4            I'm going to talk a little bit about the 3553(a)
 5    factors, I'm going to state the sentence, and then I'll give
 6    the attorneys for both sides a final chance to make legal
 7    objections to it before it's imposed, and then we'll go from
 8    there.
 9            I'd be, you know, remiss if -- if I didn't start by
10    saying that these types of cases, both in the courtroom and in
11    the community, rise an enormous amount of passion, and I think
12    the -- the -- the passion, the frustration, the anger is
13    palpable when you look both at the letters that I've seen
14    and -- and -- and some of the other materials in the file.
15            I think it's my obligation to be dispassionate about
16    the sentence and to make the -- the most informed decision that
17    I can as to the sentence based on the law and the facts that
18    came before the Court.
19            Obviously Mr. Hansberry has never been convicted
20    previously.  We balance that with the fact that he was a law
21    enforcement officer who had a decorated career and, by his
22    testimony this morning, is obviously an appealing personality
23    with a desire to -- to have done his job properly and to
24    have -- and to have served the public as he was sworn to do.
25            I viewed the case, quite honestly, as one in which
```

```
 1    the government proved Count 1 beyond a reasonable doubt.
 2    There -- there were tapes, there were financial incentives,
 3    there was an entire IRS/financial aspect to the case that I
 4    really believe demonstrated that the defendant, notwithstanding
 5    his strong personality, his -- his good efforts and his noble
 6    ideas, for some reason bought into the idea that doing a few of
 7    the acts that were laid out in the indictment and demonstrated
 8    at trial would enrich him somehow, and I -- I don't think
 9    there's any -- any question that the financial motives and the
10    acts of the defendant, in conspiracy with others, were
11    calculated to violate the extortion laws set forth in -- in
12    Count 1.
13            There is overt statement in some of the letters that
14    I've seen from some of the public officials in the file and
15    some hint of that in other places that the acts of the federal
16    government in prosecuting or investigating this case were,
17    quote, vindictive.  I read that word in at least one of the
18    letters that I read.  I think those -- those thoughts are --
19    are dangerously mistaken.
20            And being as dispassionate as possible, I think what
21    we have here is not a situation that should anger the community
22    on behalf of -- of the defendant or cause anger on the -- from
23    the community in light of suggestions of vindictiveness, but --
24    but I think we see a great deal of regrettable, unimaginable
25    and -- and, frankly, sad conduct by an individual who had
```

 1    reached the top of his profession.  And -- and why, I don't

 2    know, but what I do know was a violation of the extortion law

 3    beyond a reasonable doubt.

 4          Now, the sentence guidelines are provided to me by

 5    Congress.  I don't sit here and make up a sentence.  I am

 6    suggested that the range of a sentence of this sort should be

 7    155 to 181 months.  I diligently worked through all of the

 8    enhancements to be as fair and restrictive as I -- as I could,

 9    and my legal judgment is that that is the -- is that that is

10    the appropriate sentence in the case.

11          I don't find any basis for a variance.  I don't find

12    any basis for a departure upward or downward.  The fact of the

13    matter is that when any police officer violates the law and

14    then violates the law in the sort of manner that's been

15    demonstrated by the United States in this particular case, it

16    causes mistrust in the public, it causes those in the law

17    enforcement profession to be downgraded in their eyes, and

18    it -- it -- it -- it may cause other individuals to think about

19    crossing the line for their own personal gain.  So in terms of

20    punishment of this crime as well as a deterrent to help others

21    not engage in this sort of behavior, I believe a guideline

22    sentence is -- is -- is -- is authorized.

23          Now, the letters, by and large, without question, ask

24    for leniency, and I do believe that Mr. Hansberry's entitled to

25    leniency because I think at core he's probably a well-intended

1    individual who committed criminal activity for reasons that

2    can't be imagined by the Court, and I think concerns of reform

3    and -- and I think that concerns of general deterrence,

4    leniency and things of that nature would support a -- a low

5    sentence within the guidelines, and those would be my ration --

6    that -- that would be the rationale for the sentence that I

7    intend to impose.

8           Therefore, pursuant to the Sentence Reform Act of

9    1984, the Court, having considered the sentence guidelines and

10   factors laid out in 18 USC, Section 3553(a) that I just went

11   over, hereby commits the defendant David Hansberry to the

12   custody of the U.S. Bureau of Prisons for a term of 155 months.

13          Upon release from imprisonment, the defendant shall

14   be placed on supervised release for two years.

15          It's further ordered that the defendant pay a special

16   assessment of a hundred dollars.  That will be due immediately.

17          I will waive the imposition of a fine, the cost of

18   incarceration, the cost of supervision.  That's all due to the

19   defendant's lack of financial resources.

20          Drug testing will be suspended because I've

21   determined that the defendant poses a very low risk of future

22   substance abuse.

23          And while on supervision, the defendant shall abide

24   by the standard conditions adopted by the U.S. District Court

25   for the Eastern District of Michigan.

1    That will be the sentence of the Court.  Objections

2    from Mr. Buckley?

3    MR. BUCKLEY:  No, just the objections that have been

4    preserved previously.  Thank you, Your Honor.

5    THE COURT:  Okay.  Thank you.

6    Objections that you haven't previously stated, Mr.

7    Harrison?

8    MR. HARRISON:  No, Your Honor, no prev -- none that

9    weren't previously stated.

10    I would like to address remand if the Court would

11    allow it.

12    THE COURT:  Okay.  That's fine and I appreciate that.

13    We'll get to that in a minute.

14    The sentence that the Court stated earlier will be

15    imposed after the statements of counsel that they have no

16    further objections.

17    Mr. Hansberry, you have the right to appeal, and that

18    includes the right to appeal your sentence in the case.  Any

19    Notice of Appeal that you want to file in the case must be put

20    on the docket within 14 days of the entry of judgment in the

21    case or within 14 days of the filing of a Notice of Appeal by

22    the United States.  If requested, our clerk will prepare and

23    filed a Notice of Appeal on your behalf.

24    If you can't afford to pay the costs of an appeal or

25    for appellate counsel, you have the right to apply for leave to

Case 2:15-cr-20217-SJM-APP ECF No. 178 filed 02/27/17 PageID.2027 Page 78 of 84
Sentencing • Wednesday, February 22, 2017

78

1     appeal in forma pauperis.  That means you can apply to have the

2     Court waive the filing fee.  On appeal, you can also apply for

3     court-appointed counsel.

4          Mr. Buckley in his papers asked the Court to remand

5     the defendant for immediate service of his sentence.  Mr.

6     Harrison has objected to that.  My general sense, based on

7     everything I see, including the contact I've had with Pretrial

8     Services, indicates that this individual would not be a -- a

9     risk of flight from the community.  Granted, he is convicted of

10    a serious felony and sentenced to a long term of prison, but I

11    have no hard and fast evidence of any sort that would lead me

12    to believe that he's a -- a danger to the community.

13         I would then be inclined to order his report for

14    service of his sentence, but I would certainly allow Mr.

15    Buckley and Mr. Harrison to be heard further on that if they

16    want to.  Mr. Buckley?

17         MR. BUCKLEY:  Thank you, Your Honor.

18         It's not in every case that I seek remand at

19    sentencing, but I think, again, this is a -- this is a very

20    serious offense, it's a very serious case.  The -- the jury

21    verdict was returned, oh, about seven months ago.  I

22    respectfully submit that Mr. Hansberry's had adequate time to

23    get his affairs in order.

24         Judge, there's an old axiom, "Justice delayed is

25    justice denied."  But with regard to the Bail Reform Act

1    factors, I suggest that there now has been a material change of

2    circumstances.  Mr. Hansberry's been convicted for months, but

3    he's now been sentenced to a lengthy term of incarceration.  It

4    would give him added incentive to flee.

5          I believe the testimony of the IRS Agent Kevin Nalu

6    during trial was that not all of the stolen drug proceeds were

7    accounted for.  There -- there may be financial wherewithal for

8    him to flee.

9          But more importantly, Judge, is the danger to any

10    person in the community.  Now, one of the clips that we were

11    going to play today, and I don't need to play it but I'm going

12    to tell Court that in talking to Mr. Leavells on September 7th,

13    2014, Mr. Hansberry said that if Louis Mars, who was currently

14    incarcerated in Kentucky and who testified at that case, showed

15    up on his porch, he was going to kill him.  He said, "I'd shoot

16    him, I'd kill him," and then he used some expletives.

17          But in any event, Judge, it's our position that at

18    this time he should be remanded to serve his sentence.

19          THE COURT:  Okay.  And -- and just so you know,

20    without playing the tape, I did receive the entire transcript

21    as -- as Exhibit B to your Sentencing Memorandum.  That was

22    laid out in your Sentence Memorandum and I -- I did -- I did

23    read those words.  So I appreciate your position on that.

24          You want to respond, Mr. Harrison?

25          MR. HARRISON:  Thank you.  Briefly, Your Honor.

1          Your Honor, we all met Louis Mars.  If Louis Mars
2    showed up on my doorstep, I would be concerned for the safety
3    of my family and myself.  I -- I think perhaps that was taken
4    out of context.
5          But, Judge, I think the most telling factor here is
6    the fact that upon conviction, the government did not object to
7    a continuance of Mr. Hansberry's personal bond.  He's shown up
8    at every hearing.  He retained counsel.  He hasn't moved.  He's
9    shown up to Pretrial Services.  He hasn't had any violations
10   reported by Probation.  He's not a risk to the community.  He's
11   not a risk of flight.  He's -- I understand there's a concern
12   over hidden money.  I'd certainly like to know where it is.
13   But I don't believe he's got the wherewithal.
14         But more importantly than that, Judge, he's just
15   demonstrated to us that he's -- he's not going anywhere, and I
16   would suggest to this Court that a remand at this point, you
17   know, would serve no interest other than perhaps a public
18   spectacle.
19         THE COURT:  Okay.  I -- I have faith in -- in Mr.
20   Hansberry.  I honestly believe that he honestly believes that
21   the evidence against him was insufficient, and I think he's
22   more likely to appeal or contest his conviction within
23   traditional manners rather than by -- by fleeing.  I would
24   cert -- certainly hope so.
25         Nevertheless, I will remind Mr. Hansberry that your

1    release conditions will continue apply -- to apply, the release

2    conditions that the magistrate judge previously put you on.

3           You will be ordered to report for service of your

4    sentence in the future.  If you don't report for it, that's a

5    separate criminal offense that you could be prosecuted under.

6    The statute on that is 18 USC, Section 3146.

7           So I'll -- I'll -- I'll not order immediate

8    detention, but I will remind the defendant of those

9    obligations.

10          Both parties have copies of the Pre-Sentence Report.

11   Amended copies that reflect all corrections and resolutions of

12   disputed issues will be decided today.  Complete corrected

13   copies will be prepared for the Bureau of Prisons and the

14   Sentencing Commission, and any other copies should be kept

15   confidential as is the practices of the district.

16          Now, I expect an appeal here, and when that's taken,

17   counsel on appeal will be able to look at the Pre-Sentence

18   Report, but counsel will not be permitted to access the

19   recommendations section, which is a longstanding local rule

20   that we have.

21          With that, I would say to the defendant straight up

22   this is, you know, extremely difficult for the Court to do and

23   I take no pleasure.  I -- I've done the best I can, and I

24   hope -- I hope that the sentence and the entire process will

25   help you get back on your feet.  I think you have a lot to

```
1    offer.  And I do thank the lawyers for their spirited

2    litigation which was helpful in arriving at what I perceive to

3    be the most just sentence that I could impose.

4              It's 12:25.  We'll take a 10 to 15-minute break and

5    we'll come back and hear from Mr. Fishman and Mr. Buckley on

6    Mr. Watson's case, so we'll be in a short recess now.

7              THE CASE MANAGER:  All rise.

8              MR. HARRISON:  Thank you, Your Honor.

9              THE CASE MANAGER:  Court's now in recess.

10             (Court in recess at 12:26 p.m.)

11             (Proceedings resumed at 12:49 p.m., all parties

12             present)

13             THE CASE MANAGER:  Court is now back in session.

14             THE COURT:  Okay.  Everybody may be seated.

15             You -- you can stay there, but Mr. Harrison notified

16   my clerk who notified me that I wanted to give the bottom of

17   the guidelines, and I -- I got ahead of myself and stated a

18   sentence of 155 months when the bottom is actually 151.  I

19   meant to state 151 months.  The judgment will reflect that.

20   And it was a simple mistake that I think is corrected by this

21   colloquy as well as what we state in the judgment.  So it was

22   a -- you know, whatever the spoken version of a typographical

23   error would be, okay?  So we'll -- we'll --

24             MR. HARRISON:  Thank you, Your Honor.

25             THE COURT:  All right.  Thank you both.  Anything
```

Sentencing • Wednesday, February 22, 2017

1    else from either --

2            MR. BUCKLEY:  No.  Thank you, Your Honor.

3            THE COURT:  Okay.  Very good.

4            MR. HARRISON:  No, Your Honor.  May we --

5            THE COURT:  All right.  Thank you both.

6            MR. HARRISON:  May we be excused, Your Honor?

7            THE COURT:  You're -- yeah, absolutely.

8            (Proceedings concluded at 12:50 p.m.)

9                            —  —  —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

1          I, Linda M. Cavanagh, Official Court Reporter of the

United States District Court, Eastern District of Michigan,

appointed pursuant to the provisions of Title 28, United States

Code, Section 753, do hereby certify that the foregoing pages 1

through 83 comprise a full, true and correct transcript of the

excerpt of proceedings held in the matter of United States of

America vs. David Hansberry, Case No. 15-20217, on Wednesday,

February 22, 2017.


                    s/Linda M. Cavanagh
                    Linda M. Cavanagh, CSR-131, RPR, RMR, CRR
                    Federal Official Court Reporter
                    United States District Court
                    Eastern District of Michigan



Date: February 27, 2017
Detroit, Michigan